UNITED STATES of America, Plaintiff,

v.

AMERICAN TELEPHONE & TELE-
GRAPH COMPANY; Western Electric
Co., Inc.; Bell Telephone Laboratories,
Inc., Defendants.

Civ. A. No. 74–1698.

United States District Court,
District of Columbia.

April 18, 1979.

Memorandum Order May 14, 1980.

See also D.C., 84 F.R.D. 350.

HAROLD H. GREENE, District Judge.

PRETRIAL ORDER NO. 15

Upon consideration of the responses
submitted by the parties to the Opinion of
March 21, 1979, and of the substantive and
procedural guidelines of the Special Masters
and the parties' failure to object thereto,
and it appearing that some modification of
the pretrial proceedings and discovery as
prescribed by Pretrial Order No. 12 is war-
ranted, it is this 18th day of April, 1979,

\* \* \*

ORDERED That the substantive and pro-
cedural guidelines of the Special Masters be
and they are hereby approved and accepted
by the Court.

## SPECIAL MASTERS' GUIDELINES FOR THE RESOLUTION OF PRIVILEGE CLAIMS

### GUIDELINE NO. 1

All privileges will be strictly construed.[1] When a claim is not sustained by the rules set forth in these Guidelines, or further particularized on the basis of additional argument and deliberation in specific instances, or when the factual showing in support of a claim is insufficient to comply with the rule invoked, the claim will be rejected.[2]

1. *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). "[E]xceptions to the demand for every man's evidence are not lightly created nor expansively construed, . . ." *Id.* at 710, 94 S.Ct. at 3108.

 *United States v. Reynolds*, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953). In suits under the Tort Claims Act arising from the death of three civilians, the widows sought production of the Air Force's official accident report and the statements of the surviving crew members. In beginning its analysis of the Government's privilege to resist discovery, the Court first stated that Government privilege "is not to be lightly invoked." *Id.* at 7, 73 S.Ct. at 532.

 *Diversified Industries, Inc. v. Meredith*, 572 F.2d 596 (8th Cir. 1978). Discovery of information obtained by attorneys retained by a corporation to investigate and report on charges of corporate wrongdoing were resisted under a claim of attorney-client privilege. In analyzing their claim, the court said, "while the [attorney-client] privilege where it exists, is absolute, the adverse effect of its application on the disclosure of truth may be such that the privilege is strictly construed." *Id.* at 602.

 *NLRB v. Harvey*, 349 F.2d 900 (4th Cir. 1965). " '[T]he privilege remains an exception to the general duty to disclose. Its benefits are all indirect and speculative, and its obstruction is plain and concrete. * * * It is worth preserving for the sake of a general policy, but it is nonetheless an obstacle to the investigation of the truth. It ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle.' " *Id.* at 907.

 *In re Ampicillin Antitrust Litigation*, [1978–1] Trade Reg.Rep. (CCH) ¶ 62,043 (D.D.C.1978). "While the privilege serves a very important purpose, the Court is aware of the fact that it may nevertheless be an obstacle to the investigation of the truth. Therefore, the privilege ought to be 'strictly confined within the nar-

 rowest possible limits consistent with the logic of its principle.' " *Id.* at 74,509.

 *Jabara v. Kelley*, 75 F.R.D. 475 (E.D.Mich. 1977). Government privileges "must be narrowly construed, to permit the broadest possible discovery otherwise allowed under the Federal Rules of Civil Procedure." *Id.* at 480.

 *United States v. United Shoe Machinery Corp.*, 89 F.Supp. 357 (D.Mass.1950). In a civil antitrust action, on defendant's objections to the introduction of exhibits on the grounds of attorney-client privilege, the court held that only some of the exhibits met the requirements for applying the privilege. "The rule which allows a client to prevent the disclosure of information which he gave to his attorney for the purpose of securing legal assistance is founded upon the belief that it is necessary 'in the interest and administration of justice.' . . . But the privilege should be strictly construed in accordance with its object." *Id.* at 358.

2. *FTC v. Lukens Steel Co.*, 444 F.Supp. 803 (D.D.C.1977). "The party seeking the benefit of the privilege has the burden of demonstrating its applicability." *Id.* at 806. In that case it was sufficient for defendant's client to represent in a letter to the Court that it is the usual practice in the corporation for letters to be circulated only as indicated by the sender and that, to the best of client's knowledge, this practice was followed in connection with the subject documents, in order to establish that only persons listed as recipients had knowledge of the documents.

 *United States v. Covington & Burling*, 430 F.Supp. 1117 (D.D.C.1977). In a Justice Department investigation of a law firm which represented the country of Guinea, the Government sought documents under the Foreign Agents Registration Act. The court rejected the firm's claim of attorney-client privilege. The court found first that Covington & Burling had not pled all the elements necessary to granting the attorney-client privilege and held that it was not sufficient for defendant law firm simply to allege that each element of the attorney-client privilege was, and continued to be, present. Defendant also had the burden of showing with sufficient certainty that the elements did, in fact, exist.

### GUIDELINE NO. 2

A party claiming a privilege with respect to a particular document has the following burdens:

(a) The claimant must state the particular rule of privilege upon which the claim is based.[1] This may be done by the use of an identification code if the Special Masters establish such a code.

(b) There must be appended to the claim any information, in addition to that in

the document itself, necessary to establish the factual elements required by the privilege rule invoked.[2] The information must be sufficiently detailed to permit decision on the claim and must be verified by affidavit by a person or persons having knowledge of the facts asserted.[3]

(c) In connection with a government privilege, in addition to the substantiating material required by paragraphs (a) and (b), a statement shall be provided from the head of the department on behalf of which the privilege is claimed, stating that he has examined the documents or has been given a detailed review of them, and personally approves the assertion of the privilege.

## Comment on Guideline No. 2

With regard to paragraph (c) above, defendants have argued that every claim of government privilege must be made personally by the head of the department involved, upon a personal inspection of the documents. On the other hand, the Government has argued that it is sufficient that the claim of privilege be made by the Government's representatives in litigation, i. e., its legal counsel. It seems to us that neither position is quite correct and that both fail to take note of the distinction between a simple claim of privilege and a "formal claim" of privilege which entails a difference in the procedures by which the claim is determined.

All the cases sustaining government privilege appear to require an assertion of the claim by some responsible officer other than the Government's attorneys. The requirement that a responsible officer assert the claim is surely not to substantiate the *legal* basis of the claim, for that is a question of law. Rather, the purpose is to assure that the privilege, which in any event is waivable, is not lightly claimed. Hence, the requirement is that the claim be made by someone in a position of sufficient authority and responsibility to weigh prudently the competing considerations of making evidence available in litigation and protecting important government interests. The decision involves policy, not simple law, and therefore is more than a Government lawyer's decision. At the same time, the decision is a matter of importance and not merely routine categorization of documents, and therefore should be made by a policy-maker who can be assumed to have the larger public interest in mind.

The foregoing procedure contemplates *in camera* review by the court, or in this case the Special Masters, to determine the legal validity of the claim. In contrast with this procedure, which

may be described as a simple claim of governmental privilege, is a "formal claim" of governmental privilege. When a "formal claim" of privilege is involved, the document is not produced for inspection by the court. Rather, the executive branch withholds the document by its own authority. If given effect, such a claim is far reaching because it forecloses any judicial examination of its basis in the document. Accordingly, when the claim is not merely that the court should withhold the document from the opposing party under privilege, but that the document should be withheld from the court itself, far weightier substantiation is required. This problem is addressed in Guideline No. 3.

The foregoing analysis is suggested by the court's decision in *Black v. Sheraton Corp. of America*, 184 U.S.App.D.C. 46, 58, 564 F.2d 531, 543 (D.C.Cir. 1977), where the court stated:

> We agree that where the executive seeks to withhold *from the court* documents relevant to a civil or criminal lawsuit, the claim of privilege must meet strict requirements. In that situation the court is relying on the affidavit of the responsible department head for the information pertinent to its decision concerning the privilege. . .
>
> In this case, however, the executive does not seek to shield the documents in question from judicial scrutiny, but has stated its willingness to tender them to the court *in camera*. . . .
>
> Since the district court would be able to examine the actual documents, it did not need an affidavit of the same degree of specificity as in a case where it was relying on the affidavit to decide whether valid grounds existed for assertion of the privilege. Nor did the district court need the personal assurance of the department head as to the proper classification of each document. (Emphasis supplied.)

1. *United States v. Reynolds*, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953). Regarding government privilege, the Court said, "The privilege belongs to the Government and must be asserted by it; . . . There must be a formal claim of privilege, . . ." *Id.* at 7–8, 73 S.Ct. at 532. Thus even with information before the court regarding the danger that the accident investigation report sought had reference to military secrets, the Court held that it was proper to rule for discovery. "[T]he trial judge was in no position to decide that the report was privileged until there had been a formal claim of privilege." *Id.* at 10, 73 S.Ct. at 533.

*Kinoy v. Mitchell*, 67 F.R.D. 1 (S.D.N.Y.1975). In a suit for civil damages based on allegedly illegal and unconstitutional electronic surveillance, the Government requested discovery of the taped wiretappings. The Government resisted based on the privilege for "secrets of state and military secrets, . . ." *Id.* at 8. The court held that the Government had not

established the elements of the privilege. "It is of the utmost importance, first, that the Government comply with the formal requisites for assertion of the claim [of privilege]." *Id.* at 9.

*Carter v. Carlson*, 56 F.R.D. 9 (D.D.C.1972). The court rejected a claim of executive privilege in an action based on police brutality, in part because no formal claim of executive privilege was filed. Turning to *Reynolds* for guidance, the court stated that "[a]lthough *Reynolds* dealt with state and military secrets, its prerequisites for formal invocation of the privilege have been uniformly applied irrespective of the particular kind of executive claim advanced." *Id.* at 10.

*Zenith Radio Corp. v. Radio Corp. of America*, 121 F.Supp. 792 (D.Del.1954). In a proceeding in patent litigation on application for a pretrial order requiring the production of certain documents, the court held that first, "[o]f course, the privilege must be claimed— it is here . . ." *Id.* at 795.

*United States v. United Shoe Machinery Corp.*, 89 F.Supp. 357 (D.Mass.1950). In upholding the privilege claim as to some of the documents, the court began its analysis by noting that "[t]he defendant seasonably claimed whatever privilege it had." *Id.* at 359.

2. *Attorney-Client Privilege*

*FTC v. Lukens Steel Co.*, 444 F.Supp. 803 (D.D.C.1977). In holding that the defendant met its burden of establishing the element of confidentiality, part of the attorney-client privilege, the court clearly stated the rule that "[t]he party seeking the benefit of the privilege has the burden of demonstrating its applicability." *Id.* at 806.

*United States v. Covington & Burling*, 430 F.Supp. 1117 (D.D.C.1977). In an action under the Foreign Agents Registration Act of 1938, as amended, the Justice Department sought access to certain documents held by Covington & Burling, a law firm which represents the country of Guinea. The court, setting standards by which each document would be studied to determine the applicability of privilege, stated that Covington & Burling "has the burden of showing with sufficient certainty that the elements [of the privilege] do, in fact, exist." 430 F.Supp. at 1122.

*North American Mortgage Investors v. First Wisconsin National Bank*, 69 F.R.D. 9 (E.D. Wis.1975). In an action by a purchaser of mortgage participations brought against a bank for breach of their agreement, plaintiff moved to require the bank to produce a document regarding analysis of the agreement. The court granted the motion, holding that the bank failed to meet its burden of showing that the requested document was protected from discovery by the attorney-client privilege. "The law places the burden of proving the applicability of the attorney-client privilege on the party resisting discovery on those grounds. . . . To meet that burden, the party resisting discovery should show by affidavit sufficient facts to bring the disputed matters within the confines of the privilege." *Id.* at 12.

*Work Product Privilege*

*United States v. Chatham City Corp.*, 72 F.R.D. 640 (S.D.Ga.1976). In a civil rights action brought by the Government alleging discrimination in the operation of Chatham City Apartments, defendant's request of statements taken by FBI investigators from former tenants were found to be protected by work product. The court then denied discovery of the work product material because defendants had not met their burden of showing "need for the materials they seek." *Id.* at 644. "As previously pointed out, discovery of work product material will be denied if the information desired can be obtained by deposition. . . . A substantial equivalent of the witnesses' statements can be obtained by personal interview, by deposition or by written interrogatories. The cost or inconvenience of taking depositions 'is not in itself sufficient showing to meet the "undue hardship" requirement of the rule.' . . ." *Id.* at 644.

*Boyce v. Visi-Flash Rentals Eastern, Inc.*, 22 F.R.Serv.2d 1445 (D.Mass.1976). In a death action arising from a motor vehicle accident in which plaintiff's decedent was one of six passengers, defendant sought to discover statements taken by plaintiff's attorney from eyewitnesses to the accident. Holding that work product is discoverable only upon a showing of need by the moving party, the court, after holding that these documents were work product of the attorney, denied defendant's motion for failure to make an adequate showing of need. "A party seeking documents that allegedly are subject to the work product doctrine has a heavy burden of establishing they are essential for preparation of its case. . . . 'Work product' is discoverable upon the showing of substantial need by the moving party and an inability to obtain its equivalent by other means. . . Consequently, work product material will be denied if the party seeking discovery can obtain the desired information by taking deposition of witnesses. . . . Under Rule 26(d) of the F.R.Civ.P., this court concludes that the defendant must first depose both parties in this matter, use interrogatories, or Rule 45 and pursue the matter on that basis before further action is taken with respect to obtaining the statements of the parties." *Id.* at 1446.

*Burlington Industries v. Exxon Corp.*, 65 F.R.D. 26 (D.Md.1974). "Even if the documents are prepared in anticipation of litigation, the protection afforded in Rule 26(b)(3) [work product] is not absolute. Discovery may still be had upon a showing of 'substan-

tial need' and an inability 'without undue hardship' to obtain the information by other means." *Id.* at 43.

*SEC v. National Student Marketing Corp.*, 18 F.R.Serv.2d 1302 (D.D.C.1974). In a securities fraud suit brought by the Securities & Exchange Commission, the court was called to rule upon three discovery motions. Against one motion urged by the Securities & Exchange Commission, the defendant law firm invoked work product protection. In explaining the procedural format for judicial consideration of work product, the court stated: "Initially, there must be a demonstration by the resisting party that the disputed material has in fact been prepared 'in anticipation of litigation or for trial.' Once this threshold requirement is met, the movant must then proceed to establish both a 'substantial need' for the material as well as an inability to secure an equivalent thereof without undue hardship." *Id.* at 1305. The court ruled that work product protection was not applicable and did not need to make a decision as to a showing of necessity.

*Xerox Corp. v. IBM Corp.*, 64 F.R.D. 367 (S.D. N.Y.1974). The court found that the party seeking discovery had made a sufficient showing of substantial need and undue hardship to order discovery. Thus production of a corporation's attorney's notes of his investigation of alleged patent infringing activities was required upon a showing that the persons interviewed by counsel would be able to establish the path of the plaintiff's alleged trade secrets through the corporation and that such persons were unable to recall the answers given in the original interviews conducted on behalf of their employer.

*Executive Privilege*

*Kinoy v. Mitchell*, 67 F.R.D. 1 (S.D.N.Y.1975). In a suit for civil damages based on allegedly illegal and unconstitutional electronic surveillance, the Government requested discovery of the taped wiretappings. The court held that the Government had not established the elements of the privilege for military and state secrets. "It is of the utmost importance, first, that the Government comply with the formal requisites for assertion of the claim [of privilege]." *Id.* at 9.

*Smith v. FTC*, 403 F.Supp. 1000 (D.Del.1975). Corporations subject to the Federal Trade Commission's requirement for filing of an annual line of business reports sought pre-enforcement review of the rule requiring the reports. The court held that the FTC had not properly raised executive privilege claim with respect to certain documents which the corporations sought to discover and gave the agency an opportunity to do so. "As with any privilege the burden is upon the claimant of executive priviledge to demonstrate a proper entitlement to exemption from disclosure." *Id.* at 1016.

*Carter v. Carlson*, 56 F.R.D. 9 (D.D.C.1972). Plaintiff objected to a recommendation by a Pretrial Examiner that he receive only a portion of defendant's documents related to the police investigation of allegations of police brutality underlying this lawsuit. The court ruled that its requirement that the Government sustain its burden on the existence and applicability of the executive privilege was not met. No formal claim had been filed. Counsel for the Government merely asserted that the operations of the department would be hampered by disclosure without support.

*United States v. An Article of Drug, etc.*, 43 F.R.D. 181 (D.Del.1967). In an action respecting Government's libel for condemnation of allegedly misbranded drug, the Government objected to discovery, claiming executive privilege for internal policy records and considerations. The court denied the Government's objection since "[t]he Government has not shown—nor even alleged—that those who evaluated claimant's product were involved in internal policymaking, generally, or in this particular instance. Privilege cannot be set up by an unsupported claim. The facts upon which the privilege is based must be established." *Id.* at 190.

3. *United States v. Reynolds*, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953). "The court itself must determine whether the circumstances are appropriate for the claim of privilege, . . ." *Id.* at 8, 73 S.Ct. at 532.

*Mead Data Central, Inc. v. United States Department of the Air Force*, 184 U.S.App.D.C. 350, 566 F.2d 242 (D.C.Cir. 1977). In an action brought under the Freedom of Information Act to require the Air Force to disclose documents relating to a licensing agreement between the Air Force and one if its legal publishers, the court remanded for further proceedings under the guidelines it outlined. "[W]e require that when an agency seeks to withhold information it must provide a relatively detailed justification specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply." *Id.*, 184 U.S.App.D.C. at 359, 566 F.2d at 251.

*Black v. Sheraton Corp. of America*, 184 U.S. App.D.C. 46, 564 F.2d 531 (D.C.Cir. 1977). In an action by a former lobbyist for injuries allegedly sustained as a result of an FBI illegal eavesdropping operation, the Government resisted production of particular documents based on the harm to law enforcement efforts which might arise from disclosure of FBI files. The court held that the affidavit of Attorney General Richardson contained sufficient detail to properly assert executive privilege. "The Attorney General swore that he had personally examined many of the documents in the file and was convinced that their disclosure could harm law enforcement by revealing investigative techniques and by disclosing

collateral investigations. The statement divided the documents contained in the file into several categories, and explained more specifically the harm that would result from the disclosure of each." *Id.*, 184 U.S.App.D.C. at 58, 564 F.2d at 543.

*Kinoy v. Mitchell*, 67 F.R.D. 1 (S.D.N.Y.1975). "Assertion of this privilege, [for military and state secrets] which is not to be lightly invoked, must be made by the head of the department or agency responsible for the records, after personal consideration of the material sought. That person must set forth, with enough particularity to enable the Court to make an informed decision, the nature of the material withheld and of the threat to the national security should it be revealed." *Id.* at 8. The court found the Government's affidavit concerning privilege insufficiently specific to be of any assistance in the court's proper function of deciding whether the documents in question do fall within the privileged category. It required that the "Government insure that the court possesses the requisite supporting material to enable it to make an informed judgment upon the merits of the claim of privilege." *Id.* at 10.

*Smith v. FTC*, 403 F.Supp. 1000 (D.Del.1975). "To properly support a claim of executive privilege at least three requirements must be satisfied. First, the privilege must be claimed by the head of the applicable agency after actual personal consideration by that officer. . . . Secondly, there must be a 'specific designation and description of the documents' claimed to be privileged. . . . This is necessary in order that a court be able to make a knowledgeable decision as to whether any document or portion thereof actually contains advisory or deliberative materials. Any attempts to invoke executive privilege in the absence of this specific factual showing are actually attempts to interfere with the proper functioning of the judicial branch of our government by appropriating the means of this decision to the executive branch. . . . Finally, there must be a demonstration of 'precise and certain reasons for preserving' the confidentiality of the governmental communications. . . . A close reading of cases where claims of executive privilege were raised indicates that the necessary facts have generally been required to be raised by affidavit." *Id.* at 1016.

*International Paper Co. v. Fibreboard Corp.*, 63 F.R.D. 88 (D.Del.1974). In an action in which International sought declaratory judgment that defendant's patent was invalid and not infringed by plaintiff, the court denied defendant's motion for a protective order preventing further disclosure regarding its patent based on a claim of attorney-client privilege. The court held that defendant had not made a proper showing that each of the criteria for the privilege existed. "A proper claim of privilege requires a specific designation and description of the documents within its scope as well as precise and certain reasons for preserving their confidentiality. Unless the affidavit is precise to bring the document within the rule, the Court has no basis on which to weigh the applicability of the claim of privilege. An improperly asserted claim is no claim at all. . . . In short, a party resisting disclosure on the ground of attorney-client privilege must by affidavit show sufficient *facts* as to bring the identified and described document within the narrow confines of the privilege." *Id.* at 94.

*Carter v. Carlson*, 56 F.R.D. 9 (D.D.C.1972). The court held that the Government had not sustained its burden of showing the existence and applicability of executive privilege by merely an unsupported allegation of the need for secrecy. The court pointed out that no one in the Government came forward with affidavits or testimony in support of the privilege claim.

## GUIDELINE NO. 3

(a) There will be an *in camera* inspection by the Special Masters of all material as to which a claim of privilege is made, except when certain national security interests are raised.[1]

(b) If a privilege claim involving a national security interest is raised by the Government and the materials are believed by the Government to be too sensitive for *in camera* inspection by the Special Masters, the issue will be resolved on the basis of affidavits submitted by the agency head, particularly describing the nature of the information sought and the reasons why disclosure would jeopardize national security interests. If the submission by the agency head is found by the Special Masters to be inadequate to serve as a basis for the resolution of the privilege claim, an *in camera* inspection by Judge Greene will be recommended if an appropriate showing of need for the information has been made by the demanding party. Whether the documents will then be produced for *in camera* inspection by Judge Greene is a matter to be resolved before him.[2]

1. *United States v. Reynolds*, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953). The Supreme

Court held that courts have a range of options when they are faced with a decision regarding the applicability of government privileges on discovery of materials in litigation. One of these choices is an *in camera* inspection of the documents.

*United States v. Pfizer, Inc.,* 560 F.2d 326 (8th Cir. 1977). Court ordered an *in camera* review of documents containing the internal opinion work product of the law firm representing defendant in a patent fraud, deceit and antitrust action.

*Committee for Nuclear Responsibility, Inc. v. Seaborg,* 149 U.S.App.D.C. 385, 463 F.2d 788 (D.C.Cir. 1971). The court approved an *in camera* inspection for allegedly privileged documents following a preliminary showing of necessity for the documents.

*Sylgab Steel & Wire Corp. v. Imoco-Gateway Corp.,* 62 F.R.D. 454 (N.D.Ill.1974), *aff'd without opinion,* 534 F.2d 330 (7th Cir. 1976). The court found, after a careful, *in camera* inspection of the documents in question, that the work product privilege protected some of them from discovery.

*Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena,* 40 F.R.D. 318 (D.D.C.1966), *aff'd mem. sub nom. Carl Zeiss, Jena v. Clark,* 128 U.S.App. D.C. 10, 384 F.2d 979, *cert. denied,* 389 U.S. 952, 88 S.Ct. 334, 19 L.Ed.2d 361 (1967). The court rejected a claim for *in camera* inspection of documents withheld by the Government pursuant to a claim of executive privilege for intra- and inter-departmental opinions, records and deliberations because claimants did not show that they are or could be entitled to the documents. "In resolving the issue as to *in camera* inspection, the teachings of *Reynolds* must not be forgotten. The ultimate question is whether, in the circumstances of the case, the occasion for assertion of the privilege is appropriate. *In camera* inspection is not an end in itself, but only a method that may in given instances be indispensible to decision of that question." *Id.* at 332.

2. *United States v. Reynolds,* 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953). In a suit under the Tort Claims Act arising from the death of three civilians in a military aircraft crash, plaintiffs moved for production of the Air Force's official accident investigation report and the statements of the three surviving crew members. The Government resisted discovery based on the governmental privilege which protects against revealing military secrets. The Court refused to order submission of the documents for an *in camera* inspection after determining the likelihood that military secrets were involved in the documents, and that the demanding parties did not demonstrate a compelling need for them. "[W]hen the formal claim of privilege was filed by the Secretary of the Air Force, under circumstances indicating a reasonable possibility that military secrets were involved, there was certainly a sufficient showing of privilege to cut off further demand for the document on the showing of necessity for its compulsion that had then been made. In each case, the showing of necessity which is made will determine how far the court should probe in satisfying itself that the occasion for invoking the privilege is appropriate. Where there is a strong showing of necessity, the claim of privilege should not be lightly accepted, but even the most compelling necessity cannot overcome the claim of privilege if the court is ultimately satisfied that military secrets are at stake." *Id.* at 10–11, 73 S.Ct. at 533.

*Committee for Nuclear Responsibility, Inc. v. Seaborg,* 149 U.S.App.D.C. 385, 463 F.2d 788 (D.C.Cir. 1977). In an action by a conservation group seeking to halt underground nuclear testing, plaintiffs sought production of a document from the Government. The Government resisted on the grounds of executive privilege, claiming that the documents contained military and diplomatic secrets. The court ordered the submission of documents "after exercising [sic] any and all materials reflecting military and diplomatic secrets . . . ." *Id.* 149 U.S.App.D.C. at 387, 463 F.2d at 790. The court also held that according to the standard in *Reynolds, in camera* inspection was approved only after a preliminary showing of need.

*Machin v. Zuckert,* 114 U.S.App.D.C. 335, 316 F.2d 336 (D.C.Cir.), *cert. denied,* 375 U.S. 896, 84 S.Ct. 172, 11 L.Ed.2d 124 (1963). In explaining its order for *in camera* inspection of Air Force accident reports, the court distinguished the facts of the case before it from *U. S. v. Reynolds,* where "the Supreme Court did not require submission of the report there involved to a court for a judicial determination of the applicability of the privilege invoked to the contents of the report in question. But this disposition was clearly dependent in large part on the nature of the privilege there invoked—the protection of military secrets. In our case, in contrast to Reynolds, no substantial harm could result from submission of the report to judicial scrutiny." *Id.* 114 U.S.App.D.C. at 340, 316 F.2d at 341.

## GUIDELINE NO. 4

When a privilege is a qualified one, once the asserting party satisfies his burden of demonstrating that the material falls within the privilege (see Guideline No. 2), the burden is then on the party opposing the privilege to establish reasons why the materials should be disclosed.[1]

(a) For the work product privilege, this burden entails satisfying the standards of Guideline No. 17;

(b) For qualified government privileges other than the presidential privilege (see Guideline No. 25), this burden entails showing that the relevant interests justifying disclosure outweigh the relevant interests justifying nondisclosure.

1. *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). The Court concluded that work product may be discovered from the attorney's files if the person seeking production carries the burden of showing that there are "adequate reasons . . ." *id.* at 512, 67 S.Ct. at 394, or some "necessity or justification, . . ." 329 U.S. at 510, 67 S.Ct. at 393.

*United States v. Pfizer, Inc.* 560 F.2d 326 (8th Cir. 1977). In a three court civil action based on patent fraud, deceit and antitrust violations, the Government sought discovery of legal documents and internal memoranda prepared by law firm for Pfizer, Inc. In establishing standards for *in camera* review of the documents, the court said "work product is discoverable only upon a showing of substantial need and an inability to secure the substantial equivalent of the items through alternate means without undue hardship." *Id.* at 334.

*Marshall v. Vermont Food Industries, Inc.*, 23 F.R.Serv.2d 1511 (D.Vt.1977). In an action by the Secretary of Labor under the Fair Labor Standards Act, the court held that defendant was not entitled to discovery of statements or other materials emanating from sources other than defendant's employees, since they were the work product of plaintiff's counsel and defendant had not made the showing of "substantial need" and relative inaccessibility required to overcome the limited protection afforded by the work product doctrine.

*Boyce v. Visi-Flash Rentals Eastern, Inc.*, 22 F.R.Serv.2d 1445 (D.Mass.1976). In a wrongful death action arising out of an automobile accident, defendant was not entitled to discover statements taken by plaintiff's attorney from eyewitnesses to the accident where it appeared that the information might be available by deposing the witnesses, the statements were work product of the attorney. "A party seeking documents that allegedly are subject to the work product doctrine has a heavy burden of establishing they are essential for the preparation of its case. . . . 'Work product' is discoverable upon the showing of substantial need by the moving party and an inability to obtain its equivalent by other means. . . . Consequently, work product material will be denied if the party seeking discovery can obtain the de-

sired information by taking the deposition of witnesses." *Id.* at 1446.

*Spaulding v. Denton*, 68 F.R.D. 342 (D.Del. 1975). In litigation stemming from the sinking of a yacht, plaintiff sought discovery of reports of a marine surveyor firm which was hired by the yacht owner's insurer to find out everything possible regarding the accident. The court held that as to the documents which it found to be work product, they are "discoverable only upon a showing of need and hardship pursuant to Rule 26(b)(3)." But, the court found that "[p]laintiff's showing of need is unconvincing." *Id.* at 346.

*Kinoy v. Mitchell*, 67 F.R.D. 1 (S.D.N.Y.1975). Attorney and client brought action against government officials and Government based on alleged illegal and unconstitutional electronic surveillance of telephone conversations to which they were parties. Although the Government's claims of privilege were defective and were ordered to be refiled, the court went ahead and considered the opposing parties' burden to show need for the material. "This type of information is protected by a qualified, not an absolute privilege, so that the claim of privilege made by the Government may be overcome by a litigant's showing of need for the material great enough to outweigh the policies favoring nondisclosure." *Id.* at 11. The court explained that plaintiffs "made the strongest possible showing of need for the documents requested." *Id.* at 12. They are the key records of wiretapping which plaintiffs allege were unconstitutional, and there is no other available but less sensitive source of the information contained therein, or of equivalent proof.

*SEC v. National Student Marketing Corp.*, 18 F.R.Serv.2d 1302 (D.D.C.1974). Once the threshold requirement has been met, the resisting party demonstrating that the disputed documents were in fact work product, "the movant must then proceed to establish both a 'substantial need' for the material as well as an inability to secure an equivalent thereof without undue hardship." *Id.* at 1305.

*Kaiser Aluminum & Chemical Corp. v. United States*, 157 F.Supp. 939, 141 Ct.Cl. 38 (1958). Finding that the Government's claim of governmental privilege had been established, the court then turned "to the issue of the necessity for the presentation of the document . ." *id.* 157 F.Supp. at 947, that must be made by the party opposing the privilege. It found that the showing of need was not sufficient to outweigh the government's interest in maintaining secrecy.

## GUIDELINE NO. 5

(a) When a document contains both privileged and unprivileged material, the unprivileged material must be disclosed to the fullest extent possible without thereby disclosing the privileged material.[1]

(b) If a privilege is asserted with regard to part of the material contained in a document, the party claiming the privilege must clearly indicate the portions as to which the privilege is claimed.[2]

1. *EPA v. Mink*, 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973). In a Freedom of Information Act action to compel disclosure of documents prepared by various officials for the President concerning a scheduled underground nuclear test, the Government claimed the exemption for inter- or intra-agency deliberative documents. The Court, however, held that "memoranda consisting only of compiled factual material or purely factual material contained in a deliberative memoranda and severable from its context would generally be available for discovery by private parties in litigation with the Government." *Id.* at 87–8, 93 S.Ct. at 836.

*Mead Data Central, Inc. v. United States Department of the Air Force*, 184 U.S.App.D.C. 350, 566 F.2d 242 (D.C.Cir. 1977). In a Freedom of Information Act action to compel the Air Force to disclose documents relating to a licensing agreement between the Air Force and West Publishing Co. for a computerized legal research system, the court held that the trial court's interpretation of the FOIA Exemption 5 was impermissibly broad and remanded for further proceedings under the interpretations set out in the opinion. The court explained that information may be segregated from documents which are entitled to be withheld. "[A]n agency cannot justify withholding an entire document simply by showing that it contains some exempt material. It has long been a rule in this Circuit that non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions." *Id.* 184 U.S. App.D.C. at 368, 566 F.2d at 260.

*Duplan Corp. v. Moulinage et Retorderie de Chavanoz*, 487 F.2d 480 (4th Cir. 1973). The court, in holding that documents contain both material not discoverable due to work product immunity and discoverable material, remanded and ordered the lower court to "excise" from such documents non-discoverable from discoverable material.

*Cuneo v. Schlesinger*, 157 U.S.App.D.C. 368, 484 F.2d 1086 (D.C.Cir. 1973), *cert. denied, Rosen v. Vaughn*, 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974). In a Freedom of Information Act proceeding to compel disclosure of a defense contract audit manual which provides instructions concerning the criteria to be used in deciding what must be audited, how and how often to audit, the court held that the Government had not alleged its exemptions from disclosure with sufficient spec-

ificity to determine if the information sought falls within one of the exemptions of the Act. It stated that substantive law must be disclosed and must be segregated from exempt material. "Even when the law is closely intermingled with other data, we cannot conceive of a situation in which legal interpretations and guidelines could not be segregated from other material and isolated in a form which could be disclosed." *Id.* 157 U.S.App. D.C. at 374, 484 F.2d at 1092.

*Committee for Nuclear Responsibility, Inc. v. Seaborg*, 149 U.S.App.D.C. 385, 463 F.2d 788 (D.C.Cir. 1971). In an action by a conservation group seeking to halt underground nuclear testing, plaintiffs sought to discover documents from the Government to substantiate its claim that the Atomic Energy Commission failed to perform according to the National Environmental Protection Act. The Government resisted on the claim of executive privilege for military and diplomatic secrets. The court ordered submission for *in camera* inspection to determine which parts of the documents are discoverable and can be severed from the privileged material for disclosure. "All matters relating to the environment in these documents shall be included, but no matter that is involved directly in national security, as differentiated from the environment, or as involves foreign relations, as differentiated from the environment, shall be included in the material produced." *Id.,* 149 U.S.App.D.C. at 392, 463 F.2d at 795.

*Swanner v. United States*, 406 F.2d 716 (5th Cir. 1969). In an action by a police informer for damages for alleged failure of police officers to afford him proper protection, plaintiff sought the identity of two persons in police files, suspected of the bombing in which plaintiff was injured. The court explained the process for *in camera* inspection of documents to determine which portions of the investigatory files were privileged and which materials were not privileged and could be segregated for disclosure. "There would be at least some question as to whether their [investigatory files] use in subsequent prosecutions is a live issue. . . . There would be the possibility, too, that certain matters, e. g., statements by other informers, would be interspersed. All of this would require *in camera* inspection and disentanglement." *Id.* at 719. The court, however, held that the trial court did not abuse its discretion by refusing to get involved in the process.

*Machin v. Zuckert*, 114 U.S.App.D.C. 335, 316 F.2d 336 (D.C.Cir.), *cert. denied,* 375 U.S. 896, 84 S.Ct. 172, 11 L.Ed.2d 124 (1963). In an appeal on an accident case involving an Air Force plane, suit was brought under the Federal Tort Claims Act. The plaintiff, one of the surviving crew members, unsuccessfully sought production of the entire Air Force investigative file. The court ordered partial dis-

closure. "[C]ertain portions of the report could be revealed without in any way jeopardizing the future success of Air Force accident investigations." *Id.* 114 U.S.App.D.C. at 339, 316 F.2d at 340. After a complaint by the plaintiff that the Government had not complied with the original opinion, the court filed a supplemental opinion in which it ordered submission of the documents in order to sever the unprivileged material from the privileged for disclosure. "If the mechanics expressed any 'opinions' or 'conclusions' as to possible defects in the propellers or propeller governors that might have been due to the negligence of United Aircraft, we do not consider that such expressions would come within the privileges enunciated in our opinion. Where the line is properly drawn between privileged and unprivileged statements appearing in the mechanics' reports is impossible to ascertain without viewing the reports themselves in their entirety. . . . Consequently, it is our opinion that the mechanics' reports should be submitted in their entirety to the District Court on remand, and that that court should determine what portions are privileged." *Id.* 114 U.S.App.D.C. at 340, 316 F.2d at 341.

*Colton v. United States,* 306 F.2d 633 (2d Cir. 1962). Proceeding on a motion by the Government for an order directing an attorney to appear before an agent of the Internal Revenue Service to testify relating to the income tax liability of his clients. The court held that questions pertaining to the nature of retained documents and an order for production of retained income tax returns did not violate the attorney-client privilege. The return was not confidential because it contained information intended to be given to the I.R.S. "It is self-evident that individual documents and files may still be withheld insofar as they thus are or report confidential communications between Colton and his clients, the Matters. . . . As we have noted, the attorney-client privilege protects only those papers prepared by the client for the purpose of confidential communication to the attorney or by the attorney to record confidential communications, and Colton has not made the necessary showing that the papers he refused to produce are of such nature. Insofar as the papers include pre-existing documents and financial records not prepared by the Matters for the purpose of communicating with their lawyers in confidence, their contents have acquired no special protection from the simple fact of being turned over to an attorney." *Id.* at 639.

*Smith v. FTC,* 403 F.Supp. 1000 (D.Del.1975). In a pre-enforcement review of an FTC requirement for filing certain annual reports, the court held that the FTC did not adequately raise executive privilege against disclosure of intra-agency advisory opinions, records and deliberations with respect to documents which plaintiffs sought to discover. In discussing the privilege, the court stated that "factual material contained in deliberative memoranda has generally been held discoverable if susceptible to severance from its context." *Id.* at 1015.

*Burlington Industries v. Exxon Corp.,* 65 F.R.D. 26 (D.Md.1974). Special Master appointed to appraise applicability of claims of privilege to documents was ordered by the court to "recommend the excision of parts of documents which he finds to be privileged whereas other parts are found by him to be discoverable." *Id.* at 32.

*United States v. United Shoe Machinery Corp.,* 89 F.Supp. 357 (D.Mass.1950). Ruling on claims of attorney-client privilege, the court held that "such parts of them [documents] are privileged as contain, or have opinions based on, information furnished by an officer or employee of the defendant in confidence and without the presence of third persons. . . . Thus, for example, there is no privilege for so much of a lawyer's letter, report or opinion as relates to a fact gleaned from a witness, . . . or a public document such as a patent, . . . or a judicial opinion . . . ." *Id.* at 359.

2. *Mead Data Central, Inc. v. United States Department of the Air Force,* 184 U.S.App.D.C. 350, 566 F.2d 242 (D.C.Cir. 1977). "In addition to a statement of its reasons, an agency should also describe what proportion of the information in a document is non-exempt and how that material is dispersed throughout the document. Armed with such a description, both litigants and judges will be better positioned to test the validity of an agency's claim that the non-exempt material is not segregable." *Id.* 184 U.S.App.D.C. at 369, 566 F.2d at 261. The court found that the Air Force did not adequately address the issue of segregability of information which was not exempt from disclosure. The Air Force had simply claimed, without supporting justification, that the non-exempt material in the documents is "not reasonably segregable . . . ." *Id.* 184 U.S.App.D.C. at 369, 566 F.2d at 261.

## GUIDELINE NO. 6

The attorney-client privilege protects a communication from the client to the attorney that is:

(a) made primarily for the purpose of obtaining legal advice or assistance; [1]

(b) reasonably believed by the client to be necessary for that purpose; [2] and

(c) intended to be confidential. [3]

### Comment on Guideline No. 6

The rule of attorney-client privilege as stated above includes the subjective element that the

person making the communication believe the matter to have been necessary for the purpose of obtaining legal advice. Separate proof of this subjective element would, we assume, usually require an affidavit by the communicator that such was his intention. Such proof would be easy though mechanically burdensome to supply and almost impossible to refute, and hence would ordinarily be superfluous as a practical matter. Therefore, if a document was transmitted only among persons properly privy to the confidence under Guidelines No. 7–11 and contains material that appears appropriate in a request for legal advice, it will be inferred that the communicator intended that the communication be confidential unless there is other matter in the document or other circumstances indicating the contrary.

1. *Diversified Industries, Inc. v. Meredith*, 572 F.2d 596 (8th Cir. 1978). "In order for the privilege to be applicable, the parties to the communication in question must bear the relationship of attorney and client. Moreover, the attorney must have been engaged or consulted by the client for the purpose of obtaining legal services or advice—services or advice that a lawyer may perform or give in his capacity as a lawyer, not in some other capacity. . . . [Thus] 'where legal advice of any kind is sought from a professional legal advisor in his capacity as such, the communications relevant to that purpose, made in confidence by the client are at his instance permanently protected from disclosure by himself or by the legal advisor except the protection be waived.'" *Id.* at 602.

*Burlington Industries v. Exxon Corp.*, 65 F.R.D. 26 (D.Md.1974). "A basic element of communications within the attorney-client privilege is that the communications must be made by a client to an attorney in confidence for the purpose of obtaining legal advice and assistance." *Id.* at 37. "While it is essential that communications between client and attorney deal with legal assistance and advice in order to be privileged, it is not essential that such requests by the client for legal advice be expressed." *Id.* at 37. "In order to invoke the privilege, however, the party seeking protection must make a clear showing that documents . . . are primarily legal in nature. There must be a finding that each document is involved in the rendition of legal assistance." *Id.* at 39.

*United States v. Aluminum Co. of America*, 193 F.Supp. 251 (N.D.N.Y.1960). "The purpose of the [attorney-client] privilege is to insure to the client that his full and frank disclosures to his counsel concerning legal matters may be made with the assurance that same will not be disclosed." *Id.* at 252. *United States v. United Shoe Machinery Corp.*, 89 F.Supp. 357 (D.Mass.1950). " 'In a society as complicated in structure as ours and governed by law as complex and detailed as those imposed upon us, expert legal advice is essential. To the furnishing of such advice the fullest freedom and honesty of communication of pertinent facts is a prerequisite. To induce *clients* to make such communications, the privilege to prevent their later disclosure is said by courts and commentators to be a necessity. The social good derived from the proper performance of the functions of lawyers acting for their clients is believed to outweigh the harm that may come from the suppression of the evidence in specific cases.' " *Id.* at 358.

*McCormick on Evidence* § 87 at 175 (Cleary ed. 1972). According to McCormick, the attorney-client privilege is based on the theory "that claims and disputes which may lead to litigation can most justly and expeditiously be handled by practised experts, namely lawyers, and that such experts can act effectively only if they are fully advised of the facts by the parties whom they represent. Such full disclosure will be promoted if the client knows that what he tells his lawyer cannot, over his objection, be extorted in court from the lawyer's lips."

2. *In re Ampicillin Antitrust Litigation*, [1978–1] Trade Reg.Rep. (CCH) ¶ 62,043 (D.D.C.1978). The court lays down the first definitive D.C. approach to the corporate attorney-client privilege by requiring "relevance of the communication to a particular legal problem." *Id.* at 74,511. "The communication must have been made for the purpose of securing *legal* advice. . . . By 'relevance of the communication to a particular legal problem,' the Court does not intend to imply that a communication will only be protected if it, in fact, contains information necessary to the decision-making process for a particular legal problem, because such an *ex post facto* approach would discourage full disclosure by an employee who may not know what information is necessary. What is meant is that communications made in *the reasonable belief that they contain such necessary information* will be protected. However, communications which contain no such reasonable belief, either because of the status of the employee or because of the nature of the information, will not be protected." *Id.* at 74,511 n. 8. *Duplan Corp. v. Deering Milliken, Inc.*, 397 F.Supp. 1146 (D.S.C.1975). "[I]f the attorney cannot give advice to the corporate personnel who will apply it, then a corporation would be reluctant to seek legal advice since its confidential communications would not be protected by the attorney-client privilege." *Id.* at 1164. "Thus, the main consideration is whether the particular representative of the client, to or from whom the communication is made, is involved in rendering information necessary to the decision-making process concerning a problem on which legal advice is sought. . . . The extent of the attorney-client privilege will vary with the individual

situation; the climates are seldom identical." *Id.* at 1165.

*Mead Data Central, Inc. v. United States Department of the Air Force*, 184 U.S.App.D.C. 350, 566 F.2d 242 (D.C.Cir.1977). "In order to ensure that a client receives the best possible legal advice, based on a full and frank discussion with his attorney, the attorney-client privilege assures him that confidential communications to his attorney will not be disclosed without his consent." *Id.* 184 U.S. App.D.C. at 360, 566 F.2d at 252.

3. *Mead Data Central, Inc. v. United States Department of the Air Force*, 184 U.S.App.D.C. 350, 566 F.2d 242 (D.C.Cir.1977). In reviewing a denial of a Freedom of Information Act application for disclosure of legal opinions of Air Force attorneys regarding the legal ramifications of a computerized legal research system, the court remanded for the lower court to "order disclosure of these documents unless the Air Force demonstrates either that the attorney-client privilege does apply to these documents because the information on which they are based was supplied by the Air Force [client] with the expectation of secrecy and was not known by or disclosed to any third party, . . ." *Id.* 184 U.S.App.D.C. at 362, 566 F.2d at 254. As to a certain document which set forth the negotiations between the Air Force and the West Publishing Company regarding the computerized system, the court held that "[t]o the extent that it provides information as to what was offered to West Publishing Company and what West offered in return, it does not meet the confidentiality test of the attorney-client privilege since the information is also known by West itself." *Id.* 184 U.S.App.D.C. at 364, 566 F.2d at 255.

*United States v. Tellier*, 255 F.2d 441 (2d Cir. 1958). On defendant's appeal from a conviction of violations of the Securities Act, mail fraud and conspiracy, the court held that attorney's advice to client that a proposed bond issue was improper was not privileged since client expected attorney to prepare a letter to third persons setting forth his objections. "It is of the essence of the attorney-client privilege that it is limited to those communications which are intended to be confidential. 'The moment confidentiality ceases,' said Lord Eldon, 'privilege ceases.' . . . Thus it is well established that communications between an attorney and his client, though made privately, are not privileged if it was understood that the information communicated in the conversation was to be conveyed to others." *Id.* at 447.

*In re Ampicillin Antitrust Litigation*, [1978–1] Trade Reg.Rep. (CCH) ¶ 62,043 (D.D.C.1978). In an antitrust suit, defendant objected to Master's treatment of his privilege claims. The court, reviewing the Master's records, held that if the client permits his attorney to disclose the communication to others, there can be no confidentiality. "Thus, where a business proposal is sent to counsel for legal advice, with an accompanying expressed intent to disclose the proposal to a third party, the communication will not be deemed to be made in confidence and thus will not be privileged. . . . In general, the intention of the client will be a question of fact, and must be reviewed as such, and the burden is on the party asserting the privilege to establish the factual predicate for the claim." *Id.* at 74,-515.

*Burlington Industries v. Exxon Corp.*, 65 F.R.D. 26 (D.Md.1974). In setting out the legal criteria to be used by a Master in appraising plaintiff's privilege claims, the court stated that the requirement that communications between attorney and client be made " 'without the presence of strangers' " *id.* at 33, in order for communication to be immune from discovery, "means that the communication must have been intended as confidential, i. e., not intended to be related to others." *Id.* at 33.

*Radio Corp. of America v. Rauland Corp.*, 18 F.R.D. 440 (N.D.Ill.1955). In a patent infringement action, the court rejected withholding on the basis of attorney-client privilege, documents which were communications between directors, officers, or employees of RCA and the legal departments of General Electric, Westinghouse, American Telephone & Telegraph and others. The court held that the attorney-client privilege does not "extend to communications made by a client to his attorney with the understanding that the information is to be imparted to a third party." *Id.* at 443. "As to the documents with respect to which the attorney-client privilege has been waived by disclosure to any other person, . . . the documents will be produced to cross-claimants." *Id.* at 444.

*Rediker v. Warfield*, 11 F.R.D. 125 (S.D.N.Y. 1951). Plaintiff brought suit based on conspiracy by attorneys for plaintiff's employer to cause him to repudiate plaintiff's employment agreements to collect a claim against the government of Iran. Plaintiff objected to discovery of conversations between plaintiff's employer and defendants. The court held that these communications were not privileged because they were imparted during conferences with another bank's lawyers. "When a communication is made by a client to his attorney with the understanding that it is to be imparted to a third party, no privilege exists." *Id.* at 128.

*United States v. United Shoe Machinery Corp.*, 89 F.Supp. 357 (D.Mass.1950). Judge Wyzanski's requisites of a justified claim of the attorney-client privilege included that "(3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers . . ." *Id.* at 358.

## GUIDELINE NO. 7

For the purpose of the attorney-client privilege, an "attorney" is:

 (a) A person who was a duly licensed attorney at the time of the communication [1] and who:

 (i) had the title of attorney in the organization in which the person was employed; [2] or

 (ii) in the specific circumstances was acting in the capacity of giving legal advice,[3] as evidenced by the fact that the person regularly acted in such a capacity or by other circumstantial evidence of role.[4]

1. *United States v. United Shoe Machinery Corp.*, 89 F.Supp. 357 (D.Mass.1950). Judge Wyzanski, in setting forth the much cited requisites of a justified claim of attorney-client privilege, included the requirement that the person to whom the communication was made must be a member of the bar of a court.

2. *Natta v. Hogan*, 392 F.2d 686 (10th Cir. 1968). In a discovery proceeding pursuant to a statute giving to parties in patent office proceedings the right to secure documents in accordance with the federal civil rules, lawyers held to be within the attorney-client privilege were described as " 'duly licensed attorneys at law who were in the employment of Phillips Petroleum Company' at pertinent times. They were house lawyers . . ." *Id.* at 692. *FTC v. Lukens Steel Co.*, 444 F.Supp. 803 (D.D.C.1977). In holding that defendant had established all the elements of its claim that the documents which plaintiff sought were protected by the attorney-client privilege, the court pointed out that "[t]he attorneys who sent or received these documents were commercial lawyers in the defendant's Law Department and sent or received these documents in the course of rendering legal advice to the Corporation." *Id.* at 807.
 *United States v. United Shoe Machinery Corp.*, 89 F.Supp. 357 (D.Mass.1950). In a civil antitrust action, the court examined four groups of documents and found some within the attorney-client privilege and others not privileged. The first group was the documents to or from independent lawyers. These were "made at a time when each of the law partnerships was client for United, its subsidiaries and affiliates." *Id.* at 359. The advising attorneys were all employed as lawyers by the law firms retained by United Shoe for legal services. Thus insofar as they are "a member of the bar of a court, . . ." *id.* at 358, they are an attorney for purposes of the attorney-client privilege.

3. *SCM Corp. v. Xerox Corp.*, 70 F.R.D. 508 (D.Conn.), *appeal dismissed*, 534 F.2d 1031 (2d Cir. 1976). In antitrust litigation the court found that some of the documents sought from Xerox were protected by attorney-client privilege. The court noted that the courts have moved away from Judge Wyzanski's observations in *United States v. United Shoe Machinery Corp.*, 89 F.Supp. 357 (D.Mass.1950), "that in view of the usual duties of a person in a corporate patent department, the relationship of such a person to the corporation is 'not that of attorney and client.' " *Id.* at 523. Subsequent cases have somewhat refined this "by regarding the communications of in-house patent counsel as privileged or not, depending on what the attorney is doing in the particular communication being examined. . . . The privilege is not available when the communication from in-house patent counsel does not apply rules of law to confidential communications received from the client, . . . but this is because that type of communication is not privileged, not because the person transmitting it is (a) in-house, (b) a patent lawyer or (c) doing what some might regard as nonlegal work." 70 F.R.D. at 523.
 *Commonwealth of Puerto Rico v. SS Zoe Colocotroni*, 61 F.R.D. 653 (D.P.R.1974). In a suit arising from an oil spill, plaintiff sued Colocotroni and his indemnity underwriters, West. On the court's reconsideration, plaintiffs sent documents to a Magistrate to determine whether or not they must be produced. The court held that a person is an attorney for purposes of the attorney-client privilege if "the person to whom the communication was made a) is a member of the bar . . . and b) is acting as a lawyer in connection with this communication . . ." *Id.* at 660. The fact that the communications were made to a member of a law firm is not controlling. "[I]t must also be determined whether Hartzell has been or is acting as a lawyer in connection with the communications . . ." *Id.* at 660. The services rendered in regard to these documents must "involve(s) application of law to facts or the rendering of an opinion of law in response to the client's legal inquiries." *Id.* at 660.

4. *Zenith Radio Corp. v. Radio Corp. of America*, 121 F.Supp. 792 (D.Del.1954). In a proceeding on patent litigation, the court held that house counsel may be an attorney for purposes of the attorney-client privilege. However, attorney-employees in the patent departments of the parties qualify only if they are "primarily engaged in legal activities; . . ." *Id.* at 794. Explaining that the attorney-client relationship need be found "for each document separately considered," *id* at 794, the court added that "[t]he legal purpose of the communication is to be ascertained in the context of the comments upon the lawyer's activities, *supra*." *Id.* at 795.
 *United States v. United Shoe Machinery Corp.*, 89 F.Supp. 357 (D.Mass.1950). A

group of documents composed of communications and memoranda to or from the persons in United's patent department were held not to be privileged since the attorneys in that department do not primarily spend "time on the application of rules of law to facts which are known only to United's employees." *Id.* at 361. In explaining why attorneys in the patent department were not attorneys for the purpose of the attorney-client privilege, the court was influenced by the fact that the persons did not regularly act in a legal capacity. "All the men in the department function less as detailed legal advisers than as a branch of an enterprise founded on patents. They are comparable to the employees with legal training who serve in the mortgage or trust departments of a bank or in the claims department of an insurance company. Grist which comes to their mill has a higher percentage of business content than legal content. Unlike the independent lawyer they are expected to have at the forefront of their considerations business judgment, corporate policy and technical manufacturing aspects of the shoe machinery industry. So far as the proffered evidence in this case shows, the principal topics on which they spend time are questions of business policy, of competition as disclosed by facts derived from third persons, of the scope of public patents and of the application of patent law to developments by United and United's competitors. . . . Hence, the communication of a person in the patent department is as unprivileged as that of a lawyer who shares offices with his so-called client and gives him principally business but incidentally legal advice, . . . or an attorney who acts principally as accountant and also renders legal advice on the basis of accounting data, . . . or an attorney who acts as an investigator for the Federal Bureau of Investigation." *Id.* at 360–61.

## GUIDELINE NO. 8

For the purpose of the attorney-client privilege, the "client" is:

(a) In the case of the defendants, the named defendants (American Telephone & Telegraph Co., Western Electric Co., and Bell Telephone Laboratories, Inc.), the wholly owned subsidiaries and majority-owned subsidiaries named in pages 32–44 and pages 45–46 of Plaintiff's First Statement of Contentions and Proof, considered collectively,[1] but not the minority-owned companies named in pages 44–45 and formerly affiliated companies named in pages 46–48. The privilege also applies when an attorney provides legal advice or assistance jointly to AT&T considered collectively and to another corporation if the advice or assistance is on a basis that is confidential among the clients and relates to a matter in which the clients have a substantial *identity of legal* interest.[2]

(b) In the case of a government department or agency, the department or agency that employed the attorney. The privilege also applies when an attorney provides legal advice or assistance to another agency if the advice or assistance is on a basis that is confidential among the clients and relates to a matter in which the agencies have a substantial *identity of legal* interest.[3]

### Comment on Guideline No. 8

The cases clearly hold that a corporate "client" includes not only the corporation by whom the attorney is employed or retained, but also parent, subsidiary, and affiliate corporations. We found no cases in which there was a consideration of the degree of ownership required to give rise to the parent, subsidiary, or affiliate relationship. The cases in which the issue has arisen as to the identity of the client also involved facts in which the two related corporations had a substantial identity of legal interest in the matter in controversy. In such circumstances, notwithstanding that the corporations were distinct, the representation by the attorney was common or joint representation and hence the communications among them were still covered by the attorney-client privilege. If the claimant of the privilege can show a substantial identity of legal interest in the specific matter, it therefore makes no difference whether the two corporations were so affiliated as to be a single "client." But if there is no such community of interest in seeking advice, for example when the matter is transmitted simply for information, the question of closeness of affiliation may arise.

In the facts of this case, both parties contend that the wholly-owned and majority-owned affiliates of AT&T have close and long-standing relationships with each other, although they differ as to the legal significance of that intimacy. For purposes of the attorney-client privilege rule, however, the positions of both parties imply that these affiliates be considered part of AT&T as a single client.

As for the companies in which AT&T owns a minority interest, apparently AT&T's interest in *no case exceeds 30 percent, a position that has* been virtually unchanged for at least 20 years.

These companies appear to have an autonomous corporate life of their own and, therefore, should be treated as independent of AT&T. However, these companies may have been involved in joint or common representation in particular matters with respect to which they had a substantial identity of legal interest with AT&T.

Despite the fact that the minority-owned companies affiliated with AT&T and involved in this action will most likely have had a "substantial identity of legal interest" with the AT&T system in the matters that will be brought into question (and hence the communications will be privileged under the "joint" representation rule stated in the second section of paragraph (a)), the defendants still insist that AT&T as "client" should include collectively all member corporations of the Bell system. Defendants contend that to distinguish between member corporations on the basis of percentage of ownership exalts form over substance. We do not agree.

The cases referring to parent, subsidiary, and affiliate corporations in regard to the attorney-client privilege simply reach the conclusion that there was a single client without examining this question. Perhaps the conclusion to be reached may well depend on where one begins. If analysis begins with the proposition that corporations under unified control are "one" even though comprised of components held in varying degrees of ownership, then a minority-owned company can be assimilated to one in which substantial, although not majority, ownership is held. On the other hand, if analysis begins with the proposition that formerly distinct corporations are separate persons except as specific legal purpose warrants treating them as one, then a different conclusion is reached.

A minority-owned company by hypothesis has independent stockholders, and those stockholders, by our analysis, will have some added protection in the fact that an attorney serving their corporation is bound to regard that company as being distinct from an individual corporate stockholder that, for practical purposes, may control the company but not own a majority of the stock. Hence, we conclude that the legal form should be given effect in such a context. To pose an illustration, suppose payments were being made by the minority-owned company which that company contended were an inappropriate diversion of revenues that would otherwise go into profits and hence be available for distribution to the stockholders of the minority-owned company. In such a situation, it would be novel to say that lawyers for AT&T were representing a single client. And if that were said, it is difficult to see why a "single client" situation would not exist whenever one corporation owned more than a nominal fraction of the stock of another.

We also found no cases dealing with the identity of the client in respect to the Government. Indeed, the ruling in this case by Judge Greene that the independent regulatory agencies are not part of the Government for purposes of discovery appears to be one of few decisions recognizing the formal divisibility of the Government for purposes of trial court litigation. The rationale of that ruling would seem to imply that the Government is a cluster of "clients" for purposes of the attorney-client privilege. In some situations, it would be evident that the Government is not a single client. For example, if the Justice Department and the enforcement bureau of FCC took opposite positions before the FCC, it would be absurd to say that their exchange of briefs involved an attorney-client communication. A less extreme case, but one in which the agencies would still not have a sufficient identity of interest to justify the exchange of information by the attorneys and still maintain the attorney-client privilege, would arise when the FCC is engaged in regulatory matters that are not within the jurisdiction of the Justice Department. The Justice Department's interest in the outcome with regard to a particular related industry, because of its future implications in actions which may be instituted, would not constitute a community of legal interest with the FCC in that particular proceeding. The problem, therefore, is to determine the criteria by which the identity of a Government attorney's "client" is defined. The client clearly includes the attorney's own agency. On the other hand, it would not include some other agency under all circumstances, because any two agencies can have compatible or conflicting positions depending on the matter involved. The situation can be analogized to that of separate corporations having connections to each other. On that analogy, if the two agencies have a substantial identity of legal interest in a particular matter, the attorneys for each agency can be treated as representing both agencies jointly; if the agencies are in conflict, communications between counsel for the agencies are not within the attorney-client privilege.

1. *United States v. United Shoe Machinery Corp.,* 89 F.Supp. 357 (D.Mass.1950). In a civil antitrust action the court held that "[f]or present purposes the client is United Shoe Machinery Corporation and all its subsidiaries and affiliates considered collectively." *Id.* at 359.

2, 3. *Duplan Corp. v. Deering Milliken, Inc.,* 397 F.Supp. 1146 (D.S.C.1975). The court found a sufficient community of interest between a patent owner, a French corporation doing business in the United States, and some of its "associates"—subsidiaries or sales, manufacturing, and use licensees of the patent in the United States, both parties and non-parties— so that the attorney-client privilege applies to communications made to or received by them. As to one non-party, Whiten, the court held it was interested in the litigation only from a commercial standpoint and its exchanges with the attorney would not be an exchange based on a legal interest. Rhodracita, another non-party, was found to have a sufficient community of interest since it had a duty to

act through its patent department as legal patent advisor to the patent owner and one of its U.S. licensees, also a party. "A community of interest exists among different persons or separate corporations where they have an identical legal interest with respect to the subject matter of a communication between an attorney and a client concerning legal advice. The third parties receiving copies of the communication and claiming a community of interest may be distinct legal entities from the client receiving the legal advice and may be a non-party to the anticipated or pending litigation. The key consideration is that the nature of the interest be identical, not similar, and be legal, not solely commercial. The fact that there may be an overlap of a commercial and a legal interest for a third party does not negate the effect of the legal interest in establishing a community of interest." *Id.* at 1172. The court explained examples of a community of interest between non-parties and parties where the attorney represented both. "All of these examples involve either a duty owed to client C by client B which necessitates B being advised of communications between C and the attorney, or A [sic] *direct transaction between B and C* which necessitates the services of an attorney who represents the interests of both parties to the transaction. The above rule and its examples however are exceptions to the normal rule that the communications to a third party, of an otherwise privileged exchange between attorney and client, constitute a waiver of the privilege. Where the communication to a third party (non-party client), of an attorney-client exchange is not based on such a duty or direct transaction between the joint clients of an attorney (that is, a legal interest), but is based rather on the non-party client's interest in a matter involving the prime client and some outsider, the reason for the exception to the normal rule of waiver ceases to exist, and with it, the exception. This is so even though the communication is with the full knowledge and consent of the prime client, and even though the non-party client of the same attorney is actively assisting the prime client in his adversary action. . . . Thus, where there is no legal interest (duty or direct transaction between the two clients of the attorney), the mere interest of a non-party client in legal transactions between the prime client and an outsider is not sufficient to prevent a waiver of the attorney-client privilege. This is true no matter how commercially strong the non-party client's interest is, or how severely the non-party client may be legally effected by the outcome of the transaction between the prime client and an outsider." *Id.* at 1175. The court, citing from 8 Wigmore, *Evidence* § 2312, stated: "The chief instance occurs when the *same attorney acts for two parties* having a common interest, and each party communicates with him. Here the communi-cations are clearly privileged from disclosure at the instance of a third person. Yet they are not privileged in a controversy between the two original parties, inasmuch as the common interest and employment forbade concealment by either from the other. On the other hand, a communication to the *opposing party's* attorney, as such, is clearly without the privilege, since no confidence is reposed nor, if reposed, could be accepted. But between these two extremes occur a number of situations shading into each other. It is necessary to examine these situations separately with their respective solutions." 397 F.Supp. at 1174.

*Transmirra Products Corp. v. Monsanto Chemical Co.,* 26 F.R.D. 572 (S.D.N.Y.1960). "An examination of the few cases dealing directly with the question of privilege based upon the attorney-client relationship would seem to indicate that persons represented by different attorneys but conducting a 'joint defense' may pool information without waiving this privilege." *Id.* at 576 (dicta).

*McCormick on Evidence* § 91 at 190–91 (Cleary ed. 1972). "[W]here two parties separately interested in some contract or undertaking as in the case of borrower and lender or insurer and insured, engage the same attorney to represent their respective interests, and each communicates·separately with the attorney about some phase of the common transaction . . . [h]ere again it seems that the communicating client, knowing that the attorney represents the other party also, would not ordinarily intend that the facts communicated should be kept secret from him. Accordingly, the doctrine of limited confidentiality has been applied to communications by the insured under a liability insurance policy to the attorney employed by the insurance company to represent both the company and the insured. A confidential statement made by the insured to the attorney, or to the insurer for the use of the attorney, would thus be privileged if sought to be introduced at the trial of the injured person's action against the insured, but not in a controversy between the insured, or one claiming under him, and the company itself over the company's liability under the policy."

## GUIDELINE NO. 9

With respect to communications from an organizational client to an attorney, a person making a communication personifies the client if the subject matter of the communication from that person is within the scope of his employment. The subject matter is within that scope if:

(a) it is directly related to the person's own activities in the course of employment, or the activities of a person who is his subordinate,[1] or

(b) the person making the communication is part of the client's "control group," defined as those persons who will make, or substantially participate in making, decisions by the client on the basis of the legal advice that is sought.[2]

### GUIDELINE NO. 10

With respect to communications from an attorney to an employee of an organizational client, the matter in the communication is privileged only:

(a) to the extent that it reveals material shown to have been confidentially communicated to the attorney by a person who personifies the client, as defined in Guideline No. 9 [1] (communications from attorneys that contain or are based upon public information or matter obtained from non-client sources are not privileged even if legal advice is being given to the client); [2] and

(b) if the information is disseminated only to persons who are within the "control group" as defined in Guideline No. 9(b), or who need to know the material involved in order properly to perform their activities in the course of employment.[3]

### GUIDELINE NO. 11

A communication between employees of an organizational client that is prepared for the purpose of obtaining legal advice and is eventually transmitted to an attorney for that purpose is within the attorney-client privilege only if the employees personify the client under Guidelines No. 9 and 10(b).[1]

*Comment on Guidelines No. 9, 10, and 11*

It is well established, and both parties concur, that the attorney-client privilege applies to corporations. Since the corporate entity can act only through agents and employees, it is necessary to determine which employees "personify" the corporation for purposes of the attorney-client privilege. The earlier cases dealing with the attorney-client privilege as applied to corporations, particularly *City of Philadelphia v. Westinghouse Electric Corp.,* constructed the "control group" test to distinguish between those employees who personify the corporation and those who do not.

The "control group" concept is clearly right as far as it goes. Communications by top management have to be within the privilege, if it is given recognition at all, for otherwise the privilege would be empty; a corporation thinks and decides through its top management. Yet a corporation also learns of things affecting its affairs through the eyes and ears of lower echelon employees, and takes action on the basis of legal advice through employees who are not members of top management. The question, then, is whether the attorney-client privilege applies to communications from lower level employees to an attorney for the corporation, *i. e.,* communications to an attorney by an employee who is not a member of the control group. There are also two related questions: What about communications of advice from the attorney to lower echelon personnel that reveal information which was privileged when given to the attorney? And what about communications between employees, particularly at lower echelons, containing information that finds its way to the attorneys? If the "control group" test is used as the exclusive definition of those who personify the corporation, none of these communications involving lower echelon personnel would be covered.

Some cases have held that the "control group" includes employees whose duties entail necessary communications to the corporation's attorney. But, as Judge Richey pointed out in *Ampicillin Antitrust Litigation,* that is a distorted use of the term "control group." We conclude, in accordance with Judge Richey and other decisions, that the "control group" test is too narrow and that the proper test is whether the giving of the information to the attorney was reasonably necessary in the employee's course of duties. Correlatively, communications from an attorney to an employee containing originally privileged information are also privileged, with respect to that information, if the recipient employee requires the information in his duties. And also correlatively, passage of the information to the attorney, and back, through the hands of non-attorney employees does not remove the privilege if transmission of the information was part of the employment responsibilities of those employees.

If this definition is proper, it may well be asked why it was not long ago established in the decisions, and indeed why the "control group" test was formulated instead. The explanation lies in the historical sequence of the cases and in an unstated but clearly established limitation on the privilege.

Historically, the beginning point is an observation in *Hickman v. Taylor.* It was there said that the attorney-client privilege did not apply to a statement to an attorney from an employee who witnessed an accident involving his employer's tug. The employee, said the Court, was a "mere witness." The Court noted, but attached no significance to the fact, that the employer in *Hickman v. Taylor* was a partnership. A partnership consists of real people and hence does not beget

the problem of personifying the entity. In other words, even if a personification rule had been established at the time, it would not have applied because there was a real-person employer in *Hickman*.

Many cases subsequent to *Hickman v. Taylor* involved similar facts—a lower echelon employee giving a statement about an accident to an attorney—except that the employer was a corporation. The corporate employers in these cases attempted to invoke the attorney-client privilege, on the argument that a corporation can act only through its agents, that the employee involved was acting in the scope of his employment in the accident, that the communication related to a matter within the scope of his employment, that the communication was therefore on behalf of the employer, and that the communication accordingly was privileged.

Although a few decisions accepted this argument, the prevailing view did not. Denial of the privilege was grounded in some decisions on the proposition that the communication was not within the scope of the employee's employment, occasionally by reliance on cases holding that such a statement would not be an *admission* by the employer—a quite different evidentiary problem. Although this result may be right, it is difficult to accept the assertion that it followed because giving the statement was not within the employee's scope of employment. If it is ever within the scope of any corporate employee's employment to communicate with a company attorney, surely it is so when the communication concerns the facts of a transaction in which the employee personally participated and which involves the distinct possibility that the employee's conduct will be the basis of corporate liability. Denial of the privilege was alternatively grounded on the proposition that the employee was a "mere witness," citing *Hickman v. Taylor*. This ignores the fact that the employee in *Hickman* could not have been treated as personifying a corporate employer, because there was no such employer to personify. And it does not explain why a low echelon corporate employee, say a bus driver, is a "mere witness," while a member of top management is not simply a "mere witness" to corporate transactions involving his conduct.

Yet other cases continue to apply the "mere witness" rule to corporate employees with respect to statements about accidents. We have the peculiarity, therefore, that in a situation like *Hickman v. Taylor* but involving a corporation, the employee's statement is not privileged, whereas in communications having to do with corporate business transactions, as in *Harper & Row, Diversified Industries,* and *Ampicillin,* the privilege applies. The resolution of this apparent conflict is unlikely to be found in dissection of the concept of "scope of employment." Rather, the point would seem to be this: In cases of accidents, preserving secrecy of the statement ordinarily adds so little to the corporation's peace of mind in getting legal advice and adds so much to the fact-gathering burden of the injured party

that the statement simply should not be regarded as privileged; in other transactions, particularly where the legal consequences to the employer corporation can be large and long-lasting, the competing considerations are in closer balance, and the privilege should apply.

On this analysis applied to the present case, the protection of the privilege should not turn on the position of the employee, but rather on whether the matter communicated is within the employee's regular corporate responsibilities, however lowly, and is reasonably necessary in determining what has happened in the corporation, so that the attorney can make informed decisions and intelligently advise the corporate employees who will act upon it. Correlatively, if an informed corporate decision is to be made on the basis of legal advice, the decision may require action on the part of persons other than top management personnel and the factual communications to the attorney must be circulated to individuals who will make those decisions. The essential question in the continuing protection of these communications is whether the employee whose actions are to be guided by the legal advice as a practical matter must know the facts originally communicated in order to understand and act upon the advice in the course of his employment. Some cases have expressed this concept as the "need to know." Others have done so by enlarging the scope of "control group" to include all employees whose duties entail knowing the information in the communication.

We therefore reject the "control group" concept as the singular definition of those who personify the corporation. Rather, the test is whether the communication is a necessary incident of the employee's employment, of which an employee's being a member of the control group is an illustration.

What is the "control group" for any given matter depends on the corporate structure and the legal matter in question. At some point as one moves down into middle management, the persons involved do not generally share in originating requests for legal advice or share in decisions about legal matters of the type involved in the particular document. At that point, the "control group" concept is inapplicable. Rather, the relevant factor is the employee's particular duties in regard to the information. The privilege applies to the communication only if the employee is the source of the information going to the attorney or is a regular conduit for such information, or, in response, if the information is revealed in the attorney's advice and the employee to whom the information is disclosed has a "need to know" the information to carry out his own duties.

In this connection it seems useful to say something about the problem of "laundering" corporate information by circulating it through the corporate attorney. It seems to us that the metaphor is inapt and the fear exaggerated, if the limitations on the privilege are kept in mind. The metaphor is inapt because corporate information

does not disappear by being sent in a communication to an attorney; the attorney keeps the communication and a copy is usually kept at the point of origin in the corporate structure. A better metaphor is that communication to the attorney seals the communication from external inspection. But the document is sealed only if its contents were withheld from all persons except those who had a need to know in order to forward a request for legal advice, and is kept sealed only if its contents were subsequently disseminated only to those whose duties involved acting upon the legal advice. Furthermore, the seal attaches only if the communication is made for the purpose of obtaining legal advice, so that its content has to have some legal significance or a significance that its sender could reasonably believe was legal. The focal point of inquiry, therefore, is not the fact that the document went to the attorney (although that, too, is necessary), but the contents of the document and the identity and corporate responsibilities of persons other than the lawyer who were privy to it. What is critical as a practical matter is not that the information was revealed to the attorney, but that it was not revealed to anyone except him and those employees who had a "need to know." At least in a complex corporate organization, those conditions probably are not easy to maintain, nor is it easy to prove that they were maintained.

The Government states that it has not claimed the attorney-client privilege, and the parties do not devote extensive argument to the problem of personification of the Government for purposes of its attorney-client privilege. However, it seems likely that the Government's attorney-client privilege will be involved when discovery concerns documents of agencies other than the Justice Department. There appear to be no cases dealing with the question of personification of the Government for purposes of the attorney-client privilege. However, the analogy to the corporate problem seems apt. Clearly the head of a department or bureau should personify the Government in communicating with counsel for the department or agency, and in asking legal advice of.the Justice Department. So also, a Government truck driver's statement about an automobile.accident should not be absolutely privileged. The analysis to be used in mediating between these limiting situations in a Government bureaucratic structure should be the same as used in regard to a corporate bureaucratic structure.

1. *Diversified Industries v. Meredith,* 572 F.2d 596 (8th Cir. 1978). Information obtained by attorneys during a professional investigation from employees at all ranks of the corporation were privileged insofar as the interviews explored only areas within the employee's corporate duties.

*Harper & Row Publishers, Inc. v. Decker,* 423 F.2d 487 (7th Cir. 1970), *aff'd by an equally divided court,* 400 U.S. 348, 91 S.Ct. 479, 27 L.Ed.2d 433 (1971). An employee of a corporation is sufficiently identified with the corporation "where the subject matter upon which the attorney's advice is sought by the corporation and dealt with in the communication is the performance by the employee of the duties of his employment" *id.* at 491–92, and the communication is made at the direction of a corporate superior.

*In re Ampicillin Antitrust Litigation,* [1978–1] Trade Reg. Rep. (CCH) ⁘ 62,043 (D.D.C.1978). "1) The particular employee or representative of the corporation must have made a communication of information which was *reasonably believed to be necessary to the decision-making process* concerning a problem on which legal advice was sought; 2) the communication must have been made for the purpose of securing *legal* advice; 3) the subject matter of the communication . . . must have been related to the performance by the employee of the duties of his employment." *Id.* at 74,510–11.

2. *FTC v. Lukens Steel Co.,* 444 F.Supp. 803 (D.D.C.1977). In an action for civil penalties and equitable relief for violation of an FTC cease and desist order, corporate defendant was found to have met its burden to demonstrate the applicability of the attorney-client privilege with respect to documents exchanged by corporate counsel and corporate employees even under the restricted control group test. "Under this test, only persons who have the authority to control or substantially participate in a decision regarding action to be taken on the attorney's advice or is a member of a group with such authority act as the client on the corporation's behalf for purposes of the attorney-client privilege. . . Most of the persons who sent or received the documents were executive officers of the Corporation. . . . Defendant has represented that the other persons who sent or received these documents were involved in developing the policies based on the legal advice and that they had responsibilities for the subject matter of the communications." *Id.* at 807.

*Congoleum Industries, Inc. v. GAF Corp.,* 49 F.R.D. 82 (E.D.Pa.1969). In a patent infringement action only a few documents in defendant's possession were found to be within the attorney-client privilege. These were communications between attorneys and two corporate officials who were found to be "vested with the authority to reach a final decision as to the problems posed by the potential patent conflict, so that they alone constituted the control group . . . ." *Id.* at 84.

*City of Philadelphia v. Westinghouse Electric Corp.,* 210 F.Supp. 483 (E.D.Pa.1962). "[I]f the employee making the communication, of whatever rank he may be, is in a position to control or even take a substantial part in a decision about any action which the corporation may take upon the advice of the attorney, or if he is an authorized member of a

body or group which has that authority, then, in effect, he is (or personifies) the corporation when he makes his disclosure to the lawyer and the privilege would apply. In all other cases the employee would be merely giving information to the lawyer to enable the latter to advise those in the corporation having the authority to act or refrain from acting on the advice." *Id.* at 485.

1. *Mead Data Central, Inc. v. United States Department of the Air Force,* 184 U.S.App.D.C. 350, 566 F.2d 242 (D.C.Cir.1977). In an appeal of a denial of Freedom of Information Act application for disclosure of legal opinions of Air Force attorneys advising their client as to the applicable law and recommending courses of action with respect to the Department's Project FLITE, a computerized legal research system, the court held that the documents were covered by the attorney-client privilege component of Exemption 5 of the Freedom of Information Act. It found that the Air Force had not shown that the legal opinions were based on confidential information provided by the client. "In the federal courts the attorney-client privilege does extend to a confidential communication from an attorney to a client, but only if that communication is based on confidential information provided by the client." *Id.* 184 U.S. App.D.C. at 362, 566 F.2d at 254.

*In re Ampicillin Antitrust Litigation,* [1978–1] Trade Reg.Rep. (CCH) ¶ 62,043 (D.D.C.1978). After consideration of the Master's construction of the requirement of confidentiality, the court ruled that "an attorney communication is privileged if it would directly or indirectly reveal confidential communication by the client." *Id.* at 74,513. Strictly speaking, the privilege applies only to communications made by the client to the lawyer, but in practice it is generally impossible to separate those communications from the ones made by the attorney to the client, particularly when the attorney communications will reveal the substance of the ones made by the client that are privileged. *See* 8 Wigmore, *Evidence* § 2320 at 628–29 (McNaughton rev. 1961); E. Morgan, *Basic Problems of Evidence* 111 (1961); *Natta v. Hogan,* 392 F.2d 686, 693 (10th Cir. 1968). Therefore, the privilege 'normally extends both to the substance of the client's communication as well as the attorney's advice in response thereto.' . . . *Matter of Fischel,* 557 F.2d 209, 211 (9th Cir. 1977)." *Id.* at 74,513 n. 18.

*United States v. Covington & Burling,* 430 F.Supp. 1117 (D.D.C.1977). The court held that only where it is clear from examining a document held by Covington & Burling, a law firm, that disclosure of it would tend to reveal a confidential communication of Guinea, its client, will the court uphold the claim of privilege. "The general rule is, however, that the

privilege only protects these other communications [from the attorney to the client] to the extent that disclosure would tend to reveal a confidential communication from the client." *Id.* at 1120–21. "A special instance of this occurs in a communication from the attorney to the client. Such a communication is privileged not only if disclosure would tend to reveal a prior confidence of the client, but also if it would tend to reveal a subsequent communication—an admission by adoption." *Id.* at 1121 n. 1.

*SCM Corp. v. Xerox Corp.,* 70 F.R.D. 508 (D.Conn.), *appeal dismissed,* 534 F.2d 1031 (2d Cir. 1976). In antitrust litigation plaintiffs requested documents prepared by attorneys in Xerox patent department containing public information and brief descriptions of the patents. The court held that these were unprivileged since they were based on facts that did not come from the client. "The purpose of the privilege is to insure that the client may confide in his attorney to obtain legal advice. Unless the legal advice reveals what the client has said, no legitimate interest of the client is impaired by disclosing the advice." *Id.* at 522. The court did find "[c]ommunications by the attorney to the client in the consultation process are privileged when they state or imply facts communicated to the attorney in confidence." *Id.* at 516.

2. *Natta v. Hogan,* 392 F.2d 686 (10th Cir. 1968). In an appeal from an order granting limited disclosure in connection with interference proceedings in the patent office, the court affirmed holding some documents which were communications from a lawyer to the company privileged. In discussing appellant's reliance on 8 Wigmore *Evidence* § 2292 (McNaughton rev. 1961) p. 554, claiming that the privileged document applies only to communications to, not from, an attorney, the court stated: "Reference is there made to communications 'by the client.' In the discussion which follows, Wigmore makes it clear that the reference is to differentiate between communications made by the client and those made by a third person. . . . 'That the *attorney's communications to* the client are also within the privilege was always assumed in the earlier cases and has seldom been brought into question.'" 392 F.2d at 692–3.

*SCM Corp. v. Xerox Corp.,* 70 F.R.D. 508 (D.Conn.), *appeal dismissed,* 534 F.2d 1031 (2d Cir. 1976). In antitrust litigation the court found certain documents unprivileged since they were based on public information. "The public information is not protected. . . Legal departments are not citadels in which public, business or technical information may be placed to defeat discovery and thereby ensure confidentiality." *Id.* at 515.

*SEC v. National Student Marketing Corp.,* 18 F.R.Serv.2d 1302 (D.D.C.1974). Securities & Exchange Commission staff opinions, related

to facts obtained from statements of witnesses and documents which are public were not to be privileged. "Advice given upon facts ascertained from someone other than the client removes those communications from the privilege: . . ." *Id.* at 1312.

*United States v. United Shoe Machinery Corp.*, 89 F.Supp. 357 (D.Mass.1950). The court held that insofar as letters from United Shoe's lawyers "were prepared to solicit or give an opinion on law or legal services, such parts of them are privileged as contain, or have opinions based on, information furnished by an officer or employee of the defendant [client] . . . . Thus, for example, there is no privilege for so much of a lawyer's letter, report, or opinion as relates to a fact gleaned from a witness, . . . or a person with whom defendant has business relations, . . . or a public document such as a patent, . . . or a judicial opinion." *Id.* at 359.

3. *Diversified Industries, Inc. v. Meredith*, 572 F.2d 596 (8th Cir. 1978). Reports by a law firm were privileged as they were not disseminated "to other than those immediately concerned with the results of the investigation." *Id.* at 611.

*Mead Data Central, Inc. v. United States Department of the Air Force*, 184 U.S.App.D.C. 350, 566 F.2d 242 (D.C.Cir.1977). In a Freedom of Information Act case the court remanded a lower court's holding that seven documents relating to a licensing agreement for a computerized legal research system were exempt from disclosure. As to three of the documents which were shown to be communicated by an attorney as part of a professional relationship to give legal advice to the Air Force, the court found that the elements of attorney-client relationship were met. In explaining that the confidentiality of the information, however, had not been demonstrated and would have to be shown before attorney-client privilege could apply, the court explained that: "The fact that the communication at issue in this case may have been circulated among more than one employee of the Air Force does not necessarily destroy their confidentiality, however. Where the client is an organization, the privilege extends to those communications between attorneys and all agents or employees of the organization who are authorized to act or speak for the organization in relation to the subject matter of the communication." *Id.* 184 U.S.App.D.C. at 361 n. 24, 566 F.2d at 253 n. 24.

*SCM Corp. v. Xerox Corp.*, 70 F.R.D. 508 (D.Conn.), *appeal dismissed*, 534 F.2d 1031 (2d Cir. 1976). In antitrust litigation plaintiff's motion for an order compelling discovery was denied in part and granted in part. Communications between Xerox executives discussing legal advice were held to be privileged. "A privileged communication should not lose its protection if an executive relays legal advice to another who shares responsibility for the subject matter underlying the consultation. . . . It would be an unnecessary restriction of the privilege to consider it lost when top management personnel discuss legal advice." *Id.* at 518.

*Sylgab Steel & Wire Corp. v. Imoco-Gateway Corp.*, 62 F.R.D. 454 (N.D.Ill.1974). In a patent infringement action, the court held that documents prepared by defendant's attorney or his agents or employees of defendant who are concerned with primary responsibility for dealing with defendant's patent infringement problems were privileged. "It is well settled that the dissemination of a communication between a corporation's lawyer and an employee of that corporation to those employees directly concerned with such matters does not waive the attorney-client privilege." *Id.* at 456.

*Duplan Corp. v. Deering Milliken, Inc.*, 397 F.Supp. 1146 (D.S.C.1975). "[I]f the attorney cannot give advice to the corporate personnel who will apply it, then a corporation would be reluctant to seek legal advice since its confidential communications would not be protected by the attorney-client privilege." *Id.* at 1164. "Thus the main consideration is whether the particular representative of the client, to whom or from whom the communication is made, is involved in rendering information necessary to the decision-making process concerning a problem on which legal advice is sought. . . . The extent of the attorney-client privilege will vary with the individual situation; the climates are seldom identical." *Id.* at 1165.

*United States v. Aluminum Co. of America*, 193 F.Supp. 251 (N.D.N.Y.1960). Interoffice communication between nonlegal personnel disclosing legal advice already received was held to be privileged.

1. *Burlington Industries v. Exxon Corp.*, 65 F.R.D 26 (D.Md.1974). In setting forth the guidelines by which the court appointed Master would judge claims of privilege, the court said, "[t]his court subscribes to the view of the court in *Eutectic.*" *Id.* at 38–39. The court in *Eutectic* found privileged documents prepared by the corporate representatives which were communicated in confidence to each other and ultimately to the attorney, and though containing technical information, were primarily of a legal nature for the purpose of obtaining legal assistance. Thus documents prepared "to aid counsel in rendering legal assistance to the corporation, at the express or implied request of counsel, and which are primarily legal in nature, will not fall outside the scope of the attorney-client privilege merely because at their inception the communications were intracorporate." *Id.* at 39.

*Eutectic Corp. v. Metco, Inc.*, 61 F.R.D. 35 (E.D.N.Y.1973). Plaintiff challenged the validity of defendant's patents and moved to

**624**

compel defendant to produce certain documents. Defendant sought to withhold documents containing information gathered by four persons and eventually communicated to the attorney. The court held these documents privileged since the information was gathered "for the dominant purpose of facilitating the attorney's efforts to provide services to the client, . . ." *Id.* at 40.

*Rockwell Manufacturing Co. v. Chicago Pneumatic Tool Co.*, 57 F.R.D. 111 (N.D.Ill.1972). In patent infringement action plaintiff's motion to compel defendant to produce a letter from defendant's director of engineering to defendant's patent attorney was denied as being protected by attorney-client privilege even though the letter was disseminated to defendant's employees prior to sending it to the attorney. The letter was prepared at the attorney's request for information concerning certain patents as to which defendant had notice concerning possible infringement, and all the recipients were acting as employees of defendant and had primary responsibility for defendant's patent infringement problems. "The confidentiality of the Amtsberg letter is apparent from the face of the document. All recipients of the Amtsberg letter were acting in their capacity as employees of the defendant and had primary responsibility for dealing with the defendant's patent infringement problems. It is well settled that the dissemination of a communication between a corporation's lawyer and an employee of that corporation [such as the Amtsberg letter] to those employees directly concerned with such matters does not waive the attorney-client privilege." *Id.* at 113.

## GUIDELINE NO. 12

The fact that a communication from a client to an attorney did not specifically include a request for legal advice or assistance does not preclude its being privileged, if the information reasonably could be foreseen to be relevant to future advice or assistance.[1]

---

1. *In re Ampicillin Antitrust Litigation*, [1978–1] Trade Reg.Rep. (CCH) ¶ 62,043 (D.D.C.1978). The particular employee or representative of the corporation must have made a communication of information which was *"reasonably believed to be necessary to the decision-making process* concerning a problem on which legal advice was sought." *Id.* at 74,510.

 *Hercules, Inc. v. Exxon Corp.*, 434 F.Supp. 136 (D.Del.1977). In a patent action the court held that communications between a client and attorney concerning legal advice and assistance are privileged even without an express request by client for legal service. Following *Burlington Industries v. Exxon Corp.*,

65 F.R.D. 26 (D.Md.1974), the court explained that a client's communication may be "intended to keep the attorney apprised of continuing business developments, with an implied request for legal advice . . ." 434 F.Supp. at 144.

*Jack Winter, Inc. v. Koratron Co., Inc.*, 54 F.R.D. 44 (N.D.Cal.1971). The court included in its findings of documents which were privileged, "client communications intended to keep the attorney apprised of continuing business developments, with an implied request for legal advice based thereon, . . ." *Id.* at 46.

## GUIDELINE NO. 13

The attorney-client privilege is applicable only if the matter communicated is not for the purpose of furthering a criminal or fraudulent transaction.[1] To establish this exception to the attorney-client privilege, the party seeking discovery must make a *prima facie* showing that the lawyer's advice was sought for the purpose of furthering the client's wrongful conduct.[2]

### Comment on Guideline No. 13

In this action the Government contends, among other things, that the defendants furthered their wrongful activity by improperly prosecuting and defending legal proceedings for the purpose of harassing competitors and preserving and extending their monopoly. There is authority that pursuit of litigation for such purpose is "sham" litigation and is evidence of wrongful purpose under the antitrust laws and may itself constitute a violation of those laws. *California Motor Transport v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). It would follow that the Government should be allowed to prove such a contention. Consequently, the Government argues that it should be allowed to discover defendants' activities in the proceedings referred to without regard to the attorney-client privilege, because the use of litigation for wrongful purposes is an "operative fact."

The law of attorney-client privilege has long recognized an exception to the effect that the privilege does not apply to advice or assistance sought for the purpose of aiding the client in an illegal or wrongful purpose. The terms of the exception are variously stated. The prohibited purpose that triggers the unveiling has been described as a "crime," "crime or fraud," and "crime, fraud, or tort." Whichever definition is used, a violation of the Sherman Act would seem to be included, because such conduct is a crime, a tort, and a wrong interdicted by a public policy at least as strong as that proscribing fraud. Hence, if it can be shown that the defendants' conduct in prosecuting or defending various proceedings was for the purpose of protecting or enlarging an

illegal monopoly, the attorney-client privilege would not apply. There appears to be no authority as to whether the same principle would apply with regard to the work product privilege, but we conclude that it should. If the client's communications are to be exposed because they served an illicit purpose, it would seem that the lawyer's work in executing that purpose should also be exposed.

The key problem, however, concerns the showing that must be made in order to lift the veil. Clearly it would be improper to allow discovery as against the attorney-client privilege, merely on the allegation that the communications were in furtherance of sham litigation. That would open the door too far. Yet it would also be improper never to allow discovery, for a plaintiff thereby would be precluded from obtaining proof that could convert a well substantiated suspicion of wrongful use of legal process into an overwhelming demonstration of the fact. The problem has arisen elsewhere, for example, in connection with the privilege against self-incrimination, where the claimant must show justification for the claim but need not go so far as to establish his own guilt. The solution, as indicated in *Burlington Industries v. Exxon Corp.*, is to sustain the privilege until the party seeking to lift it has established, by evidence *aliunde*, a *prima facie* showing that the use of legal procedure was wrongful. Hence, the privilege, if established as to various matters, is not lost until such a showing is made. The question that then arises is to whom such a showing ought to be made.

We believe, and hold, that any such showing should be made before Judge Greene at trial, or at such other hearing as he may direct. By hypothesis, such a showing would not involve a question of privilege, which is within our designated authority, but rather a question of wrongdoing that would vitiate a privilege. Moreover, proof of wrongdoing for this evidentiary purpose would largely if not wholly duplicate proof of wrongdoing on the substantive issues in the case. We think both the limitations on our authority and considerations of economy in adjudication require that we not consider proof intended to vitiate defendants' privilege on the ground of wrongdoing.

1. *Natta v. Zletz*, 418 F.2d 633 (7th Cir. 1969). In an appeal proceeding on a motion to compel production of documents, plaintiff claimed that defendant's attorney-client privilege claims are foreclosed because of fraud on the patent officer. "It is well settled that the attorney-client privilege has no application where the communication involves advice in furtherance of a criminal or fraudulent transaction." *Id.* at 636.

*Duplan Corp. v. Deering Milliken, Inc.*, 397 F.Supp. 1146 (D.S.C.1975). "Communications made *after* the fact of the commission of a crime, fraud, or tort between an attorney and persons within the control group of the corporate client are protected by the attorney-client privilege. Indeed, the main purpose for the creation of the attorney-client privilege is to allow just such communications to be made in the interest of establishing a legal defense. . . . Communications made *before* the fact or *during* the commission of a crime, fraud, or tort between an attorney and persons within the control group of the corporate client are *not* protected by the attorney-client privilege. To allow the attorney-client privilege to attach for such communications would permit an attorney to be a principal or an accessory to a crime, fraud, or tort without fear of discovery and would permit clients to commit crimes, frauds, and torts with the aid of legal advice beforehand. Consultation to carry out the wrongful conduct is a conspiracy. The attorney-client privilege was not meant to protect such communications intended to foster criminal, fraudulent, or tortious conduct." *Id.* at 1172. Thus although no crimes were charged in the case, plaintiff did allege business torts in the form of antitrust violations and frauds on the Patent Office.

*Burlington Industries v. Exxon Corp.*, 65 F.R.D. 26 (D.Md.1974). "Only where the confidential communications between attorney and client concern advice in preparation for the commission of a criminal or fraudulent act, or in the actual commission thereof, is the privilege abrogated. 8 Wigmore, *Evidence* § 2298 (McNaughton Rev. 1961)." *Id.* at 40.

*United States v. United Shoe Machinery Corp.*, 89 F.Supp. 357 (D.Mass.1950). In setting forth the requirements for successful assertion of attorney-client privilege, the court stated that the privilege applies only if "(3) the communication relates to a fact of which the attorney was informed . . . (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (a) for the purpose of committing a crime or tort; . . ." *Id.* at 358.

2. *Clark v. United States*, 289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993 (1933). Petitioner appealed her conviction for criminal contempt with intent to obstruct justice by concealment and misstatement during a voir dire examination as a juror. In seeking an analogy to the privilege which protects from exposure the arguments and ballots of a juror, the Court discussed the privilege protecting communications between attorney and client. The privilege, the Court explained, is lost if a client abuses the relation, i. e., consults an attorney for advice that will serve him in the commission of a fraud. He "will have no help from the law. He must let the truth be told. There are early cases apparently to the effect that a mere charge of illegality, not supported by any evidence, will set the confidences free. . . . But this conception of the privilege

is without support in later rulings. 'It is obvious that it would be absurd to say that the privilege could be got rid of merely by making a charge of fraud.' . . . To drive the privilege away, there must be 'something to give colour to the charge;' there must be '*prima facie* evidence that it has some foundation in fact.' . . . when that evidence is supplied, the seal of secrecy is broken. . . . Nor does the loss of the privilege depend upon the showing of a conspiracy, upon proof that client and attorney are involved in equal guilt. The attorney may be innocent and still the guilty client must let the truth come out." *Id.* at 15, 53 S.Ct. at 469–470.

*Natta v. Zletz*, 418 F.2d 633 (7th Cir. 1969). Plaintiff claimed that the attorney-client privilege claims are foreclosed because of "fraud" on the Patent Office. The court, however, held that Natta had not made a showing sufficient to disregard the attorney-client privilege. "In order to defeat the claimed privilege, however, a *prima facie* case of fraud must be shown. . . . If fraud existed, Natta will have an opportunity to demonstrate it in the interference proceeding. Also, at any time the district court shall be satisfied that a *prima facie* case of fraud exists, the production of otherwise privileged documents may be ordered." *Id.* at 636.

*United States v. Bob*, 106 F.2d 37 (2d Cir. 1939). On appeal from a conviction for using and conspiring to use the mails to defraud in the sale of stock in a gold mine, petitioner, Bob, alleged error in the admission of testimony by his attorney, also the attorney for the mining companies. The court held that the evidence was not covered by the attorney-client privilege since the testimony related to conversations and communications with Bob during the commission and in furtherance of the crime charged. Thus, a *prima facie* case of fraud and crime, required before the attorney is released to speak, had been established.

*Duplan Corp. v. Deering Milliken, Inc.*, 397 F.Supp. 1146 (D.S.C.1975). To ensure that the attorney-client privilege did not apply to communications made before or during a fraud, crime, or tort, the court required a *prima facie* showing that the lawyer's advice was for the purpose of furthering his client's wrongful conduct.

## GUIDELINE NO. 14

Materials prepared in anticipation of litigation by the attorney, the client or the agent of either are subject to a qualified privilege.[1]

1. *United States v. Nobles*, 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975). In citing *Hickman* as the Court's initial recognition of

"a qualified privilege for certain materials prepared by an attorney 'acting for his client in anticipation of litigation,' " *Id.* at 237–38, 95 S.Ct. at 2170, the Court extended the protection to include the work product of agents for the attorney. "[T]he doctrine is an intensely practical one, grounded in the realities of litigation in our adversary system. One of those realities is that attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial. It is therefore necessary that the doctrine protect material prepared by agents for the attorney as well as those prepared by the attorney himself." *Id.* at 238–9, 95 S.Ct. at 2170.

*Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). In determining the propriety of any of the discovery devices attempted to obtain statements of witnesses and other information secured by adverse counsel, the court held that it is improper "to inquire into materials collected by an adverse party's counsel in the course of preparation for possible litigation." *Id.* at 505, 67 S.Ct. at 391. "Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. That is the historical and the necessary way in which lawyers act within the framework of our system of jurisprudence to promote justice and to protect their clients' interests. This work is reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways—aptly though roughly termed by the Circuit Court of Appeals in this case as the 'work product of the lawyer.' Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served." *Id.* at 511, 67 S.Ct. at 393–394.

*Spaulding v. Denton*, 68 F.R.D. 342 (D.Del. 1975). In holding that some reports of a marine surveyors firm investigating the sinking of a yacht were work product, the court cited the Rule 26(b)(3) codification of work product immunity, as authority for the application of the doctrine to materials prepared by non-lawyers.

*Burlington Industries v. Exxon Corp.*, 65 F.R.D. 26 (D.Md.1974). Plaintiff, in a patent infringement action, resisted discovery, asserting work product immunity. In setting out the rules under which a Master would

appraise the applicability of plaintiff's claims of privilege, the court stated: "The work product doctrine assures an attorney that his private files shall, in the absence of special circumstances, remain free from intrusions of opposing counsel. Those [are] documents prepared in anticipation of litigation . . ." *Id.* at 33.

*Thomas Organ Co. v. Jadranska Slobodna Plovidba*, 54 F.R.D. 367 (N.D.Ill.1972). In a lawsuit arising from cargo loss, the court granted defendant's motion for production, holding that documents made by marine surveyors hired by the insurer of the damaged goods were not protected by work product immunity since they were not prepared in anticipation of litigation. Documents and investigative reports compiled by a nonattorney for an attorney and/or under his general direction in anticipation of litigation were protected from discovery.

## GUIDELINE NO. 15

In the terms "material prepared in anticipation of litigation or for trial":

(a) "Litigation" includes a proceeding in a court or administrative tribunal in which the parties have the right to cross-examine witnesses or to subject an opposing party's presentation of proof to equivalent disputation.[1]

(b) "In anticipation" means any time after initiation of the proceeding or such earlier time as the party who normally would initiate the proceeding had tentatively formulated a claim, demand, or charge. When the material was prepared by a party who normally would initiate such a proceeding, that person must establish the date when the claim, demand, or charge was tentatively formulated. When the material was prepared by a potential defendant or respondent, that person must establish the date when he received a demand or warning of charges or information from an outside source that a claim, demand, or charge was in prospect.[2]

### Comment on Guideline No. 15

The "work product" qualified privilege originated in *Hickman v. Taylor*, where it was used to protect against discovery of the statement taken by an attorney from an occurrence witness to the very tort transaction in which the attorney was involved as an advocate. Through developing case law and the 1970 revision of F.R.C.P. 26, the privilege was extended to work prepared in anticipation of litigation, as well as with respect to pending litigation, and to the work of non-lawyers as well as lawyers. Subsequent decisions hold and the parties both assert that the privilege applies to past litigation as well. Both parties also assert, correctly in our view, that the privilege applies not only to litigation in courts, but to litigation before administrative tribunals, although they disagree somewhat as to the classes of administrative proceedings that should be included in this category.

The application of the work product privilege apparently will have broad effect in this litigation if it is applied to those categories of proceedings that the parties agree are "litigation." The privilege applies to all matter prepared by anyone, whether or not an attorney, in anticipation of litigation; under the decisions it applies not only to litigation that seems certain to eventuate, but also to that which appears as a distinct possibility; it applies to material prepared in connection with past cases as well as pending and future litigation; and it applies not only to court proceedings but to a broad array of administrative proceedings as well.

The Federal Rules do not define what is meant by "litigation." There appears to be no authority applying the term to administrative proceedings except Professor Dam's holding in *MCI v. AT&T* that it includes administrative adjudication but excludes administrative rule-making. The parties recognize that as applied to administrative proceedings, the term "litigation" has a very broad sweep. The Government asserts that the term includes proceedings in which testimony is taken and cross-examination is allowed. This includes all trial-type proceedings under the Administrative Procedure Act and cognate state statutes in which a trial-type hearing is allowed, all proceedings involving rule-making on a record, and, according to many decisions of the Court of Appeals for the District of Columbia, some "informal" rule-making proceedings to the extent these decisions hold there is a right in such proceedings to present testimony and to cross-examine opposing witnesses. The defendants assert that "litigation" includes any proceeding in which "adjudicative facts" are to be determined, which would include all trial-type hearings and some rule-making procedures; the only administrative proceedings not included in defendants' definition is notice-and-comment rule-making.

The parties' proposals concerning the definition of "litigation" as applied to administrative proceedings are very much the same. In administrative law, proceedings in which testimony is taken and cross-examination is allowed (the Government's proposed definition) largely coincide with those in which "adjudicative facts" are to be found (AT&T's proposed definition). Indeed, it is because specific "adjudicative" facts are to be found in a proceeding that the rights to present testimony and to cross-examine are afforded. We have adopted a modified version of the Government's proposed definition, in which the

right to cross-examine is the determinative factor. There are many proceedings in which there is a right to present testimony where there is not also the right to cross-examine, for example a legislative hearing. However, in all cases we know of in which there is a right to cross-examine, there is also a right to present evidence. Hence our definition is more economical. More fundamentally, cross-examination is the hallmark of adversary procedure, and adversary procedure is what the work product privilege was designed to protect.

Defining "litigation" to include all proceedings in which there is a right of cross-examination contemplates inclusion of all trial-type hearings, proceedings in which a trial-type hearing may be had of right even if no such hearing is actually held, rule-making on the record, and any other proceedings in which by law or established practice the right of cross-examination exists. When there is doubt about the matter, the party claiming privilege for a document must show that the right existed in the proceeding for which the document was prepared.

The parties apparently recognize that both will enjoy the benefit of the work product privilege, although perhaps understandably each contemplates that the privilege has broad application to its own files but narrow application to those of the opposing party. Thus the Government seeks to narrow AT&T's work product privilege by arguing that the privilege does not apply to proceedings in which AT&T participates "in the regular course of its business," while AT&T suggests that the privilege does not apply to "regulatory or investigative activities" unless litigation was specifically in contemplation.

Denial of the privilege to AT&T with regard to proceedings that are the "regular course of its business" would have far-reaching effect. Most of AT&T's business undertakings are the subject of some sort of regulatory proceeding, certainly most of the undertakings relevant to the present action. The Government's definition of AT&T's work product privilege presumably would permit AT&T to claim the privilege only in proceedings that were not regular, i. e., unusual, such as prior antitrust litigation. AT&T's definition of the Government's work product privilege is also restrictive. The Government would have to show that litigation was contemplated when it began an investigation, whereas a Government investigation often if not always includes the question whether litigation would be warranted.

We have rejected both restrictions. There is no authority for the Government's suggestion that the privilege is inapplicable to litigation in which a party participates "in the regular course of its business." For many organizations, litigation is an integral part of their business, for example liability insurance companies, transportation companies, and lending companies. It may be noted that Rule 26(b)(3) expressly confers the work product privilege on "surety, indemnitor, insurer," a category that includes what might be termed litigants by vocation. Similarly

there is no authority for AT&T's suggestion that the Government is required to have some specially distinct anticipation of litigation in order to claim work product privilege for materials it has prepared in an investigation. Of course, a routine Government administrative inquiry, such as that in *Peterson v. United States*, 52 F.R.D. 317 (S.D.Ill.1971), cannot fairly be described as anticipating litigation, but we do not understand the Government to contend that it would.

The fact that each party seeks severe restrictions of the scope of the work product privilege as applied to the other party is, however, significant. It suggests both parties recognize that the work product privilege, as defined under the authorities, may radically restrict discovery in this case. That is, the privilege as so defined applies to all legally significant material prepared by anyone in the staff of either the Government or AT&T, in contemplation of any contested proceeding that is reasonably anticipated, respectively by two huge organizations whose essential activity in substantial part proceeds through the medium of contested proceedings. This problem is brought more sharply into focus if it is remembered that many of the documents assembled by the Justice Department are from the FCC and that many of those assembled by AT&T are counterparts relating to the same FCC proceeding.

We do not now know whether this sweeping withholding will result from applying the work product privilege as we have defined it on the basis of the authorities. The parties have yet to make their claims of privilege. Perhaps relatively few documents will meet the definition, and perhaps the privilege will not be claimed as to all that do meet the definition. But if the parties' apparent fears are realized, the work product privilege will have substantial exclusionary effect. If so, there is the prospect of proceeding without large amounts of evidence to the decision of a case involving the structure of the largest economic enterprise in the United States because of a discovery limitation originated in the loss of a tugboat.

We contemplate that with respect to particular documents, questions may arise of overriding the work product privilege on the ground of "necessity" as provided in Rule 26(b)(3). If so, we will resolve those questions as they arise. However, it is possible that the bulk of the work product material will not be challenged on that ground or, if challenged, will survive in the particular instances. If so, either, or indeed, both, of the parties may assert that, looking at the material as a whole, there is the "necessity" under Rule 26(b)(3) that all or large parts of it be produced. That problem will be addressed at a later point in the litigation.

1. *United States v. Brown*, 478 F.2d 1038 (7th Cir. 1973). Work product was held to be applicable to materials prepared for a proceeding for the enforcement of an Internal Revenue summons, since the proceeding is adversarial in nature.
 *Natta v. Zletz*, 418 F.2d 633 (7th Cir. 1969). Documents prepared in connection with pat-

ent interference proceedings were found to be protected by work product immunity.

*Natta v. Hogan*, 392 F.2d 686 (10th Cir. 1968). The court held the work product doctrine applicable to interference proceedings in the Patent Office. "The rationale for the work product doctrine is the prevention of unnecessary interference with the work of an attorney. An attorney's work in the patent law field should be as much his own as it is in other areas of the law." *Id.* at 693.

*Hercules, Inc. v. Exxon Corp.*, 434 F.Supp. 136 (D.Del.1977). In a patent infringement action the court held that work product is not limited to proceedings in courts of record. The court allowed work product immunity for documents prepared by an attorney in anticipation of a proceeding before the Board of Patent Interferences in a subsequent patent interference hearing. The court found that one document from one patent department attorney to another requesting a law search was protected work product material as it primarily reflected a concern with future litigation. Other documents, however, which were prepared in response to claims raised in an *ex parte* prosecution of a patent application were not. The court explained the distinction. "The prosecution of an application before the Patent Office is not an adversary, but an *ex parte* proceeding. Although the process involves preparation and defense of legal claims in a quasi-adjudicatory forum, the give and take of an adversary proceeding is by and large absent." *Id.* at 152.

*Burlington Industries v. Exxon Corp.*, 65 F.R.D. 26 (D.Md.1974). In setting out the guidelines by which a Master was to appraise claims of privilege, the court found that documents prepared for patent infringement proceedings may be protected by attorney's work product. However, the court explained, work product does not protect documents "relating to research, tests, and experiments which are to be disclosed to the Patent Office at the time of an application for a patent since the documents do not constitute the results of an attorney's efforts to represent his client in a potentially adversary legal proceeding, . ." *Id.* at 42.

2. *Herbert v. Lando*, 73 F.R.D. 387 (S.D.N.Y. 1977). In a defamation action based on alleged malicious publication, plaintiff moved for an order compelling discovery of pre-publication communications between one defendant and his attorney and a post-publication communication listing discrepancies in defendant's article, and defendant's response to that list. The documents were held to be protected by work product immunity even though suit had not yet commenced when they were prepared. Thus the court held that when the defendant received plaintiff's communication of discrepancies, it "clearly gave rise to the 'prospect of litigation,' and it would have been imprudent for Atlantic [defendant] to conclude otherwise." *Id.* at 402.

*In re Grand Jury Investigation*, 412 F.Supp. 943 (E.D.Pa.1976). Documents prepared by a lawyer prior to the serving of a grand jury subpoena on a bank officer were not in anticipation of litigation. The court found the service of the subpoena was the first notice of possible adversarial criminal litigation against attorney's clients.

*Spaulding v. Denton*, 68 F.R.D. 342 (D.Del. 1975). In litigation for damages resulting from the sinking of a yacht, some of the documents which plaintiff sought were held to be discoverable while the court held that others were prepared in "anticipation of litigation" and entitled to work product immunity. The documents involved were reports prepared by a marine surveyors firm hired by the yacht owner's, defendant's, insurer. Documents prepared immediately after the accident to find out everything possible as soon as possible were found not to be prepared "in anticipation of litigation." The court explained that they "were prompted by the unusual (in their experience) circumstances of the *accident*, not of the *claim*." *Id.* at 346. However, a later report prepared after the claim was several months old and each side was represented by attorneys was in anticipation of litigation.

*Rogers v. U. S. Steel Corp.*, 22 F.R.Serv.2d 324 (W.D.Pa.1975). The court held that materials concerning validation of defendant's personnel procedures, which were prepared after the enactment of Title VII of the Civil Rights Act of 1964, were prepared in anticipation of litigation, although not prepared for the instant suit.

*Burlington Industries v. Exxon Corp.*, 65 F.R.D. 26 (D.Md.1974). "In order to satisfy the requirement that documents be prepared in anticipation of litigation, it is not necessary that the documents be prepared after litigation has been commenced." *Id.* at 42.

*SEC v. National Student Marketing Corp.*, 18 F.R.Serv.2d 1302 (D.D.C.1974). In fraud action brought by the SEC, some memoranda prepared during and principal to investigation of defendants were found to be in anticipation of litigation, while others were not. Documents were not in anticipation of litigation if they were prepared prior to the time the investigation ripened into preparation for litigation, "when the agency accumulates and evaluates factual material——. . ." *Id.* at 1310. Documents prepared after a draft memorandum to the Commission recommending institution of the injunctive suit was the point in time when it was clear litigation was anticipated.

*Miles v. Bell Helicopter Co.*, 385 F.Supp. 1029 (N.D.Ga.1974). The court held that accident reports immediately following a helicopter crash were not prepared in anticipation of litigation simply because such crashes rou-

tinely gave rise to litigation. The reports were not prepared "in response to a particular claim advanced by any individual, but merely on the contingency that litigation might well arise from the helicopter crash." *Id.* at 1033.

*Garfinkle v. Arcata National Corp.*, 64 F.R.D. 688 (S.D.N.Y.1974). The court held that although opinion letters regarding the sale of shares without SEC registration might result in liability, the documents were prepared as a routine procedure and were not done with litigation in mind.

*Sylgab Steel & Wire Corp. v. Imoco-Gateway Corp.*, 62 F.R.D. 454 (N.D.Ill.1974). In a patent infringement action, the court held that opinion letters by defendant's attorney regarding the scope of the Patent Act, the validity of plaintiff's patent application, and whether it was infringed, were in anticipation of litigation. Even though they were prepared prior to litigation commencing, the court found that they were prepared "with an eye toward litigation." *Id.* at 457. Thus the court explained, "If the prospect of litigation is identifiable because of specific claims that have already arisen, the fact that, at the time the document is prepared, litigation is still a contingency has not been held to render the [work product] privilege inapplicable." *Id.* at 457.

*Atlanta Coca Cola Bottling Co. v. Transamerica Insurance Co.*, 61 F.R.D. 115 (N.D.Ga. 1972). The court held that an insurer's evaluation of a claim by policy holders was not in "anticipation of litigation" because most claims result in payment and evaluation of claims is the routine principal business of defendant.

*American Optical Corp. v. Medtronic, Inc.*, 56 F.R.D. 426 (D.Mass.1972). The court held that where defendant, patent holder, had charged infringement and proposed that plaintiff, maker of allegedly patented device, take a license under its patent, documents prepared by an attorney commissioned to study the validity of the patent prior to a license agreement being reached were within protection of work product immunity. The documents were concerned with whether or not plaintiff should risk litigation or accept a license.

*Almaguer v. Chicago, Rock Island & Pacific R.R. Co.*, 55 F.R.D. 147 (D.Neb.1972). The court held that statements taken by a claim agent immediately after an accident when a railroad employee had claimed to have been injured were in anticipation of litigation, even though taken prior to the time that suit was filed. The court reasoned that "[t]he anticipation of the filing of a claim against a railroad, when a railroad employee has been injured or claims to have been injured on the job, is undeniable, and the expectation of litigation in such circumstances is a reasonable assumption." *Id.* at 149.

*Banks v. Lockheed Georgia Co.*, 53 F.R.D. 283 (N.D.Ga.1971). Reports by defendant's research team appointed to study employer's equal employment problems were work product since the first suit had been filed against Lockheed before its investigation began.

*Arney v. George A. Hormel & Co.*, 53 F.R.D. 179 (D.Minn.1971). The court held that of the documents plaintiff sought between the company's officers and attorneys interpreting provisions regarding plaintiff's rights to benefits under defendant's pension plan, those which were prepared after plaintiff gave notice to terminate employment were work product.

*Abel Investment Co. v. United States*, 53 F.R.D. 485 (D.Neb.1971). The court held that documents routinely prepared at various levels of the Internal Revenue Service prior to filing any lawsuit, were not prepared in anticipation of litigation. The documents were prepared in each case, they were non-adversary and did not set the Government's theory of the case to be used should litigation ensue.

*Stix Products, Inc. v. United Merchants & Manufacturers, Inc.*, 47 F.R.D. 334 (S.D.N.Y. 1969). The court found that documents prepared by plaintiff's attorney were in "anticipation of litigation" although not prepared in the actual course of litigation. At the time of preparation the court noted that litigation was likely and the preparation of the documents was induced by a threat received by plaintiff. The documents asserted plaintiff's rights of infringement action should defendant's patent be held valid in litigation pending at that time.

## GUIDELINE NO. 16

The trial preparation material privilege applies to matter prepared for litigation other than the instant litigation.[1]

---

1. *United States v. Pfizer, Inc.*, 560 F.2d 326 (8th Cir. 1977). In this case the court gave work product protection to documents prepared in preparation for patent application proceedings and infringement actions, unrelated to the present litigation in fraud and deceit. "If work product is protected in related, but not unrelated future cases, an attorney would be hesitant to assemble extensive work product materials because of the concern that the materials will not be protected in later, unrelated litigation. The unrelatedness of the subsequent litigation provides an insufficient basis for disregarding the privilege articulated in *Hickman* and incorporated in Rule 26(b)(3). The mischief engendered by allowing discovery of work product recognized in *Hickman* would apply with equal vigor to discovery in future unrelated litigation." *Id.* at 335.

*United States v. Leggett & Platt, Inc.*, 542 F.2d 655 (6th Cir. 1976), *cert. denied*, 430 U.S. 945, 97 S.Ct. 1579, 51 L.Ed.2d 792 (1977). In a civil antitrust suit brought to compel defendant to divest itself of certain corporate acquisitions, defendant sought discovery of Government files relating to other investiga-

tions in the industry. The court upheld the Government's claim that work product immunity protects the closed investigatory files of other litigation.

*Duplan Corp. v. Moulinage et Retorderie de Chavanoz*, 487 F.2d 480 (4th Cir. 1973). In a multidistrict patent-antitrust proceeding, the court held that the work product immunity for documents prepared incident to prior terminated litigation was not lost in the present litigation. "On balance, we think the legal profession and the interests of the public are better served by recognizing the qualified immunity of work product materials in a subsequent case as well as that in which they were prepared, . . . ." *Id.* at 484. Moreover, the court refused to allow the work product privilege to rest upon the "technical touchstone", *id.* at 484 n. 15, of relatedness.

*Burlington Industries v. Exxon Corp.*, 65 F.R.D. 26 (D.Md.1974). "The qualified immunity of documents within the work product doctrine does not end when the lawsuit for which the documents were prepared terminates." *Id.* at 43.

## GUIDELINE NO. 17

Materials prepared in anticipation of litigation may be discovered "only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means." Rule 26(b)(3) F.R.Civ.P.[1]

1. *United States v. Pfizer, Inc.*, 560 F.2d 326 (8th Cir. 1977). In litigation brought by the United States against drug producers, the Government sought discovery of documents containing opinion work product relating to an earlier action. The court remanded its Master's recommendations for proceedings consistent with its guidelines. The court looked at the underlying work product doctrine as first espoused in *Hickman*. The basis of the doctrine is that "[s]ome restrictions on access to attorneys' work product are necessary . . . ." *id.* at 333, and that "the person seeking production carries the burden of showing that there are 'adequate reasons,' . . . or some 'necessity or justification' . . . for invading the attorney's privacy." *Id.* at 334. The court noted that although the *Hickman* Court did not specify the quantum of proof necessary to carry that burden, Rule 26(b)(3), which codifies *Hickman* and its progeny did. "[W]ork product is discoverable only upon a showing of substantial need and an inability to secure the substantial equivalent of the items through alternate means without undue hardship." *Id.* at 334.

 *Duplan Corp. v. Moulinage et Retorderie de Chavanoz*, 487 F.2d 480 (4th Cir. 1973). In a multidistrict patent-antitrust proceeding, the

court explained the results of its holding that qualified immunity of work product protected materials in a subsequent case as well as that in which they were prepared. "Our decision will not in any way frustrate the ends of justice. If the party seeking discovery can demonstrate the substantial need and undue hardship specified in the Rule and recognized in *Hickman*, the district court will order production." *Id.* at 485.

*Marshall v. Vermont Food Industries, Inc.*, 23 F.R.Serv.2d 1511 (D.Vt.1977). In an action by the Secretary of Labor under the Fair Labor Standards Act, the court held that the defendant was not entitled to discovery of statements or other materials emanating from sources other than defendant's employees, since they were the work product of plaintiff's counsel and defendant had not made the showing of "substantial need" and relative inaccessibility required to overcome the limited protection afforded by the work product doctrine.

*Boyce v. Visi-Flash Rentals Eastern, Inc.*, 22 F.R.Serv.2d 1445 (D.Mass.1976). In a wrongful death action arising out of an automobile accident, defendant was not entitled to discover statements taken by plaintiff's attorney from eyewitnesses to the accident where it appeared that the information might be available by deposing the witnesses. The statements were held to be the work product of the attorney. "A party seeking documents that allegedly are subject to the work product doctrine has a heavy burden of establishing they are essential for the preparation of its case. . . . 'Work product' is discoverable upon the showing of substantial need by the moving party and an inability to obtain its equivalent by other means. . . . Consequently, work product material will be denied if the party seeking discovery can obtain the desired information by taking the deposition of witnesses." *Id.* at 1446.

*Spaulding v. Denton*, 68 F.R.D. 342 (D.Del. 1975). In litigation stemming from the sinking of a yacht, plaintiff sought discovery of reports of a marine surveyors firm which was hired by the yacht owner's insurer to find out everything possible regarding the accident. The court held that as to the documents which it found to be work product, they are "discoverable only upon a showing of need and hardship pursuant to Rule 26(b)(3)." *Id.* at 346. The court, however, found the plaintiff's showing of need unconvincing.

*SEC v. National Student Marketing Corp.*, 18 F.R.Serv.2d 1302 (D.D.C.1974). Once the threshold requirement has been met, the resisting party demonstrating that the disputed documents were in fact work product, "the movant must then proceed to establish both a 'substantial need' for the material as well as

an inability to secure an equivalent thereof without undue hardship." *Id.* at 1305.

*Burlington Industries v. Exxon Corp.,* 65 F.R.D. 26 (D.Md.1974). In setting out standards by which an appointed Master would appraise the applicability of plaintiff's claims of privilege, the court set out the need-hardship test for discovery of work product. "Even if the documents are prepared in anticipation of litigation, the protection afforded in Rule 26(b)(3) is not absolute. Discovery may still be had upon a showing of 'substantial need' and an inability 'without undue hardship' to obtain the information by other means. The factors to be considered by the master in deciding whether to recommend an order of disclosure are (1) the importance of the information sought and (2) the difficulty the party seeking discovery will face in obtaining substantially equivalent information from other sources if discovery is denied." *Id.* at 43.

*Xerox Corp. v. IBM Corp.,* 64 F.R.D. 367 (S.D. N.Y.1974). In a patent infringement action the court ordered production of documents for *in camera* inspection in accordance with its opinion. In reviewing the report and recommendations of a Special Master with respect to certain discovery disputes the court found that an investigation of employees within IBM by an in-house attorney was work product. However, because Xerox had deposed the employees and was unable to obtain the information sought, it had established sufficient justification for the material requested. "Turning to the facts of the instant case, the court believes that Xerox has clearly made a sufficient showing of substantial need and undue hardship and therefore is entitled to some of the Galbi [attorney's] notes." *Id.* at 382.

*Bird v. Penn Central Co.,* 61 F.R.D. 43 (E.D. Pa.1973). In an action to rescind an insurance policy covering defendants, plaintiff resisted discovery on the grounds of work product immunity. Although the court found that the materials were protected by work product, they were ordered produced because substantial need was shown.

*Arney v. George A. Hormel & Company,* 53 F.R.D. 179 (D.Minn.1971). Plaintiff, seeking judgment that he was entitled to certain benefits under defendant's pension plan, sought letters and documents transmitted between executives of Hormel & Co. and a law firm detailing legal advice regarding the cancellation of plaintiff's policy for violation of a provision prohibiting competitive practices. In finding that the documents were work product, the court indicated that plaintiff's request was "premature." Plaintiff had not attempted to take depositions or obtain the information in another way and had thus not shown a substantial need for the materials. The extra cost and inconvenience did not satisfy the undue hardship required to override the qualified work product immunity.

## GUIDELINE NO. 18

Disclosure will not be required of the mental impressions, conclusions, opinions, or legal theories of the attorney or his agent in the absence of a showing of extreme necessity by the party seeking discovery.[1]

1. *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). In *Hickman* there was an attempt to discover the oral statements made to an attorney by witnesses which at the time of the discovery request were in the form of the attorney's mental impressions or memoranda. The Court was faced with deciding what showing might satisfy "substantial hardship" and justify discovery of written statements of witnesses and a lawyer's memoranda and mental impressions of interviews. As to the first, Justice Murphy suggested that a showing that the witness was no longer available or could only be reached with difficulty might be sufficient to order production. As to the other, he stated, "[i]f there should be a rare situation justifying production of these matters, petitioner's case is not of that type." *Id.* at 513, 67 S.Ct. at 395.

*United States v. Pfizer, Inc.,* 560 F.2d 326 (8th Cir. 1977). Although recognizing that "[a]n attorney's thoughts are inviolate, . . . ." *id.* at 336, the court refused to adopt the rule of absolute immunity because of the rare, extraordinary yet unencountered situations "where weighty considerations of public policy and a proper administration of justice would militate against the non-discovery of an attorney's mental impressions." *Id.* at 336.

*Harper & Row Publishers, Inc. v. Decker,* 423 F.2d 487 (7th Cir. 1970), *aff'd by an equally divided court,* 400 U.S. 348, 91 S.Ct. 479, 27 L.Ed.2d 433 (1971). Under the pre-1970 requirements of good cause, the Seventh Circuit, characterizing the attorney's work product privilege as a qualified privilege, let stand the production of an attorney's memorandum of an interview based on a failure of witnesses' memories because of lapse of time. The court indicated that the less lawyers' mental processes are involved, the less good cause needs to be shown to override work product immunity.

*SEC v. National Student Marketing Corp.,* 18 F.R.Serv.2d 1302 (D.D.C.1974). In setting forth the line of inquiry required of a court called upon to rule on a claim of work product protection for resisting production of documents, the court stated: "Initially, there must be a demonstration by the resisting party that the disputed material has in fact been prepared 'in anticipation of litigation or for trial.' Once this threshold requirement is met

the movant must then proceed to establish both a 'substantial need' for the material as well as an inability to secure an equivalent thereof without undue hardship. Such a special showing is not entirely dispositive for it is further provided that the court is prevented from ordering disclosure of any material prepared in anticipation of litigation which reflects the 'mental impressions, conclusions, opinions, or legal theories of any attorney or other representative of a party . . . ' " *Id.* at 1305. The court noted, however, that disclosure in this case was requested from attorneys as defendants and that it presented the rare exception to the rule—the situation where the activities of counsel are being inquired into because they are at issue in the action before the court. " '[W]hile Rule 26(b)(3) provides that protection against discovery of the attorney's or representative's 'mental impressions, conclusions, opinions or legal theories' *shall* be provided, such protection would not screen information directly at issue . . . ' " *Id.* at 1305.

*Duplan Corp. v. Deering Milliken, Inc.,* 397 F.Supp. 1146 (D.S.C.1975). The court undertook to set up guidelines to be used in ruling upon the applicability of privilege claims to documents withheld during the course of discovery in consolidated patent-antitrust multi-district lawsuits. On a motion for reconsideration, one party requested the court to reconsider certain documents previously held to consist of nothing other than factual work product information. The court stood by its holding, permitting discovery of the factual material, after a showing of substantial need and undue hardship. The court suggested, "[O]bviously mental impressions, 'are [not] necessarily free from discovery in all cases.' . . . There are obviously *degrees* of mental impression. . . . It is illogical to state that all degrees of mental impressions, varying from totally creative thought to recognition of accepted fact, require the identical demonstration of need and hardship . ." *Id.* at 1199.

*Xerox Corp. v. IBM Corp.,* 64 F.R.D. 367 (S.D. N.Y.1974). The court pointed out that in *Hickman* the Supreme Court denied production of the attorney's evaluative work, after finding that " 'we do not believe that any showing of necessity can be made *under the circumstances of this case* so as to justify production,' . . . " *Id.* at 378. Therefore, the court reasoned that the decision means that petitioner had failed to establish sufficient justification for the attorney's mental impressions and materials requested since the relevant information could be obtained by alternative means. Under other circumstances, however, with a greater showing of need, the material would be discoverable. "It is therefore apparent that the basic thrust of *Hickman* and its progeny is that documents containing the work product of attorneys which contain the attorneys' thoughts, impressions, views, strategy, conclusions, and other similar information produced by the attorney in anticipation of litigation are to be protected when feasible, but not at the expense of hiding the non-privileged facts from adversaries or the court." *Id.* at 381.

*Bird v. Penn Central Co.,* 61 F.R.D. 43 (E.D. Pa.1973). In an action to rescind insurance policies covering defendants, the defendants claimed the defense of laches. Although the court found documents sought were evaluative opinions and observations protected by work product immunity, it held that they are discoverable because they are essential to establish and substantiate defendant's claim. "Because the nature of this defense concerns knowledge, legal theories, and conclusions of plaintiffs' attorneys charged with claim investigation, such 'advice of counsel' evidenced in these documents is discoverable . . . exceptions have been made where such information is directly at issue, and the need for its production is compelling, as here." *Id.* at 47.

*Advisory Comm. Notes—Explanatory Statement Concerning Amendments of the Discovery Rules,* 48 F.R.D. 487 (1970). "The subdivision then goes on to protect against disclosure the mental impressions, conclusions, opinions, or legal theories concerning the litigation of an attorney or other representative of a party. The *Hickman* opinion drew special attention to the need for protecting an attorney against discovery of memoranda prepared from recollection of oral interviews. The courts have steadfastly safeguarded against disclosure of lawyers' mental impressions and legal theories, as well as mental impressions and subjective evaluations of investigators and claim-agents." *Id.* at 502.

*Contra Decisions*:

One court has held opinion work product absolutely immune from discovery. *See, Duplan Corp. v. Moulinage et Retorderie de Chavanoz,* 509 F.2d 730 (4th Cir. 1974), *cert. denied,* 420 U.S. 997, 95 S.Ct. 1438, 43 L.Ed.2d 680 (1975). The court reasoned that the tenor of the *Hickman* opinion is the concern with protecting the thought processes of lawyers, and thus the very adversary system. Therefore, to allow an attorney's thoughts, theories, opinions, and impressions to become discoverable would undermine the foundation of the adversary system. Thus, in holding that the immunity which encompasses mental impressions, conclusions, opinions or legal theories is absolute, it reasoned that "[n]o other rule is compatible with the interests of justice. The client seeking the opinion must be similarly uninhibited. So the attorney may not properly perform, and the client may not seek his due, if candid professional opinions prepared for a client in one case may be used against the client in subsequent litigation . . . ." *Id.* at 736. The court stated that a

qualified immunity for opinion work product is "incompatible with *Hickman v. Taylor* and certainly the subsequent Rule 26(b)(3) . . ." *Id.* at 735. Under the terms of the rule, "[t]he first sentence grants a qualified immunity 'to documents and tangible things . . . prepared in anticipation of litigation.' " *Id.* at 734. The second sentence, however, provides " '[i]n ordering discovery of *such materials* . . . the court *shall* protect against the disclosures of mental impressions. . . .' " *Id.* at 734. Thus "the clear command of the second sentence . . . applies to all materials referred to in the first sentence. In our view, no showing of relevance, substantial need or undue hardship should justify compelled disclosure of an attorney's mental impressions, conclusions, opinions or legal theories. This is made clear by the Rule's use of the term 'shall' as opposed to 'may.' " *Id.* at 734.

## GUIDELINE NO. 19

A party does not lose the trial preparation material privilege by disclosing the material in question to a person aligned in interest against a common adversary, for example, co-defendants or two government agencies assisting each other in a criminal or civil action.[1]

### *Comment on Guideline No. 19*

This guideline does not resolve the question of the time and degree of alignment of interest required between parties such that exchange of trial preparation materials between them does not result in waiver of the work product privilege. In particular it leaves open for subsequent briefing, argument, and decision whether waiver results from exchange of materials between private litigants in different litigations, between a private party and the Government, and between Government agencies under various circumstances.

1. *Duplan Corp. v. Deering Milliken, Inc.*, 397 F.Supp. 1146 (D.S.C.1975). In ruling on whether there was a sufficient community of interest between corporations so that there was no waiver of the attorney-client privilege as to joint consultations between personnel of different corporations with the attorney, the court stated that work product may attach to the communications if they were made to the attorney for purposes of gathering evidence during preparation for litigation. "The sharing of information between counsel for parties having common interests does not destroy the work product privilege, during the course of the litigation." *Id.* at 1172 (dicta). *Burlington Industries v. Exxon Corp.*, 65 F.R.D. 26, (D.Md.1974). The court held that the exchange of information between joint licensees which have a mutual interest in a patent interference action does not waive the work product immunity, explaining that it was sufficient that joint licensees share a mutual interest in the success of their program, even without evidence that one licensee had been threatened with litigation. Thus continued communication between their attorneys was needed and work product documents prepared by them did not lose protection because they were exchanged in confidence.

*Stix Products, Inc. v. United Merchants & Manufacturers, Inc.*, 47 F.R.D. 334 (S.D.N.Y. 1969). In patent proceedings, the defendant sought production of opinions concerning patent validity rendered to a third party witness by a law firm which the witness subsequently disclosed to plaintiff's attorney. The court, finding that the opinions were work product material, held that the immunity was not waived by the confidential disclosure of the opinions to the attorneys. The court found that there was sufficient community of interest between the witness and plaintiff since as a customer of plaintiff, the witness had an economic stake in the outcome of the litigation, and he was also threatened with infringement litigation by defendant.

*Stanley Works v. Haeger Potteries, Inc.*, 35 F.R.D. 551 (N.D.Ill.1964). Plaintiff objected to several interrogatories submitted by defendants seeking the identification of all correspondence between plaintiff and its partner in a joint licensing program for the exploitation of the patent in controversy. Although the partner was not a party to the action, the court found that he shared defendant's interest in the outcome of litigation, and in fact was aware of possible litigation involving himself. Thus the court held that the correspondence was part of defendant's preparation for the trial and protected from discovery by work product immunity. "Where attorneys for parties having a mutual interest in litigation exchange their work product, it remains protected by a qualified privilege." *Id.* at 555.

*Transmirra Products Corp. v. Monsanto Chemical Co.*, 26 F.R.D. 572 (S.D.N.Y.1960). In a patent infringement action, plaintiff sought discovery of information regarding the nature of legal aid by the defendant to a third party whom plaintiff had previously charged with infringement of the same patent. The communications between the attorneys for the first defendant and the later defendant were protected from disclosure by the work product doctrine in view of the community of interest in litigation between the two defendants. "One could not deny the advantages of, and even the necessity for, an exchange or pooling of information between attorneys representing parties sharing such a common interest in litigation, actual or prospective." *Id.* at 579.

*Vilastor-Kent Theatre Corp. v. Brandt*, 19 F.R.D. 522 (S.D.N.Y.1956). The court held that the work product doctrine applied to the

exchange of a confidential legal memorandum between attorneys of potential co-parties.

## GUIDELINE NO. 20

Information obtainable by a member of the public under the Freedom of Information Act is not privileged,[1] but material not so obtainable is not necessarily privileged.[2]

1. *Moore-McCormack Lines, Inc. v. ITO Corp.*, 508 F.2d 945 (4th Cir. 1974). In a shipowner's indemnity suit for damages paid a long-shoreman injured while unloading a ship, plaintiff sought discovery of the Department of Labor's accident report to prove that the operator was at fault. The court reversed, holding that a paragraph of the report was not exempt from disclosure under the Freedom of Information Act for law enforcement files, and that F.R.Civ.P. 26(b) does not authorize an agency to withhold any records which the Freedom of Information Act makes available to the public. The Department claimed the "traditional privilege under Rule 26(b) of the Federal Rules of Civil Procedure. We find *no merit in this contention.* A government agency now has no privilege to withhold information from the public if the Freedom of Information Act requires its disclosure. . . It is sufficient for us to hold that Rule 26(b) does not authorize an agency to withhold any records which the Act commands it to disclose." *Id.* at 949–50.

2. *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975). The Court distinguished between the standard for disclosure under the discovery provisions of the Civil Procedure Rules and the standard for disclosure under the Freedom of Information Act. "The ability of a private litigant to *override a privilege claim set up by the* Government, with respect to an otherwise disclosable document, may itself turn on the extent of the litigant's need in the context of the facts of his particular case; or on the nature of the case. . . . However, it is not sensible to construe the Act to require disclosure of any document which would be disclosed in the hypothetical litigation in which the private party's claim is the most compelling." *Id.* at 149 n. 16, 95 S.Ct. at 1516 n. 16.

*Kerr v. United States District Court for Northern District of California*, 511 F.2d 192 (9th Cir.), aff.d 426 U.S. 394, 96 S.Ct. 2119, 48 L.Ed.2d 725 (1976). In a civil rights action by California prisoners against the California Adult Authority, defendants resisted discovery on the bases of the Freedom of Information Act exemption for personnel, medical and investigatory files. The court held that the Freedom of Information Act claim was improper, since it does not apply to California state agencies. And even if the claim was proper, the fact that the materials fall within the FOIA exemptions does not make them privileged from discovery. "[T]he exceptions to the disclosure in the Act were not intended to create evidentiary privileges for civil discovery. . . . They were intended only to permit withholding of certain types of information from the public generally." *Id.* at 197–8.

*Pierson v. United States*, 428 F.Supp. 384 (D.Del.1977). In a taxpayer refund suit based on the contention that the Commissioner of Internal Revenue's revocation of a previously issued private letter ruling was incorrect under the law, the court held that "[t]he argument apparently is that if the document would qualify for exemption under the Act, then it must be privileged. Put another way, once the defendant shows that the document is exempt under the Act, [then] it has claimed executive privilege. This argument stands the law on its head." *Id.* at 394.

*Firestone Tire & Rubber Co. v. Coleman*, 432 F.Supp. 1359 (N.D.Ohio 1976). The court consolidated a Freedom of Information Act procedure for disclosure of information regarding the promulgation and enforcement of a Federal Motor Vehicle Safety Standard by a tire manufacturer whose tire line was found to be in non-compliance with the standard, and a pre-enforcement suit brought alleging that the standard does not accurately measure road performance, in which plaintiff moved for production of documents. The court held that some documents which were found to be exempt from disclosure under the Freedom of Information Act would be discoverable under the Federal Rules of Civil Procedure 34 if plaintiff could establish a particularized need. Plaintiff, however, failed to establish such a need. "The second document which the plaintiff seeks to discover under Rule 34 appears in the *in camera* inspection material at Tab 6(c). The Court has already held that this document is protected for disclosure under the FOIA by the attorney-client and intra-agency consultative privileges delineated in 5 U.S.C. § 552(b)(5). . . However, the disclosure requirements of the discovery rules are more rigorous than the disclosure requirements of Exemption 5 of the FOIA." *Id.* at 1371.

*Pleasant Hill Bank v. United States*, 58 F.R.D. 97 (W.D.Mo.1973). In an action for conversion of certain fixtures and equipment used in the operation of a nursing home, defendant refused to produce documents relying on *Freedom of Information Act exemptions.* The court held that documents exempt from disclosure under the Freedom of Information Act may be discoverable in litigation, and since defendant did not attempt to show privilege other than reliance on FOIA exemptions, he had failed to establish privilege from evidentiary disclosure under F.R.Civ.P. 34(b).

"For evidentiary purposes, then, Government information that is exempt under the Freedom of Information Act is not privileged without an additional showing that disclosure would be contrary to the public interest. Such a showing is also the source and standing for any governmental privilege cognizable under Rule 26(b)(1). . . . The only permissible conclusion is that disclosure exemptions of the Act were not intended to and do not create or show by their own force a privilege within the meaning of Rule 26(b)(1) disqualifying a Government document from discovery." *Id.* at 100–101.

*Verrazzano Trading Corp. v. United States,* 349 F.Supp. 1401 (Cust.Ct.1972). Defendant opposed a motion for discovery relying on exemptions of the Freedom of Information Act. The court held that the applicability of the Freedom of Information exemption for inter-agency or intra-agency memoranda or letters would not insulate them from discovery in connection with a pending action involving classification of certain imported fabrics, and granted production. "The difficulty is that the Freedom of Information Act was enacted to provide the public with the right to obtain information from administrative agencies and agencies in the executive branch of the government; it was not enacted to provide discovery procedures for obtaining information during litigation. Put otherwise, the fact that § 552(b) of the Information Act provides specified exemptions from the Act's public information requirement does not in and of itself create a judicial discovery privilege with respect to such exemptions." *Id.* at 1403.

*McCormick on Evidence* § 108 at 233 (Cleary ed. 1972). "Any person is eligible to proceed under the [Freedom of Information] Act; no standing or showing of need for the desired information is exacted. As a result, the justifications for shutting off information under the Act are in some instances of lesser dimension than would warrant withholding information from a litigant with a genuine need for it in the litigation. Accordingly, the Act, in excepting certain matters from its disclosure provisions, does not purport to make them privileged in an evidentiary sense, although it does represent a significant Congressional expression of what areas are sensitive and does overlap evidentiary privilege in several instances."

## GUIDELINE NO. 21

There is a qualified privilege for intra-agency and inter-agency memoranda containing advice, opinions, and recommendations given in the course of deliberations concerning government legal and policy decisions by persons with responsibility for participating in such deliberations.[1]

(a) The privilege applies to the advice, opinions, and recommendations, but not to the facts to which they relate.[2] The privilege applies to advice, opinions, and recommendations given by outside consultants as well as to that given by government employees;[3] the fact that the advice, opinions, and recommendations come from a person of subordinate rank or position does not diminish its eligibility for the privilege.[4]

(b) The privilege does not apply to the final decision, the reasons stated for that decision, or the deliberative documents that were incorporated in the final decisions by reference.[5]

1. *EPA v. Mink,* 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973). In a Freedom of Information Act suit to compel disclosure of nine documents prepared by various officials for the President concerning a scheduled underground nuclear test, the Government claimed the exemption for inter-agency or intra-agency documents used in the Executive Branch decision-making. The Court first related the Freedom of Information Act exemption to executive privilege in discovery: "This language clearly contemplates that the public is entitled to all such memoranda or letters that a private party could discover in litigation with the agency." *Id.* at 86, 93 S.Ct. at 835. The Court then explained the privilege. "In each case, the question was whether production of the contested document would be 'injurious to the consultative functions of the government that the privilege of nondisclosure protects.'" *Id.* at 87, 93 S.Ct. at 836.

*Mead Data Central, Inc. v. United States Department of the Air Force,* 184 U.S.App.D.C. 350, 566 F.2d 242 (D.C.Cir. 1977). In a Freedom of Information Act action to compel the Air Force to disclose documents relating to a licensing agreement between the Air Force and West Publishing Co. for a computerized legal research system, the court held that the trial court's interpretation of the FOIA Exemption 5 was impermissibly broad and remanded for further proceedings under the interpretations set out in the opinion. "It generally has been accepted that exemption five incorporates the governmental privilege, developed in discovery cases, to protect documents containing advisory opinions and recommendations or reflecting deliberations comprising the process by which government policy is formulated." *Id.* 184 U.S.App.D.C. at 364, 566 F.2d at 256.

*Smith v. FTC,* 403 F.Supp. 1000 (D.Del.1975). In a preenforcement review of an FTC requirement for filing certain annual reports,

the court held that the FTC did not adequately raise executive privilege against disclosure of intra-agency advisory opinions, records and deliberations with respect to documents which plaintiffs sought to discover. The court explained the policy rationale for the privilege. "The purpose behind the executive privilege against disclosure of intra-agency advisory communications is the encouragement of frank discussions within the government as regards formulation of policy. . . This is because 'human [sic] experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances . . . to the detriment of the decision-making process.'" *Id.* at 1015.

*Carl Zeiss Stiftung v. V. E. B. Carl Zeiss, Jena,* 40 F.R.D. 318 (D.D.C.1966), *aff'd mem. sub nom. Carl Zeiss, Jena v. Clark,* 128 U.S. App.D.C. 10, 384 F.2d 979, *cert. denied,* 389 U.S. 952, 88 S.Ct. 334, 19 L.Ed.2d 361 (1967). The government motioned for additional modification of a subpoena commanding production of documents from Justice Department files, in an action to settle trademark disputes to which the government is not a party. The government withheld 49 of over 4500 documents on a claim of executive privilege that the documents consist of intra-departmental memoranda and inter-departmental communications concerning opinions, records and deliberations pertaining to Department decisions. "It is evident that the Department, to function adequately must depend heavily upon candid exchange of ideas, not only among its own staff but also, particularly because of the institutional nature of its decisions, with other agencies whose interests are involved." *Id.* at 325.

*Kaiser Aluminum & Chemical Corp. v. United States,* 157 F.Supp. 939, 141 Ct.Cl. 38 (1958). The plaintiff, in a suit for contract damages, was denied the production of an intra-agency document relating to sales to plaintiff and to another concern. The Court of Claims held that Kaiser did not demonstrate a need for the documents sufficient to override the Government's claim of privilege for intra-agency advice in policy. Commenting on the purpose and scope of the privilege, the court stated: "There is a public policy involved in this claim of privilege for this advisory opinion— the policy of open, frank discussion between subordinate and chief concerning administrative action." *Id.* 157 F.Supp. at 946. "Free and open comments on the advantages and disadvantages of a proposed course of governmental management would be adversely affected if the civil servant or executive assistant were compelled by publicity to bear the blame for errors or bad judgment properly chargeable to the responsible individual with power to decide and act." *Id.* 157 F.Supp. at 945–6.

2. *EPA v. Mink,* 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973). In a Freedom of Information Act action to compel disclosure of documents prepared by various officials for the President concerning a scheduled underground nuclear test, the Government claimed the exemption for inter- or intra-agency deliberative documents. The Court, however, held that "memoranda consisting only of compiled factual material or purely factual material contained in deliberative memoranda and severable from its context would generally be available for discovery by private parties in litigation with the Government." *Id.* at 87–8, 93 S.Ct. at 836.

*Mead Data Central, Inc. v. United States Department of the Air Force,* 184 U.S.App.D.C. 350, 566 F.2d 242 (D.C.Cir. 1977). Plaintiff's arguments that some documents were factual rather than deliberative in nature had been rejected by the trial court. The court set out the limitations of the deliberative process exemption and held that to the extent that these documents reflect Air Force staff views and opinions, as opposed to facts regarding negotiations, they were exempt from disclosure. "[T]he courts have required disclosure of essentially factual material but allowed agencies to withhold documents which reveal their deliberative or policy-making processes. The Supreme Court approved this approach in *EPA v. Mink* and found it consistent with the discussion of a 'factual—deliberative' distinction . . ." *Id.* 184 U.S.App.D.C. at 364, 566 F.2d at 256. Thus, the court explained, "factual material must be disclosed but advisory material, containing opinions and recommendations, may be withheld." *Id.* 184 U.S. App.D.C. at 364, 566 F.2d at 256.

*Bristol-Myers Co. v. FTC,* 138 U.S.App.D.C. 22, 424 F.2d 935 (D.C.Cir.), *cert. denied,* 400 U.S. 824, 91 S.Ct. 46, 27 L.Ed.2d 52 (1970). In a Freedom of Information Act suit, Bristol-Myers sought an order compelling the FTC to produce certain documents relevant to a rulemaking procedure initiated by the Commission based on certain materials not explained, described, or made available to the public. The Commission claimed the documents were exempt from disclosure, within the Act's exemption for inter- and intra-agency deliberative material. On remand, the lower court was ordered to analyze the documents carefully since "[p]urely factual reports and scientific studies cannot be cloaked in secrecy by an exemption designed to protect only 'those internal working papers in which opinions are expressed and policies formulated and recommended.'" *Id.* 138 U.S.App.D.C. at 26, 424 F.2d at 939.

*Smith v. FTC,* 403 F.Supp. 1000 (D.Del.1975). In a pre-enforcement review of an FTC requirement for filing certain annual reports, the court held that the FTC did not adequately raise executive privilege against disclosure of intra-agency advisory opinions, records and deliberations with respect to documents

which plaintiffs sought to discover. In discussing the privilege, the court stated: "This privilege is not absolute, . . . but instead is subject to at least two significant qualifications. First, the privilege does not attach to purely factual communications within or between agencies, the disclosure of which would not compromise military or state secrets. . . . Moreover, factual material contained in deliberative memoranda has generally been held discoverable if susceptible to severance from its context." *Id.* at 1015.

3. *Wu v. National Endowment for the Humanities,* 460 F.2d 1030 (5th Cir. 1972), *cert. denied,* 410 U.S. 926, 93 S.Ct. 1352, 35 L.Ed.2d 586 (1973). Memoranda prepared by Endowment's consultants which recommend against Endowment's funding plaintiff's writing of China's history were held to be within the Freedom of Information Act exemption relating to intra-agency memoranda, even though the five experts consulted were not actually agency employees.

*Soucie v. David,* 145 U.S.App.D.C. 144, 448 F.2d 1067 (D.C.Cir. 1971). In a Freedom of Information Act suit by citizens against the Director of the Office of Science and Technology, a report evaluating the Government's program for development of a supersonic transport aircraft prepared by the agency's outside consultants was held to be within the Freedom of Information Act exemption for inter-agency or intra-agency memoranda or letters. "The rationale of the exemption for internal communications indicates that the exemption should be available in connection with the Garwin Report even if it was prepared for an agency by outside experts. The Government may have a special need for the opinions and recommendations of temporary consultants, and those individuals should be able to give their judgments freely without fear of publicity. A document like the Garwin Report should therefore be treated as an intra-agency memorandum of the agency which solicited it." *Id.* 145 U.S.App.D.C. at 155 n. 44, 448 F.2d at 1078 n. 44.

4. *Kaiser Aluminum & Chemical Corp. v. United States,* 157 F.Supp. 939, 141 Ct.Cl. (1958). The plaintiff, in a suit for contract damages, was denied the production of an intra-agency document relating to sales to plaintiff and to another concern. The Court of Claims held that Kaiser did not demonstrate a need for the documents sufficient to override the Government's claim of privilege for intra-agency advice on policy. In its discussion of the privilege, the court stated that the privilege applies to deliberative documents regardless of the rank of person from whom it comes. "There is a public policy involved in this claim of privilege for this advisory opinion—the policy of open, frank discussion between subordinate and chief concerning administrative action." *Id.* 157 F.Supp. at 946.

5. *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975). In a Freedom of Information Act case, Sears sought "Advice" and "Appeals" memoranda and related documents generated by the Office of the General Counsel in the course of deciding whether or not to permit the filing with the Board of unfair labor practice complaints. The court stated that Exemption 5 withholds from a member of the public documents which a private party could not discover in litigation with the agency, thus construing Exemption 5 to exempt those documents "normally privileged in the civil discovery context." *Id.* at 149, 95 S.Ct. at 1515–1516. In considering the process by which the National Labor Relations Board determines whether to file complaints in cases which come to the Board's attention, the Court noted that in making decisions, a particular form of memorandum is prepared by the Board's General Counsel, which discusses whether a complaint should be filed. If the General Counsel concludes that a complaint should not be filed, his decision is final, but not otherwise. Consequently, the Court concluded that disclosure was required of memoranda reflecting decisions by the General Counsel not to proceed, but not of memoranda in similar form reflecting his recommendations that complaints be filed. "Manifestly, the ultimate purpose of this long recognized privilege is to prevent injury to the quality of agency decisions. The quality of a particular agency decision will clearly be affected by the communication received by the decisionmaker on the subject of the decision prior to the time the decision is made. However, it is difficult to see how the quality of a decision will be affected by communications with respect to the decision occurring after the decision is finally reached; and therefore equally difficult to see how the quality of the decision will be affected by forced disclosure of such communications, as long as prior communications and the ingredients of the decision-making process are not disclosed. Accordingly, the lower courts have uniformly drawn a distinction between predecisional communications, which are privileged, . . . and communications made after the decision and designed to explain it, which are not." *Id.* at 151–2, 95 S.Ct. at 1516–1517.

*Niemeier v. Watergate Special Prosecution Force,* 565 F.2d 967 (7th Cir. 1977). In a Freedom of Information Act suit a memorandum which was found to be within the predecisional intra-agency Exemption 5 of the Act was subject to disclosure where found to be a final opinion. The document involved was a letter to the Special Watergate Prosecutor from his client and was the basis for his decision not to seek indictment of President Nixon following his pardon. "[D]efendant's contention that disclosure will reveal the underlying decision-making processes of the

agency, with consequential inhibiting effects, must fail when a memorandum is adopted by an agency as part of its final disposition." *Id.* at 974.

*Merrill v. Federal Open Market Committee of the Federal Reserve System,* 184 U.S.App. D.C. 203, 565 F.2d 778 (D.C.Cir. 1970), *cert. granted,* 436 U.S. 917, 98 S.Ct. 2260, 56 L.Ed.2d 757 (1978). Suit was instituted to challenge a regulation under which the Federal Open Market Committee delayed disclosure of certain of its records. The court held that domestic policy directives and supplementary statements of objectives for rates of growth expressed in terms of tolerance ranges were not encompassed by the government's deliberative process privilege. The documents were found not to be predecisional, deliberative communications exempt from disclosure in the Freedom of Information Act, but the embodiment of effective policy decisions. The court first explained the relationship between the exemption and discovery privilege: "This exemption incorporates the familiar 'executive' privilege attaching to predecisional communications which reflect the policymakers' deliberative processes." *Id.* 184 U.S.App. D.C. at 208, 565 F.2d at 783. The court then went on and held that "[t]his privilege is based on the view that the quality of a decision would be adversely affected if deliberative processes were exposed to public view: such exposure would inhibit discussions by policymakers and their advisors. . . . Moreover, no harm to the consultative functions of FOMC results from disclosing the policy actually adopted by it before the policy is executed." *Id.* 184 U.S.App.D.C. at 208, 565 F.2d at 783.

*Gruman Aircraft Engineering Corp. v. Renegotiation Board,* 157 U.S.App.D.C. 121, 482 F.2d 710 (D.C.Cir. 1973). In a Freedom of Information Act action, the court held that reports sought which explain a decision of the Board and its decisionmaking delegates as to whether certain companies accrued excess profits in their business with the government must be disclosed. The court explained that insofar as the reports function as justification for recommendations to the National Board, they were similar to a document of the decisionmaker in adjudication and thus a final decision which is not within the scope of Exemption 5 as it would not be in the evidentiary privilege for intra- and inter-agency deliberative memoranda. "[A] document which a decision-maker treats as justification for a decision communicated outside the bureaucracy to regulated parties should not be shielded from public disclosure on the ground that it was originally prepared for purposes of pre-decisional consultation, because the agency has customarily not disclosed the document, or because the agency labels the document other than what it really is." *Id.* 157 U.S.App.D.C. at 131–32, 482 F.2d at 720–21.

## GUIDELINE NO. 22

There is a qualified privilege against disclosing material in the file of a government law enforcement investigation, civil or criminal, if:

(a) The investigation is pending or, although presently closed, has a substantial possibility of being reactivated,[1] and revelation of the material may prejudice the success of the investigation or a proceeding to which the investigation is directed;[2] or

(b) The investigation is closed and the disclosure of the information will seriously impair the ability of investigatory bodies to conduct future investigations.[3]

1. *NLRB v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 98 S.Ct. 2311, 57 L.Ed.2d 159 (1978). The Court held the Freedom of Information Act exemption for law enforcement investigatory files protected from disclosure witness statements collected in an NLRB investigation, at least until completion of the Board's hearing.

*Bristol-Myers Co. v. FTC,* 138 U.S.App.D.C. 22, 424 F.2d 935 (D.C.Cir.), *cert. denied,* 400 U.S. 824, 91 S.Ct. 46, 27 L.Ed.2d 52 (1970). In a Freedom of Information Act suit to compel reports relied upon by FTC in its rulemaking, the Commission claimed an exemption from disclosure for investigatory files compiled for law enforcement purposes indicating that two years prior to the rulemaking action the Commission intended to proceed against Bristol-Myers and others on the basis of misleading advertising practices. The complaint, however, had been withdrawn. The court ordered that the lower court, on remand, "must determine whether the prospect of enforcement proceedings is concrete enough to bring into operation the exemption for investigatory files, . . ." *Id.* 138 U.S.App.D.C. at 26, 424 F.2d at 939. Thus the court explained that the exemption is similar in scope to the common law privilege which protects investigatory files, as it "prevents a litigant from using the statute to achieve indirectly 'any earlier or greater access to investigatory files than he would have directly.'" *Id.* 138 U.S.App.D.C. at 26, 424 F.2d at 939.

*Brown v. Thompson,* 430 F.2d 1214 (5th Cir. 1970). On appeal from a dismissal of a wrongful death action, the court held that the trial court did not abuse its discretion in refusing to require protection of files of police and highway patrol on plaintiff's decedent on

the grounds that they were privileged homicide investigation files on an ongoing investigation.

*Jabara v. Kelley*, 75 F.R.D. 475 (E.D.Mich. 1977). In an action by an attorney against federal government officials for wiretap damages, the court held that defendant's resistance of discovery based on executive privilege for an ongoing criminal investigation was not substantiated by factual information. The Government did not establish whether plaintiff was actually involved in an ongoing law enforcement investigation. The criminal investigation allegedly began four years prior to bringing this suit, and the court stated "that claims of privilege based upon ongoing criminal investigations do not apply indefinitely. After the expiration of a reasonable period of time, the privilege is lost." *Id.* at 494.

*Kinoy v. Mitchell*, 67 F.R.D. 1 (S.D.N.Y.1975). Attorney and client brought suit against government officials and the Government for illegal electronic surveillance of telephone conversations to which they were parties. The court held that the affidavit of the Attorney General claiming privilege for materials connected to ongoing domestic intelligence investigations was defective. The court discussed privilege for "police files compiled in connection with an ongoing criminal investigation. This type of information is protected by a qualified, not an absolute privilege, so that a claim of privilege made by the Government may be overcome by a litigant's showing of need for the material great enough to outweigh the policies favoring nondisclosure." *Id.* at 11.

*Frankenhauser v. Rizzo*, 59 F.R.D. 339 (E.D. Pa.1973). In a civil rights action against police and superiors to recover for the death of plaintiffs' husband and father who was shot and killed by police, plaintiffs sought discovery of police investigatory reports relating to the killing and the events leading up to it. The court cited *Brown v. Thompson*, 430 F.2d 1214 (5th Cir. 1970) and explained that despite the ongoing nature of the investigation, denial of discovery is not automatic. Each case must be determined upon the specific circumstances before it. The court must balance the need of the litigant for the material against the policies for maintaining secrecy. *Capitol Vending Co. v. Baker*, 35 F.R.D. 510 (D.D.C.1964). In an action for wrongful diversion of business and contracts wherein plaintiff sought discovery of documents from the Attorney General of the United States relating to the activities of one of the defendants, the documents were denied in view of their relation to the Government's continuing investigation of defendant's possible criminal violations. The court explained "that the Department of Justice may not retain documents indefinitely and keep them from disclosure on a statement that the investigation is still continuing. There must be a reasonable terminus." *Id.* at 511.

2. *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 98 S.Ct. 2311, 57 L.Ed.2d 159 (1978). The Court held the Freedom of Information Act exemption for law enforcement investigatory files protected from disclosure witness statements collected in an NLRB investigation, at least until completion of the Board's hearing. The Court found that disclosure of NLRB witness statements during the pendency of Board proceedings would harm the Government's case both by "giving a party litigant easier and greater access to the Board's case than he would otherwise have," *id.* 98 S.Ct. at 2328, and by making it possible for employers or unions to "coerce or intimidate employees and others who have given statements, in an effort to make them change their testimony or not to testify at all." *Id.* at 2325.

*Moore-McCormack Lines, Inc. v. ITO Corp.*, 508 F.2d 945 (4th Cir. 1974). Plaintiff appeals from a dismissal of its third party claim against the ITO Corporation, a stevedoring company. Plaintiff sought indemnity for damages paid a longshoreman injured on one of plaintiff's ships. The case was vacated and remanded because of the lower court's error in exempting as an investigatory file under the Freedom of Information Act a critical paragraph in the Labor Department's accident report. The court explained that the purpose of the exemption, "1) to prevent the premature disclosure of the results of an investigation so that the government can present its strongest case in court, . . ." *id.* at 949, was not offended by disclosure.

*Jabara v. Kelley*, 75 F.R.D. 475 (E.D.Mich. 1977). In an action by an attorney against officials of the federal government for wiretap damages, plaintiff's motion to compel answers to interrogatories was denied on claims of executive privilege made by defendants. However, insofar as defendant's claim of privilege was based upon an ongoing criminal investigation, the court held it was not sufficiently established and ordered the lower court upon remand to determine whether the privilege is lost due to the expiration of a reasonable passage of time. "In ruling on prior discovery motions in this case, the Court has indicated that it would not order the disclosure of information that would have the effect of compromising ongoing federal criminal investigations or jeopardize current investigatory techniques." *Id.* at 494.

*Marathon LeTourneau Co., Marine Division v. NLRB*, 414 F.Supp. 1074 (S.D.Miss.1976). In a Freedom of Information Act action to compel the National Labor Relations Board to disclose certain information and to enjoin the Board from conducting certain hearings until disclosure was made, the court held that affidavits and statements relating to the events

that led to filing the pending charges were exempt as law enforcement investigatory records to the extent they would interfere with a concrete law enforcement proceeding. A law enforcement agency, then, is permitted "to withhold from disclosure information which would harm its case in court by allowing an opposing litigant earlier or greater access to investigative files than he would otherwise have, but only where there exists a concrete *prospective law enforcement proceeding.*" *Id.* at 1083.

*Capitol Vending Co. v. Baker,* 35 F.R.D. 510 (D.D.C.1964). In an action for wrongful diversion of business and contracts wherein plaintiff sought discovery of documents from the Attorney General of the United States relating to the activities of one of the defendants, the documents were denied in view of their relation to the Government's continuing investigation of defendant's possible criminal violations. The court accepted the agency head's statement that " '[p]remature exposure of what might be used as evidence in any subsequent criminal prosecution to public scrutiny as well as to the attention of prospective defendants could only result in seriously prejudicing such a proceeding before it is commenced.' " *Id.* at 510.

3. *Black v. Sheraton Corp. of America,* 184 U.S. App.D.C. 46, 564 F.2d 531 (D.C.Cir. 1977). The court rejected plaintiff's contention that the public interest in protecting disclosure of law enforcement files are irrelevant here because investigation has been concluded. This case "concerns a claim of privilege based primarily on the harm to law enforcement efforts which might arise from public disclosure of F.B.I. investigatory files." *Id.* 184 U.S.App. D.C. at 56, 564 F.2d at 541. "The argument here—that law enforcement operations cannot be effective if conducted in full public view—is analogous to that made on behalf of intra-agency deliberations." *Id.* 184 U.S.App. D.C. at 47, 564 F.2d at 542. "We begin with the proposition that there is indeed a public interest in minimizing disclosure of documents that would tend to reveal law enforcement investigative techniques or sources. . . . Congress recognized the necessity for such a privilege in the Freedom of Information Act, which contains an exemption for certain types of investigatory records compiled for law enforcement purposes. . . . We reject plaintiff's contention that the public interest in disclosure can be disregarded simply because the principal investigation involved here has apparently been concluded." *Id.* 184 U.S.App.D.C. at 50–51, 564 F.2d at 545–46.

*Rural Housing Alliance v. United States Department of Agriculture,* 162 U.S.App.D.C. 122, 498 F.2d 73 (D.C.Cir. 1974). In a Freedom of Information Act action by private organization to obtain disclosure of a report of the Department of Agriculture investigation of governmental housing discrimination, the court reversed and remanded for determination of factual issues; to determine if the investigation was an inquiry into possible violation of the law and thus "for law enforcement purposes" within the Act. The court said the purpose of the exemption is "the maintenance of confidentiality of both the procedures of investigation and witnesses' revelations." *Id.* 162 U.S.App.D.C. at 129, 498 F.2d at 80. Thus when these procedures may be impaired, "the Government need not show 'imminent adjudicatory proceedings or the concrete prospect of enforcement proceedings.' " *Id.* 162 U.S.App.D.C. 129, 498 F.2d at 80.

*Weisberg v. United States Department of Justice,* 160 U.S.App.D.C. 71, 489 F.2d 1195 (D.C. Cir.), *cert. denied,* 416 U.S. 993, 94 S.Ct. 2405, 40 L.Ed.2d 772 (1973). In a Freedom of Information Act action plaintiff sought to compel disclosure of materials compiled by the F.B.I. after the assassination of President Kennedy. The materials were held to be part of the FBI investigatory files and exempt from disclosure even though there was no indication that *the Government contemplated the use of the* information for law enforcement purposes.

*Jabara v. Kelley,* 75 F.R.D. 475 (E.D.Mich. 1977). In an action by an attorney against officials of the Federal Government for wiretap damages, plaintiff's motion to compel answers to interrogatories was denied on claims of executive privilege made by defendants. However, insofar as defendant's claim of privilege was based upon an ongoing criminal investigation, the court held it was not sufficiently established and ordered the lower court upon remand to determine whether the privilege is lost due to the expiration of a reasonable passage of time. "In ruling on prior discovery motions in this case, the Court has indicated that it would not order the disclosure of information that would have the effect of compromising ongoing federal criminal investigations or jeopardize current investigatory techniques." *Id.* at 494.

*Contra Decisions:*

*Moore-McCormack Lines, Inc. v. ITO Corp.,* 508 F.2d 945 (4th Cir. 1974). Plaintiff appeals from a dismissal of its third party claim against ITO Corporation, a stevedoring company. Plaintiff sought indemnity for damages paid a longshoreman injured on one of plaintiff's ships. The case was vacated and remanded because of the lower court's error in exempting as an investigatory file under the Freedom of Information Act a critical paragraph in the Labor Department's accident report. Holding first that the exemption does apply to all law enforcement proceedings, not just violations of the criminal statutes, the court held that only when disclosure prejudices an ongoing investigation is the exemption appropriate. "Because no enforcement

proceeding is pending or contemplated, disclosure will not prejudice the government." *Id.* at 949.

*Associated Dry Goods Corp. v. NLRB,* 455 F.Supp. 802 (S.D.N.Y.1978). In a Freedom of Information Act action plaintiff sought to compel the National Labor Relations Board to make available the contents of a closed unfair labor practice case. Defendant resisted, claiming exemptions under the Act, including the exemption for investigatory files which would interfere with enforcement proceedings. The court rejected the Board's argument that disclosure would interfere with future enforcement proceedings by deterring individuals with relevant information from cooperating in Board investigations. It held that the protection for investigatory files did not apply a blanket protection for all future proceedings but only prevented disclosure when a "specific, concrete proceeding" *id.* at 813, would be affected. This need not be the single proceeding for which the investigation was conducted, but also prevents disclosure if it would have a serious effect on corollary proceedings which could be specifically identified. The court explained the purpose of the exemption is the prevention of harm to the Government's case in court. Thus the purpose is "promoted 'by deferring disclosure until after the Government has "presented its case in court." ' " *Id.* at 813.

*Boyd v. Gullett,* 64 F.R.D. 169 (D.Md.1974). In a Civil Rights action alleging claimed systematic police brutality aimed at Blacks in the county, plaintiffs sought discovery of police files, which defendant police claimed were entitled to executive privilege. "Under federal law there is no privilege for police investigative files other than to files relating to ongoing investigations." *Id.* at 178. Agreeing with *Brown v. Thompson,* 430 F.2d 1214 (5th Cir. 1970), the court explained that case was concerned only with discovery of the files of an ongoing police homicide investigation and added that "[m]aterials relating to ongoing investigations are indeed privileged although they cease to be privileged once the investigation ceases. . . . Thus investigatory, files relating to investigations currently in progress may properly be withheld." 64 F.R.D. at 178.

## GUIDELINE NO. 23

There is a qualified privilege against disclosing the identity of a person ("informer") who has provided the Government with information or assistance concerning conduct on the part of others that might be found unlawful, if such information or assistance is generally given with the expectation that it be confidential because of a fear of retaliation if identities are revealed.[1]

(a) The privilege applies even after the informer gives evidence, but is lost if the informer's identity is revealed or is soon to be revealed.[2]

(b) The privilege does not apply to the information that the informer provided the Government except to the extent necessary to prevent revelation of the informer's identity.[3]

### Comment on Guideline No. 23

In the cases where the informer privilege has been recognized, the information provided to the Government has involved violations of the law. The two cases which we found where the privilege was denied because the information disclosed did not relate to illegal activities were both from the Northern District of Illinois. *Alliance to End Repression v. Rochford,* 75 F.R.D. 441 (N.D. Ill.1977) and *United States v. Swift & Co.,* 24 F.R.D. 280 (N.D.Ill.1959).

In *Rochford* the court stated: "The informer's privilege encourages citizen's cooperation in law enforcement by ensuring the anonymity of informers who have good reason to fear that disclosure of their identity could bring physical harm. . . . When, on the other hand, a citizen reports on purely *lawful* activities, law enforcement goals are not furthered and the informer need not fear bodily harm if his identity is disclosed." *Supra* at 445. We believe that the reason given for denying the protection of the privilege, i. e., fear of harmful repercussions, offers greater support for the opposite conclusion.

Since the primary goal of the privilege is to protect the flow of information to the Government, by protecting informers from retaliation, we believe that it is unwise to limit the protection to potential physical harm and correspondingly to the reporting of illegal acts. Particularly in the context of regulated industries, the government is in need of a great deal of information that may not reflect illegalities, but which may dictate the direction of regulatory activities. If confidential sources of such information are to be expected to continue, those individuals, often employees, must be protected from financial retaliation that could result through the loss of their employment.

By limiting the informer privilege to the reporting of illegal activities, we place the burden and ultimate risk of loss on the informant to correctly evaluate what is illegal prior to reporting it. Such an expectation is clearly unreasonable and can only lead to the discouragement of that which the rule was intended to encourage.

1. *Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). Petitioner was convicted of knowingly possessing and transporting heroin imported unlawfully. The Supreme Court held that the trial court's refusal

to disclose the identity of an undercover informer material in bringing about petitioner's possession of the drugs and who was present with defendant at the occurrence of the alleged crime was, in the circumstances of this case, reversible error since it was essential to a fair trial. "What is usually referred to as the informer's privilege is in reality the Government's privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law. . . . The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation." *Id.* at 59, 77 S.Ct. at 627.

*Black v. Sheraton Corp. of America*, 184 U.S. App.D.C. 65, 564 F.2d 550 (D.C.Cir. 1977). In suit seeking compensatory and punitive damages from a hotel corporation, plaintiff alleged that the defendant, through its agents or employees, was involved in or was negligent in not preventing or discovering an illegal eavesdropping · operation carried out against plaintiff in defendant's hotel by FBI agents. Although the hotel supplied names and addresses and position of all hotel employees at the time of the acts alleged, the court upheld the Government's informer's privilege claimed by an FBI agent who refused to answer questions regarding names of possible hotel participants. The plaintiff's need for the information was found not to override "the public interest in preserving the anonymity of those who cooperate on a confidential basis with law enforcement authorities, . . ." *id.* 184 U.S.App.D.C. at 67, 564 F.2d at 552. The court ruled that the informer's privilege applied even though informers did not furnish information but merely assisted in the operation of the electronic listening device used to eavesdrop. "As long as there is assistance with the expectation of confidentiality, whether or not it is limited to provision of information, disclosure of the identity of the cooperating citizen may unfairly defeat his expectation of anonymity and effectively destroy his utility in other law enforcement efforts. Disclosure may discourage other persons from providing assistance to the police." *Id.* 184 U.S.App.D.C. at 69, 564 F.2d at 554.

*Association for Women in Science v. Califano*, 185 U.S.App.D.C. 19, 566 F.2d 339 (D.C. Cir. 1977). In holding that the U.S. Attorney for the District of Columbia had properly asserted government privilege for confidential files, the court reviewed the policy rationale for the procedural requirements for asserting the several different governmental privileges. "[T]he informer's privilege, . . . protects from disclosure the identity of persons who furnish information to law enforcement officials. The governmental interest in this instance is the protection of the flow of information concerning possible violations of the law." *Id.* 185 U.S.App.D.C. at 23, 566 F.2d at 343 (dicta).

*Westinghouse Electric Corp. v. City of Burlington, Vermont,* 122 U.S.App.D.C. 65, 351 F.2d 762 (D.C.Cir. 1965). In antitrust litigation, defendants served the United States with a subpoena *duces tecum* directing production of documents relevant to government antitrust litigation. The Government claimed informer's privilege in support of the trial judge's decision to quash the subpoena. In overturning the quashing on the grounds of the privilege, the court ordered on remand, the lower court to apply the *Roviaro* standard in considering the claim of privilege as it relates to each document. "[T]he privilege exists for the benefit of the general public, not for the benefit of the particular informer involved." *Id.* 122 U.S.App.D.C. at 71, 351 F.2d at 768. "Most important, *Roviaro* rejects the theory that the privilege *guarantees* the informer's anonymity. The opinion imports a 'fairness' concept and states that a court must balance competing interests in reaching its decision on privilege: . . ." *Id.* 122 U.S. App.D.C. at 71, 351 F.2d at 768. "The purpose of the privilege is not to protect the particular informer from retaliation, but to protect the flow of information to the Government. However, it rests on the assumption that a citizen, recognizing the risk of retaliation, will be more likely to inform if he knows that his identity will be kept secret. The privilege is maintained to encourage possible informers in the future by giving them some assurance of anonymity." *Id.* 122 U.S.App. D.C. at 71, 351 F.2d at 768.

*Mitchell v. Bass,* 252 F.2d 513 (8th Cir. 1958). An appeal from dismissal of action by the Secretary of Labor to enjoin defendants from violating Fair Labor Standards Act. The Secretary had refused to obey orders to produce statements taken by the Secretary's investigators from four of defendant's employees. "The informer's privilege is well established in the law of evidence." *Id.* at 516.

*Contra Decisions:*

*Alliance to End Repression v. Rochford,* 75 F.R.D. 441 (N.D.Ill.1977). In a civil rights action based on allegedly unconstitutional surveillance activities, the court held that the Government's assertion of 'informer's privilege' to justify their deletion of informer's numbers, FBI file numbers and information which would tend to jeopardize the anonymity of informers, did not completely preclude disclosure of information concerning informers who reported purely legal activities. "The informer's privilege encourages citizen cooperation in law enforcement by insuring the anonymity of informers who have good reason to fear that disclosure of their identity

could bring physical harm. . . . When, on the other hand, a citizen reports on purely *lawful* activities, law enforcement goals are not furthered and the informer need not fear bodily harm if his identity is disclosed." *Id.* at 445.

*United States v. Swift & Co.*, 24 F.R.D. 280 (N.D.Ill.1959), *aff'd*, 367 U.S. 909, 81 S.Ct. 1918, 6 L.Ed.2d 1249 (1961) (per curiam). Defendants sought a modification of an antitrust consent decree previously entered into and moved for production of copies of all statements from any person, firm or corporation received by the Government in answers to Government inquiries relating to conditions in their industry. The court granted defendant's motion, denying Government's claim of informer's privilege because the statements were not reports of violations of the law to appropriate law enforcement officials. "[T]he privilege has no application where the information supplied does not relate to the commission of some unlawful act or is not the kind to excite resentment." *Id.* at 284.

2. *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). Petitioner was convicted of knowingly possessing and transporting heroin imported unlawfully. The Supreme Court held that the trial court's refusal to disclose the identity of an undercover informer material in bringing about the petitioner's possession of the drugs and who was present with defendant at the occurrence of the alleged crime was, in the circumstances of this case, reversible error since it was essential to a fair trial. "Likewise, once the identity of the informer has been disclosed to those who would have cause to resent the communication, the privilege is no longer applicable." *Id.* at 60, 77 S.Ct. at 627.

*Westinghouse Electric Corp. v. City of Burlington, Vermont*, 122 U.S.App.D.C. 65, 351 F.2d 762 (D.C.Cir. 1965). In an appeal from an antitrust case brought by privately owned utilities, holding that defendants, manufacturers of electrical equipment, had violated the law, the trial judge's decision to quash an entire subpoena for documents relevant to Government antitrust litigation on the basis of informer's privilege was overturned. The court ordered the judge to determine the applicability of the privilege under the standards set out in *Roviaro*. "And once the identity is revealed, the privilege terminates." *Id.*, 122 U.S.App.D.C. at 71, 351 F.2d at 768.

*Mitchell v. Bass*, 252 F.2d 513 (8th Cir. 1958). An appeal from dismissal of action by the Secretary of Labor to enjoin defendants from violating Fair Labor Standards Act. The Secretary had refused to obey orders to produce statements taken by the Secretary's investigators from four of defendant's employees. "We agree with the trial court that after the Government had voluntarily disclosed the names of the informers no further reason for applying the informer's privilege remained." *Id.* at 517.

3. *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). The Supreme

Court reversed a drug conviction based on the trial court's refusal to disclose the identity of an undercover informer who was material to bringing about the conviction. "The scope of the privilege is limited by its underlying purpose. Thus, where the disclosure of the contents of a communication will not tend to reveal the identity of an informer, the contents are not privileged." *Id.* at 60, 77 S.Ct. at 627.

*Westinghouse Electric Corp. v. City of Burlington, Vermont*, 122 U.S.App.D.C. 65, 351 F.2d 762 (D.C.Cir. 1965). Appellants, defendants below, sought discovery of documents relevant to the trial of antitrust litigation which the Government had begun against several manufacturers of electrical equipment. The Government claims that the informer's privilege supports the trial judge's decision to quash the subpoena. The court remanded to have the judge inspect the documents to determine whether any or all are privileged under the standards set out in *Roviaro*: "(1) Only the identity of the informer is privileged. The content of the communication is not privileged unless it would tend to reveal the identity of the informer." *Id.* 122 U.S.App.D.C. at 71, 351 F.2d at 768.

## GUIDELINE NO. 24

There is a qualified privilege for confidential communications between the President and his immediate staff. The privilege may be overborne by a showing of compelling circumstances justifying disclosure. If the privilege is asserted, the parties will be asked for further briefs addressed to the specific matter.[1]

1. *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1973). Following indictment charges alleged against certain White House staff and political supporters of the President, the Special Prosecutor sought production of tapes and documents between the President and others. The President resisted on the grounds of absolute privilege for confidential conversations between a President and his close advisors. "The expectation of a President to the confidentiality of his conversations and correspondence, like the claim of confidentiality of judicial deliberations, for example, has all the values to which we accord deference for the privacy of all citizens and, added to those values, is the necessity for the protection of the public interest in candid, objective, and even blunt or harsh opinions in Presidential decisionmaking. A President and those who assist him

must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately. These are the considerations justifying a presumptive privilege for Presidential communications. The privilege is fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." *Id.* at 708, 94 S.Ct. at 3107. The Court found that there is a qualified privilege for a President's high level communications which requires that Presidential confidentiality be afforded the greatest protection consistent with the fair administration of justice. "Since we conclude that the legitimate needs of the judicial process may outweigh Presidential privilege, it is necessary to resolve those competing interests in a manner that preserves the essential functions of each branch." *Id.* at 707, 94 S.Ct. at 3107.

## GUIDELINE NO. 25

There is a privilege for military and diplomatic secrets that are classified as confidential in the interest of national security. If the privilege is asserted, the parties will be asked for further briefs addressing its nature and scope and its application to the specific matter.[1]

1. *United States v. Reynolds*, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953). In a suit under the Tort Claims Act arising from the death of three civilians in a military aircraft crash, plaintiffs moved for production of the Air Force's official accident investigation report and the statements of the three surviving crew members. The Government resisted discovery based on the governmental privilege which protects military and state secrets. The Court refused to reach the issue of privilege because no formal claim of privilege had been made. However, the Court stated that once a formal claim is filed, "there was certainly a sufficient showing of privilege to cut off further demand for the documents on the showing of necessity for its compulsion that had been made." *Id.* at 11, 73 S.Ct. at 533. *Black v. Sheraton Corp. of America*, 184 U.S. App.D.C. 46, 564 F.2d 531 (D.C.Cir. 1977). Before analyzing the merits of the issue of executive privilege before it, the court, explaining the use of that term, stated that "[t]he Supreme Court has recognized a privilege for documents possessed by the executive that contain military secrets." *Id.* 184 U.S.App.D.C. at 56, 564 F.2d at 541.

## GUIDELINE NO. 26

A government privilege is waived by the Government's voluntary disclosure of the materials which it protects unless the disclosure was reasonably necessary to accomplish the purpose for which the materials were prepared.[1] This does not exclude the possibility of waiver of privilege claims by other conduct of the Government. Contentions concerning such waiver will be considered in the context of specific documents.

1. *Niemeier v. Watergate Special Prosecution Force*, 565 F.2d 967 (7th Cir. 1977). In a Freedom of Information Act suit, a disclosure of an entire memorandum was ordered although only part of it had been voluntarily disclosed. The document involved is a letter written to the Special Watergate Prosecutor by his client. "[W]here an underlying memorandum is expressly relied on in a final agency dispositional document, even though only part of it is expressly reproduced, we hold that a presumption in favor of disclosability of the memorandum as a whole is created. This presumption is subject to rebuttal by the agency challenging disclosure upon the showing that other portions of the memorandum fall within the coverage of some exemption other than exemption five." *Id.* at 973.

*Cooper v. Department of Navy of the United States*, 558 F.2d 274 (5th Cir. 1977). Attorney who represented the family of a person killed in a Marine Corps helicopter crash brought suit under the Freedom of Information Act to obtain disclosure of the accident and safety investigation reports. The court upheld the claim of exemption from disclosure under the inter-agency and intra-agency memoranda exemption of the Freedom of Information Act even though the report is routinely forwarded to the Navy plant representative office at the factory at which the aircraft is manufactured. "And though other regulations do permit a limited access to the AAR [reports] by manufacturer's technical representatives on a 'need to know' basis, it is the law of this Circuit that such limited disclosures to proper outside persons as are necessary to carry out effectively a purpose for assembling a governmental report in the first place do not waive its privilege. . . . Doubtless a broadcast disclosure would be another matter, but we are unable to see [a] reason in holding that a limited and proper use of the report for accident prevention purposes should work destruction of the confidentiality promised in assembling it and permit its use for the very purposes those whose disclosure made it possible were promised it would not be used for." *Id.* at 278.

*American Mail Line, Ltd. v. Gulick*, 133 U.S. App.D.C. 382, 411 F.2d 696 (D.C.Cir. 1969). In a Freedom of Information Act action by

steamship operators who were required by the Maritime Subsidy Board to refund federal subsidies, the defendants sought a 31 page memorandum which they claimed was prepared by the staff of the Maritime Subsidy Board and which formed the basis for the refund which it required. The last five pages were clipped and recorded as the Board's findings and determination in the matter. The court held the whole memorandum must be disclosed. "If the Maritime Subsidy Board did not want to expose its staff's memorandum to public scrutiny it should not have stated publicly in its April 11 ruling that its action was based upon that memorandum, giving no other reasons or basis for its action." *Id.* 133 U.S.App.D.C. at 389, 411 F.2d at 703.

*Safeway Stores, Inc. v. FTC*, 428 F.Supp. 346 (D.D.C.1977). In a Freedom of Information Act action, the court held that a staff report resulting from a non-public investigation of the retail food industry, transmitted to the FTC and rejected was within the intra-agency exemption of the Act and that exemption was not waived either by disclosure to authorized Congressional committees or by a leak to the newspaper. The court explained that even if the newspaper had full access to the report, publication was unauthorized and disclosure by the Commission staff was prohibited by statute. "Disclosure to an authorized Congressional committee does not waive the exemption." *Id.* at 347. "[A]n unauthorized 'leak' does not constitute a waiver of the (b)(5) exemption." *Id.* at 347.

*Smith v. FTC*, 403 F.Supp. 1000 (D.Del.1975). In a pre-enforcement review of an FTC requirement for filing certain annual reports, the court held that the FTC did not adequately raise executive privilege against disclosure of intra-agency advisory opinions, records and deliberations with respect to documents which plaintiffs sought to discover. However, the court explained that an FTC witness had inadvertently waived the privilege by divulging the contents of his advisory comments to others even though he refused to divulge the responses he received during the agency deliberations. "Therefore, if executive privilege had been properly invoked, the Commission would be deemed to have waived the privilege with respect to two specific questions by allowing the witness to respond to prior questions in which the substance of the witness' advisory communications were divulged." *Id.* at 1019.

## GUIDELINE NO. 27

Statutory bases for withholding documents from discovery will be addressed by the parties at such time as the documents are submitted to the Special Masters.

*Comment on Guideline No. 27*

In this regard we would note that in these guidelines we have rejected the Government's proposal of a qualified common law privilege regarding information filed with various government agencies by third persons and containing matters of a confidential or proprietary nature. The proposed guideline, which we were initially disposed to accept, was formulated as follows:

There is a qualified privilege for information that was supplied to the Government by third persons ("proprietary information"). "Proprietary information" consists of trade secrets, confidential research, private financial information, and similar information which, if disclosed, might result in embarrassment or injury to the person or organization to which it relates.

Although such a privilege may be recognized by law, the cases so far have all involved FOIA (Freedom of Information Act) action or claims of confidentiality based on specific statutes. We could find no authority for such a privilege under common law, as distinct from statute or FOIA exceptions, although there is much to be said favoring such a privilege. On further consideration, however, we think it unnecessary to come to a conclusion on the subject. This is because, as defendants contend, in the special posture of this case, recognizing such a privilege would be redundant or inconsistent with Pretrial Order No. 7.

That Order provides that *all* material produced through discovery in this action and denoted as "protected" by the producing party can be disclosed to no one except the opposing attorneys and their staffs in this action and to particularly identified individuals such as expert witnesses, and then only for the purpose of conducting this litigation. The essence of defendants' argument is this: The "proprietary information" privilege is in any event inoperative if the need for discovery outweighs the interest of preserving confidentiality of the information and thereby keeping open the flow of such information to the government; the interest of preserving such confidentiality can very largely if not completely be served by permitting the discovery only on the condition that the information be kept confidential to the attorneys and those assisting in presentation of this case; and that condition of confidentiality already exists by reason of Pretrial Order No. 7.

This contention is persuasive, given the law of this Circuit strongly favoring discovery. In *Association for Women in Science v. Califano*, 185 U.S.App.D.C. 19, 566 F.2d 339 (D.C.Cir. 1977), the court was concerned with a claim of statutory privilege essentially similar to the more general "proprietary information" privilege argued for here. The claim was overruled, however, because provision was made to prevent prejudice to the third persons whose confidential data was involved. In *AWIS* the protection was achieved chiefly by obtaining waiver from the third persons. Here the protection is to be achieved by prohibiting dissemination of the discovery prod-

uct outside this litigation. That is something of a difference, but not very much of one. Moreover, if the situation is considered from the viewpoint of the third persons whose data is involved, the question would be whether they would have a legal right not to yield the information if defendants demanded it of them under Rule 45. That question must be considered in light of the protection already established under Pretrial Order No. 7. Hence, the question is whether production would be required if use of the product was confined to this case. The decision in *Westinghouse Electric Corp. v. City of Burlington, Vermont*, 122 U.S.App.D.C. 65, 351 F.2d 762 (D.C. Cir. 1965) seems square authority that production would be required.

On this analysis, it would be pointless to give general qualified protection to proprietary information when Pretrial Order No. 7 contains a general provision that would overcome the privilege. Hence, no general common law privilege concerning "proprietary information" will be recognized. This does not exclude the possibility of a Government claim based on such a privilege concerning specific material as to which the protection of Pretrial Order No. 7 might be regarded as inadequate under the principles of *AWIS v. Califano* and *Westinghouse v. City of Burlington* and specific statutory authority.

## GUIDELINE NO. 27.1

There is a privilege on the part of the Government under 15 U.S.C. § 1313(c) to refuse disclosure of documentary material, answers to interrogatories, and transcripts of testimony obtained by the Government under 15 U.S.C. § 1312. The privilege is absolute unless one of the following events occurs, in which case the privilege lapses with respect to the material involved:

(a) The party from whom the material was obtained consents to its disclosure, as provided in 15 U.S.C. § 1313(c)(3); or

(b) The material is delivered by the custodian to a person in contemplation of its direct use in this action. For this purpose, "direct use" means offering the material in evidence at trial, listing it in a pretrial order as material to be introduced in evidence, showing it to a witness in preparing the witness' testimony at a pretrial deposition or at trial, using it to impeach a witness at pretrial deposition or at trial, formulating interrogatories, demands for admission, or questions to be propounded at a deposition, or similar use.

### Comment on Guideline No. 27.1

Under 15 U.S.C. §§ 1311–1314, the Attorney-General and the Antitrust Division are given broad powers of *ex parte* discovery in investigation of suspected antitrust violations. In substance, the Justice Department, on its own initiative and without having filed suit, can subpoena documents, submit interrogatories, and take depositions to discover information potentially relevant to civil antitrust proceedings. The product of these demands is usually called "CID" material. To protect the persons against whom such discovery demands are made, the statute provides that CID material is to be kept in special custody, 15 U.S.C. § 1313(a) from which it may not be released except to authorized members of the Justice Department, § 1313(c)(2), or by or upon consent of the person from whom the material was obtained, § 1313(c)(3), (4). The statute specifically prohibits disclosure of CID material to persons not members of the Justice Department, § 1313(c)(3). It also provides that a staff attorney of the Department engaged in litigation may obtain from the custodian CID material needed in litigation. In the latter situation, "Upon the completion of any such case . . . such attorney shall return to the custodian any such material . . . which [has] not passed into the control of [the] court . . . through the introduction thereof into the record of such case . . . ." 15 U.S.C. § 1313(d)(1).

The Government's claim of privilege clearly is sustained by the statute where the Government does not intend to offer CID material into evidence in a subsequent action, such as the present action. The defendant does not appear to contend otherwise. Moreover, the Government has said to the Special Masters that it does not intend to use any CID material as evidence in this case. Apparently, any material uncovered through the CID procedure has been, so to speak, rediscovered by the Government through voluntary production or subpoena after commencement of the present litigation. Hence, the CID material relevant to this case may well indefinitely repose with the custodian, and thus remain privileged.

However, as trial impends the Government may find it wishes to use some part of the CID material, and the question would arise as to the effect of this Guideline in that eventuality. The material might be used either in trial or in the pretrial phase, for example in connection with a Rule 30 deposition. Although the question is in a sense hypothetical, it directly implicates the intended meaning of the Guideline. Subparagraph (b) of the Guideline seeks to make clear our conclusion in this respect.

The problem is to reconcile the confidentiality provision of § 1313(c)(3) with the provision of § 1313(d)(1) authorizing the Government to use CID material in a suit subsequent to the investigation that yielded the CID material. A literal reading of the two provisions admits of the con-

struction that the Government could keep the material in custody until the point in the trial when it is needed, and then simply offer the material in evidence. Defendant would then have to do its best to meet the proof, if necessary moving for a continuance, as it would if other unexpected evidence were offered. Although literally sustainable, this construction of the statute seems manifestly unfair when considered according to modern principles of civil procedure. Particularly would it be unfair in a proceeding such as this, where elaborate pretrial discovery and issue-formulation procedures have been designed to get all the thousands of cards on the table in advance of trial itself. Hence, a more just interpretation of the statute would require that the privilege elapse not simply when the Government might offer CID material at trial, but at such earlier point as would give defendants fair opportunity to study it and thus meet it at trial. That is, at a reasonable time before trial defendants should be able to see the CID material the Government intends to introduce, and related material held by the custodian that throws light on the material to be introduced. The "control of the court" referred to in § 1313(d)(1) thus should be deemed to attach at that point.

A further difficulty in construing the statute arises when attention is focused on the possibility that the Government's trial staff might make use of CID material at the pretrial stage. The statute plainly contemplates that CID investigations may be followed by Government civil antitrust suits, which of course, are governed by the Federal Rules of Civil Procedure. And under those Rules, apart from the statute, all material collected by the Government would be discoverable even if the Government made no use of it (subject, of course, to the work product and other relevant privileges). Indeed, the most proper candidate for discovery would be relevant material that the Government did not wish to use, for such would be most likely to be advantageous to a defendant. However, that would mean that the CID privilege is nothing more than a statutory version of the work product rule and has no independent force of its own.

The question posed then is how the statutory privilege works in conjunction with the Federal Rules of Civil Procedure and the concepts of fairness and mutuality that underlie them. One interpretation would be that the CID privilege lapses if the Government trial staff makes any use of the material after the investigation has been completed. On this view, the documents would lose their privileged status if checked out of custody by any member of the trial staff in the course of their work.

Such a construction is hard to square with the tenor of the statute, however. Specifically, it would make no sense to provide that the custodian shall receive back unused material at the end of the litigation, if the material was subject to discovery immediately upon its being checked out. Hence, the statute must contemplate some degree of use of the material that does not lay it open to discovery. At the same time, the statute should not be construed to allow the Government undue advantages in pretrial discovery, for the same reason it should not be construed to allow such advantage at the trial stage. We conclude therefore that release of CID material for perusal by the Government trial staff does not terminate the privilege, but that the privilege does terminate if the material is put to any more direct use in the pretrial stage.

## GUIDELINE NO. 27.2

There is an absolute privilege under 13 U.S.C. § 9 for raw data collected by the Bureau of the Census.

### Comment on Guideline No. 27.2

Statutory privileges are to be narrowly construed. *Freeman v. Seligson*, 132 U.S.App.D.C. 56, 78, 405 F.2d 1326, 1348 (D.C.Cir. 1968). *See generally*, Guideline No. 7 of the Special Masters' Guidelines for the Resolution of Privilege Claims. As a consequence, in the absence of explicit language to the contrary, statutory privilege provisions will be interpreted as granting qualified rather than absolute protection. *See, Association for Women in Science v. Califano*, 122 U.S.App. D.C. 65, 72, 566 F.2d 339, 346 (D.C.Cir. 1977). And even an absolute privilege may be waived by the Government initiating an action and being in exclusive possession of documents that are essential to the fair resolution of the issues raised. *See United States v. International Business Machines Corp.*, [1975–2] Trade Cases ‘ 60,383 at 66,663 (S.D.N.Y.1975). However, we do not deal with the question of waiver at this time.

Nevertheless, 13 U.S.C. § 9 plainly expresses the legislative intention to make raw census material collected by the Bureau of Census absolutely privileged. The present version of the statute is a legislative response to *St. Regis Paper Co. v. United States*, 368 U.S. 208, 82 S.Ct. 289, 7 L.Ed.2d 240 (1961), which permitted discovery of a copy of a report to the Census Bureau that had been retained by the company making the report. In response to that decision, the statute was amended to provide:

9. Information as confidential; exception

(a) Neither the Secretary, nor any other officer or employee of the Department of Commerce or bureau or agency thereof, may, except as provided in section 8 of this title—

(1) use the information furnished under the provisions of this title for any purpose other than the statistical purposes for which it is supplied; or

(2) make any publication whereby the data furnished by any particular establishment or individual under this title can be identified; or

(3) *permit anyone* other than the sworn officers and employees of the Department or bureau or agency thereof *to examine the individual reports.*

No department, bureau, agency, officer, or employee of the Government, except the Secretary in carrying out the purposes of this title, shall require, for any reason, copies of census

reports which have been retained by any such establishment or individual. *Copies of census reports which have been so retained shall be immune from legal process, and shall not, without the consent of the individual or establishment concerned, be admitted as evidence or used for any purpose in any action, suit, or other judicial or administrative proceeding.* (Emphasis added.)

Although the statute does not confer immunity from process on the original reports, it evidently presupposes that 9(a)(3) seals them from examination by persons outside the Bureau.

## GUIDELINE NO. 27.3

There is an absolute privilege under 15 U.S.C. § 176a for raw data collected by the Bureau of Economic Analysis as delegate of the Bureau of Foreign and Domestic Commerce.

### Comment on Guideline No. 27.3

The provisions of this statute are not as explicit as those of 13 U.S.C. § 9. However, given the language of the statute and the similarity of its purpose and content to that of 13 U.S.C. § 9, we think it should be similarly construed.

## GUIDELINE NO. 27.4

There is an absolute privilege under 22 U.S.C. § 3104(c) for raw data collected by the Bureau of Economic Analysis as delegate of the Department of Commerce.

### Comment on Guideline No. 27.4

The language of § 3104(c) falls short of the formula of 13 U.S.C. § 9. However, § 3104(c) refers to the possibility of a person seeking to "compel the submission or disclosure of any report . . . or any copy . . .," and proscribes it. The only methods we can conceive by which a person could "compel" such disclosure of the original report would be use of legal process, specifically a subpoena or demand for production of documents under the Federal Rules, or a demand under the Freedom of Information Act. If focus is confined to the original report, it is possible to say that the statute intended to preclude FOIA production but not necessarily production by subpoena. However, the production that no person may "compel" also includes "any copy." The copy contemplated no doubt is the one retained by the "person who . . . furnished such report." Production of a copy in the hands of such a person could be compelled only through subpoena and not FOIA, for the latter runs only against the Government. Thus, textual analysis suggests that the prohibition addressed to disclosure of the original report refers not only to FOIA compulsion, but also the compulsion of subpoena. That makes the privilege absolute. Such seems to have been Congress' intention. *See* H.R. Report No. 94–1490, September 21,

1976, U.S.Code Cong. & Admin. News 1976, p. 4663. That inference is strengthened by the fact that the statute was enacted in 1976, a time when the general direction of legislative policy was to expand the types of Government matters open to disclosure. In that milieu, it seems unlikely Congress was unconscious of the interpretation that naturally would be placed on its language. Having thus concluded that the referent of "compel" is legal process, we further conclude that the statute confers an absolute privilege against that compulsion.

## GUIDELINE NO. 27.5

There is no statutory privilege afforded to Shipper's Export Declarations (SEDs) under 50 U.S.C.App. § 2406(c),[1] or to foreign commerce and trade information under 13 U.S.C. §§ 301(a) and 302[2] or generally created by 22 U.S.C. § 286f(c) which prescribes criminal penalties for the disclosure of information "otherwise than in the course of official duty."[3]

### Comment on Guideline No. 27.5

With regard to the claim under 50 U.S.C.App. § 2406(c), the case law in the District of Columbia is clear that no privilege attaches to Shipper's Export Declarations. *American Jewish Congress v. Kreps*, 187 U.S.App.D.C. 413, 574 F.2d 624 (D.C.Cir. 1978). See *Green v. Department of Commerce*, 468 F.Supp. 691 (D.D.C.1979).

Relative to 13 U.S.C. §§ 301(a) and 302, neither the statutes nor the regulations promulgated pursuant thereto confer on foreign commerce and trade data collected by the Department of Commerce a privilege against discovery by a civil litigant. The contrast in terminology between this statute and its implementing regulations in 13 U.S.C. § 9 is sharp. Indeed, given the general policy favoring discovery, a privilege will not be inferred unless the statute or regulation incorporates something approximating the formula of 13 U.S.C. § 9. *Cf. St. Regis Paper Co. v. United States*, 368 U.S. 208, 82 S.Ct. 289, 7 L.Ed.2d 240 (1961).

For the same reasons, we conclude that the provisions of the Bretton Woods Agreement Act appearing in 22 U.S.C. § 286f(c) do not confer a privilege against disclosure demanded under the Federal Rules of Civil Procedure. It was designed to prevent misuses such as industrial espionage and does not address disclosure pursuant to judicial process.

We have carefully considered the presentation by the Department of Commerce, both its original brief and its comment on the draft of this Guideline. The Department cites no legal authority for its contention; the authority is adverse to its position. If, as held in *American Jewish Congress*, SEDs are subject to disclosure under FOIA, *a fortiori* they are discoverable under the Civil Rules.

The Department makes a strong case on grounds of policy that the material referred to in

this Guideline, particularly the SEDs, should be absolutely privileged. The Department relies on pending legislation to suggest that such a policy soon will become law. However, the pending legislation, responding to *American Jewish Congress*, would amend FOIA, but does not deal with the problem of discovery through legal process. Hence, we fear as Congress is now preparing to speak, it apparently will not speak to the latter question. Since discovery process runs to the Government except as statute or recognized privilege otherwise provides, and since the statute does not otherwise provide either as written or as it may foreseeably be amended, there is simply no basis in law for the privilege claim.

For essentially the same reasons there is no basis for a qualified privilege. Making the privilege qualified rather than absolute simply shifts the process of weighing disclosure versus confidentiality from the point of drawing a general rule to the point of applying the rule. That would restate the problem concerning the documents involved here.

Whether the privilege is absolute or qualified, its objective is largely served by the Protective Order. The Department contends that the Protective Order really is not protective, i. e., it does not assure that use of this material will be confined to the purposes of this litigation. It may well be that shippers fear any disclosure, even a guarded one, is the equivalent of total disclosure. Hence the Department no doubt is correct in suggesting that shippers will be uneasy, and perhaps deterred, by the absence of even a qualified privilege. But again that only restates the problem of choice in whether there should be a privilege. We believe the Protective Order gives substantially the assurance that the Department seeks.

Finally, we think it beside the point that there are thousands or millions of documents involved. That goes to the scope of discovery, which is under the supervision of the Magistrate, and not to privilege, which is our responsibility.

We are mindful of the seriousness of the matters advanced by the Department. If we were members of Congress we might well support legislation making the Department involved immune not only from FOIA, but also from discovery under the Civil Rules. We are also mindful that the Department, like the other agencies subjected to discovery in this action, have sought to be cooperative in producing documents. In this respect the Department has displayed the official responsibility one would hope for. Its lawyers have demonstrated competent professional responsibility on their part. Yet in these matters the Department and its legal counsel are guided by law, as indeed we are. In the matter in question here, the law seems quite clear.

---

1. 50 U.S.C.App. § 2406(c) provides in part:
 "[N]o department, agency, or official exercising any functions under this Act shall publish or disclose information obtained hereunder which is deemed confidential or with reference to which a request for confidential treatment is made by the person furnishing such information, unless the head of such department or agency determines that the withholding thereof is contrary to the national interest."

2. Under 13 U.S.C. § 301(a) the Bureau of Census has the responsibility to
 ". . . collect information from all persons exporting from or importing into the United States and the noncontiguous areas over which the United States exercises sovereignty, jurisdiction, or control, and from all persons engaged in trade between the United States and such noncontiguous areas between those areas, or from the owners or operators of carriers engaged in such foreign commerce or trade, and shall compile and publish such information pertaining to exports, imports, trade, and transportation relating thereto as he deems necessary or appropriate to enable him to foster, promote, develop, and further the commerce, domestic and foreign, of the United States . . . ."
 And pursuant to 13 U.S.C. § 302 the Secretary of Commerce
 ". . . may also provide by rule or regulation, for such confidentiality, publication or disclosure, of information collected hereunder as he may deem necessary or appropriate in the public interest."
 Administrative regulations promulgated by the Secretary pursuant to these statutes appear in sections 30.90 and 30.91 in Part 30 of Title 15 of the Code of Federal Regulations (CFR). Section 30.91 provides in part:
 "(a) *Confidential status.* The Shipper's Export Declaration is an official Department of Commerce form prescribed jointly by the Bureau of Census and the Bureau of East-West Trade. Information supplied thereon is confidential, for use solely for official purposes authorized by the Secretary of Commerce. Use for unauthorized purposes is not permitted. Information on Shipper's Export Declarations may not be disclosed to anyone except the exporter or his agent by those having possession of or access to any copy for official purposes, except as provided in paragraph (3) of this section."
 Paragraph (e) provides that when the Secretary determines that the withholding of information stated in the SEDs
 ". . . is contrary to the national interest, he may make such information available, taking such safeguards and precautions to limit dissemination.

 . . . . .

 "In recommendations regarding such actions, the Bureau of the Census will, in general, consider that it is not contrary to

the national interest to withhold information on Shipper's Export Declarations from private individuals or businesses . . . or from State or local government agencies or officials, regardless of the purposes for which the information may be requested. In recommendations regarding any other requests for access to official copies, a judgment in the light of circumstances will be made as to whether it is contrary to the national interest to withhold the information, keeping in view that the maintenance of confidentiality has in itself an important element of national interest."

3. 22 U.S.C. § 286f(c) states:

 (c) It shall be unlawful for any officer or employee of the Government, or for any adviser or consultant to the Government, to disclose, otherwise than in the course of official duty, any information obtained under this section, or to use any such information for his personal benefit. Whoever violates any of the provisions of this subsection shall, upon conviction, be fined not more than $5,000, or imprisoned for not more than five years, or both."

### GUIDELINE NO. 28

These guidelines may be modified by the Special Masters to the extent that experience with their application or other subsequent developments reveal that their modification is appropriate. The parties will not be foreclosed from proposing such modifications on the ground that they failed to make such proposals previously.

### ORDER

It is hereby ordered that the above guidelines will form the substantive basis upon which claims of privilege will be resolved by the Special Masters.

/s/ Geoffrey C. Hazard, Jr.

/s/ Paul R. Rice

Filed: February 28, 1979.

As amended by Order dated August 10, 1979.

### SPECIAL MASTERS' PROCEDURAL GUIDELINES FOR THE SUBMISSION OF PRIVILEGE CLAIMS *

### PROCEDURAL GUIDELINE NO. 1

The rules of procedure and the law of privilege to be applied by the Special Masters shall be set forth in a First Report to be submitted to the Court in accordance with Rule 53(e) of the Federal Rules of Civil Procedure and the Order of Reference. Within ten days after being served with notice of the filing of the First Report, any party may file and serve written objections to that Report.

### PROCEDURAL GUIDELINE NO. 2

Within ten days of the expiration of the period to file objections, if no objections are filed to the First Report, and otherwise within ten days of the date the approval or modification of the First Report by the Court becomes final, each party shall submit to the Special Masters a Revised Index listing each document from the party's previous index as to which that party asserts a claim of privilege under the law of privilege adopted by the Court. The Revised Index shall contain the following information for each document listed: document number, date of document, file or files in which the document was located, author, distribution (broken down as to addressees and other distributees), a summary of the document, and the specific privilege or privileges asserted to be applicable (including a reference to any statute asserted to be applicable). All documents that were listed on a party's previous index but are not listed on that party's Revised Index shall be produced immediately.

### PROCEDURAL GUIDELINE NO. 3

Within three weeks after the submission of the Revised Index, the party claiming a privilege with respect to a particular document shall submit to the Special Masters the document itself and the substantiating materials required by Privilege Guideline No. 2. Copies of all substantiating materials, but not the document itself, shall be served upon the party challenging the claim of privilege.

---

* These procedural guidelines were agreed to by the parties in a joint submission to the Special Masters.

### PROCEDURAL GUIDELINE NO. 3.1

When a document with respect to which privilege claims have been asserted is delivered to the Special Masters under Procedural Guideline No. 3, all privilege claims which have not been asserted in the accompanying index are waived. If a greater number of privilege claims are raised in the index under which a document is submitted than are marked on the face of the document or listed in the supporting affidavit, see Guideline No. 10.1 (for example, the index claims the privileges of attorney-client and work product, but on the face of the document or in the supporting affidavit only the work product claim is marked or otherwise asserted), the assertion of the omitted claim will be construed as being dropped and thereby waived.

### PROCEDURAL GUIDELINE NO. 4

Within two weeks after the submission of documents claimed to be privileged and substantiating materials, the challenging party may file a response to any claim of privilege. When the privilege asserted is a qualified one, the challenging party may elect to attempt in its response to establish reasons why the material should be disclosed if the privilege asserted is applicable (as required under Special Masters' Guideline for the Resolution of Privilege Claims No. 4) or may elect not to attempt to make such a showing until after the Special Masters have determined preliminarily that the qualified privilege applies (as provided for in Procedural Guideline No. 8).

### PROCEDURAL GUIDELINE NO. 5

A party asserting a claim of privilege shall have one week to reply to any response to that claim of privilege.

### PROCEDURAL GUIDELINE NO. 6

(a) When a privilege claim is made on a privilege not dealt with in the Guidelines, the party asserting the privilege shall accompany the claim with a brief on the law of the privilege in question.

(b) Within two weeks after the assertion of such a claim, the opposing party may file a responsive brief. The Special Masters shall promptly thereafter formulate a draft guideline on the privilege.

(c) Within one week after the Special Masters have circulated their draft guideline, the parties may submit comments concerning it. The Special Masters shall then adopt the guideline in final form.

(d) Within one week after the Special Masters have issued the guideline in final form, the party asserting the privilege may submit supplementary substantiating materials in accordance with the ruling.

(e) Within one week after the submission of such materials, the opposing party may file a response to the claim.

### PROCEDURAL GUIDELINE NO. 7

The Special Masters shall circulate proposed Findings of Fact and Conclusions of Law with respect to each document submitted to them for review. Within ten days after receipt by the parties of the proposed Findings of Fact and Conclusions of Law, they shall submit comments to the Special Masters on the proposed Findings and Conclusions. During this period the parties may also request leave to submit additional materials for consideration by the Special Masters. Following their consideration of the comments of the parties and any additional materials they permit to be submitted, the Special Masters shall issue a Report to the Court of their Findings of Fact and Conclusions of Law in accordance with paragraph 3 of the Order of Reference.

### PROCEDURAL GUIDELINE NO. 8

If the Special Masters determine that a document falls within a qualified privilege and if the challenging party has elected to defer its attempt to make a showing why the document should be disclosed, then the challenging party may, within time limits established by the Special Masters, but not

later than April 1, 1980, file any materials it deems appropriate to satisfy its burden under Special Masters' Guideline for the Resolution of Privilege Claims No. 4. The party claiming the privilege shall have one week to reply to any such filing. Thereafter, the Special Masters will propose Findings of Fact and Conclusions of Law with respect to the attempted showing of cause. Within one week of the date of such proposed findings the parties may submit comments thereon to the Special Masters.

### PROCEDURAL GUIDELINE NO. 9

Upon the filing of a Report with the Court in accordance with Procedural Guideline No. 8, each party shall have ten days within which to file objections with the Court in accordance with Rule 53 of the Federal Rules of Civil Procedure. If at the end of this ten-day period no objections have been filed to a ruling that a particular document must be produced, that document shall be produced immediately. Otherwise, the parties shall proceed in accordance with Rule 53 unless different review procedures are established by the Court.

### PROCEDURAL GUIDELINE NO. 10

At the time that the parties submit documents and substantiating materials to the Special Masters under Procedural Guideline No. 3 above, the parties shall also submit indices meeting the requirements of Procedural Guideline No. 2 that list all remaining documents withheld by them from production on grounds of privilege as of one week prior to that date. Thereafter, the parties and the Special Masters shall proceed in accordance with the sequence and time intervals set forth in Procedural Guidelines No. 3–9 above.

### PROCEDURAL GUIDELINE NO. 10.1

When documents are delivered to the Special Masters, they shall either be marked to indicate the privilege claims that are being raised with regard to them or accompanied by a supporting affidavit in which the privilege claims shall be raised individually as to each document. If a party elects to mark its documents, the following color codes shall be employed: Fact work product —blue; opinion work product—yellow; attorney-client—red; inter-agency and intra-agency deliberative—green; and government investigative—black. If this marking method is used for the assertion of other privileges, the accompanying affidavit should indicate the color code being used.

### PROCEDURAL GUIDELINE NO. 11

When only a portion of a document is claimed to be privileged, the party asserting the privilege shall indicate what portion of the document is claimed to be privileged. If different privileges are asserted to be applicable to the same document (e. g., fact and opinion work product privileges), they shall be indicated in a manner so that the Special Masters may discern easily what privilege is claimed to apply to each portion of the document. When the Special Masters rule that only a portion of the document is privileged, they shall indicate what portions are to be produced. Each party shall then be responsible for masking and producing its own documents in accordance with the Special Masters' ruling.

### PROCEDURAL GUIDELINE NO. 12

With regard to the assertion and documentation of privilege claims under these Procedural Guidelines, all documents to be served on the Special Masters and opposing party will be hand delivered.

### ORDER

It is hereby ordered that the above Guidelines will form the procedural basis upon which privilege claims will be submitted to and resolved by the Special Masters.

/s/ Geoffrey C. Hazard, Jr.

/s/ Paul R. Rice

Dated: June 1, 1979.

As amended by Order dated May 11, 1979.

As amended by Order dated June 1, 1979.

As amended by Order dated August 10, 1979.

## MEMORANDUM ORDER

On February 13, 1980 the Court granted a motion of the defendants American Telephone & Telegraph Co. to compel compliance with a subpoena duces tecum directed to Litton Industries, Inc. (Litton) which requested for purposes of this case all documents which Litton had previously produced and which defendants had previously copied in connection with *Litton Systems, Inc., et al. v. AT&T, et al.,* 76 Civ. 2512 WCC (S.D.N.Y.), an antitrust action Litton itself had brought against these defendants. The Order further provided that the filing with the Court by Litton of its consent to the use by defendants in this case of the documents produced and copied in the private antitrust action would constitute compliance.[1] The Court noted that in the event that Litton failed to provide such consent "the Court will decide subsequently, on further submissions by the parties, who will bear the expense of such copying, and how costs and attorneys' fees should otherwise be allocated."[2] On March 25, 1980 defendants moved for an order to require Litton to bear all costs, expenses and attorneys' fees which defendants may incur in inspecting and copying Litton's documents.[3]

As the Court pointed out in its February 13, 1980 Order, AT&T is already in possession of the approximately 500,000 documents at issue. Thus, as was noted then, there does not now appear to be any need for the physical production of the identical documents from the identical party (Litton) to the identical recipient (AT&T) a second time. The only reason for not simply using the same documents in this litigation was Litton's reliance on the fact that it had furnished the documents to AT&T under a protective order issued by the United States District Court for the Southern District of New York in the course of the litigation between these two parties in that district. Absent Litton's agreement to have AT&T use these documents in this case—in addition to their use in the case for which they were previously produced—there appeared to be no alternative[4] but to require the production of the same documents to the same party a second time, in the exercise of this Court's unquestioned power to require the production of documents relevant to a case pending before it. Fed.R.Civ.P. 26(a), (b)(1); *United States v. American Telephone & Telegraph Co.,* 461 F.Supp. 1314, 1331, 1337–43 (D.D.C.1978).

The Court fully recognized the wastefulness of the procedure, and its essential irrationality, and it therefore offered to Litton the option of giving its consent to the use of the documents already in AT&T's possession in lieu of a second production. Although as noted *supra* note 1, MCI Communications Corp. promptly availed itself of the consent option, Litton refused. It is at that juncture that defendants—seeing no choice but to proceed with the time-consuming and expensive process of searching once more Litton's files and records for documents which it already has in its possession and copying those same documents a second time—applied for an order to compensate it for the costs, expenses, and attorneys' fees related to that inspection and copying.

Litton filed an opposition to the motion which raises a number of issues and which is accompanied by a number of exhibits.

1. The February 13, 1980 Order also applied to MCI Communications Corporation which has litigation against AT&T pending in the Northern District of Illinois. MCI, on February 20, 1980, filed its consent in accordance with the option contained in the February 13, 1980 Order.

2. Except for a clerical correction, Litton's motion for reconsideration of that order was denied in an order dated February 26, 1980.

3. An affidavit attached to the motion stated that defendants incurred approximately $532,-000 in costs and expenses associated with Lit-

ton's first production of the documents at issue in 1977, and it was suggested that additional costs beyond that amount may be justified at this time.

4. In theory, the problem could also be solved by a dissolution or modification by the District Court in the Southern District of New York of its protective order. However, AT&T is requesting the documents for use in the litigation pending in this Court, and it is therefore this Court which must appropriately deal with this problem.

The arguments made in the opposition are all irrelevant, frivolous, or repetitious of contentions which the Court has previously rejected.[5] Significantly, the opposition does not advance a single cogent reason [6] why AT&T should be required to engage in the expensive and wasteful exercise of searching through millions of files to come up in the end with the same 500,000 documents which it already has and to the use of which it is clearly entitled. ·

█ The discovery process, a major and useful tool of modern litigation, has in practice often become in effect a trial by combat, in which the litigant most able to afford the necessary expense or most willing to spend (usually corporate) funds will eventually prevail by hiring a law firm willing to engage in needless and endless rounds of discovery maneuvers. Unnecessary requests are made, unnecessary objections are interposed, there are repeated motions to compel and oppositions to such motions, until finally the opposing party may run out of either funds or stamina. A number of authorities have commented on this trend,[7] and just last week Justice Powell, speaking on his own behalf and that of two of his colleagues, voiced similar concerns.[8] It is no doubt difficult to generate much sympathy on behalf of the American Telephone and Telegraph Company as a victim of such practices. However, the principle applies here, too: useless discovery

---

5. Thus, Litton argues that defendants are delaying completion of discovery in this case to harass it because it is pursuing its own antitrust action against defendants, and that AT&T is a larger company than Litton. It is not necessary to explore these contentions for they are irrelevant to the issue presently before the Court. (It may, however, be noted that Litton is itself a vast conglomerate with considerable assets and that costs are awarded on the basis of recalcitrance, not size). Litton also argues that defendants may well know where the documents in question are located, and that they therefore should designate specific documents. The Court previously dealt with that issue in the February 13, 1980 order, at 4. Another argument—made for the first time in a reply memorandum—is that the subpoena was addressed to the wrong Litton company. The subpoena was properly, and contrary to Litton's claim, directed to Litton Industries, Inc., which is in possession and control of the relevant documents. There is thus no basis for this last-minute claim. Finally, by way of a cross-motion, Litton requests that defendants be ordered to pay to Litton the costs of production or that Litton be relieved of its obligation to make any further production. The cross-motion has no merit whatever, either factual or legal, and it will be denied.

6. The only basis advanced is that "for reasons relating to confidentiality, Litton chose to comply with the Court's Order by producing the documents requested." It is unclear what that cryptic statement is intended to convey. In its February 13, 1980, Order the Court fully dealt with problems of confidentiality. Further, the confidentiality of documents would of course not be more readily assured by their second production than by the use of the identical documents on the basis of their first production.

7. See, Renfrew, *Discovery Sanctions: A Judicial Perspective,* 67 Cal.L.Rev. 264 (1979); Withrow & Larm, *The "Big" Antitrust Case: 25 Years of Sisyphean Labor,* 62 Cornell L.Rev. 1 (1976); Letter of former Attorney General Bell to the Chairman of the Committee on Rules of Practice and Procedure of the Judicial Conference, p. 1 (June 27, 1978); Becker, *Modern Discovery: Promoting Efficient Use & Preventing Abuse of Discovery in the Roscoe Pound Tradition,* 78 F.R.D. 267 (1978); Pollack, *Discovery—Its Abuse & Correction,* 80 F.R.D. 219 (1978); Epstein, Corcoran, Kreiger & Carr, *An Update on Rule 37 Sanctions After National Hockey League v. Metropolitan Hockey Clubs, Inc.,* 84 F.R.D. 145 (1979); Lundquist & Schecter, *The New Relevancy: An End to Trial by Ordeal,* 64 A.B.A.J. 59 (1978); *Report to the President and the Attorney General of the National Commission for the Review of Antitrust Laws & Procedure,* 81–88 (1979); ABA Section of Litigation, *Second Report of Special Committee for the Study of Discovery Abuse,* p. 5 (1980).

8. In his statement dissenting from the adoption by the Court of amendments to Rules 26, 33, 34 and 37 of the Federal Rules of Civil Procedure, Justice Powell stated that ". . . all too often discovery practices enable the party with greatest financial resources to prevail by exhausting the resources of a weaker opponent. The mere threat of delay or unbearable expense denies justice to many actual or prospective litigants. Persons or businesses of comparatively little means settle unjust claims simply because they cannot afford to litigate. Litigation costs have become intolerable, and they cast a lengthening shadow over the basic fairness of our legal system."

and frivolous resistance to legitimate discovery requests must be curtailed if justice is to be done on bases other than the willingness to spend money and to waste time.

 Certainly, the courts must be cautious not to frustrate legitimate assertions of rights by those subjected to discovery requests, whether in the form of subpoena or otherwise. Thus, sanctions, costs, attorneys fees, and the like, should not be awarded where there is any risk that such an award would chill the assertion of such rights. But here the Court has fully considered the subpoena question, entertained extensive briefs, and gave Litton the option of a simple consent. Still Litton refused, and it is a fair characterization of the record to conclude that this refusal is based on nothing more substantive than that Litton "does not feel like" consenting and prefers instead to have the defendants spend the time and money to conduct an extensive search and copying operation. In these special circumstances, it is not inappropriate to have Litton pay for the exercise.[9]

Litton has argued that the Court lacks the authority to require it to bear the costs of searching and copying. However, a number of decisions under Rule 37, Fed.R. Civ.P., explicitly allow the imposition of costs in circumstances where recalcitrance has been shown. See *National Hockey League v. Metropolitan Hockey Club,* 427 U.S. 639, 642–43, 96 S.Ct. 2778, 2780–81, 49 L.Ed.2d 747 (1976); *State of Ohio v. Arthur Andersen & Co.,* 570 F.2d 1370 (10th Cir. 1978); *Securities & Exchange Commission v. Arthur Young & Co.,* 190 U.S.App.D.C.

37, 584 F.2d 1018, 1032–34 (1978); cf. *Dellums v. Powell,* 184 U.S.App.D.C. 339, 566 F.2d 231, 235–36 (1977). Nor is the Court's authority limited to situations directly encompassed by the Rule. Both commentators and courts have indicated that when sanctions are appropriate but not specifically provided for under the Rules,[10] a court may invoke its inherent equitable power to impose costs and sanctions.[11] Indeed, as the Supreme Court recently reminded the federal courts, "the discovery provisions . . . are subject to the injunction of Rule 1 that they 'be construed to secure the just, *speedy,* and *inexpensive* determination of every action'." *Herbert v. Lando,* 441 U.S. 153, 177, 99 S.Ct. 1635, 1649, 60 L.Ed.2d 115 (1977). Litton's actions with respect to the present controversy are inconsistent with the mandate of Rule 1, Fed.R.Civ.P., and this Court is required to act, at least to the extent of imposing costs.[12]

In an effort to minimize the problem notwithstanding Litton's recalcitrance, defendants have suggested that both the search for documents and the costs associated therewith be limited to the approximately 35,000 documents which were marked confidential in the course of the private litigation. While until recently Litton had not made its position entirely clear, the Court assumed in its February 13, 1980, order that the principal objections related to those documents. Now, in connection with the motion for costs, Litton has stated explicitly (Opposition, p. 6) that "defendants are free to use the other 465,000 documents as they see fit in this case and have

---

**9.** The Court will impose only the costs incurred in searching and copying the files, including any attorney time legitimately extended in connection therewith. Insofar as defendants' motion relates to attorneys fees expended in connection with the filing of the various motions and other pleadings, it will be denied.

**10.** Where there has been no actual disobedience, the blunt contempt power is not applicable. Compare Rule 45(f), Fed.R.Civ.P.; *United States v. American Telephone & Telegraph Co.,* 461 F.Supp. 1314, 1331 (D.D.C.1978).

**11.** Note, Proposed 1967 Amendments to the Federal Discovery Rules, 68 Col.L.Rev. 271, 293–94 (1968); Wright & Miller, Federal Prac-

tice and Procedure, Civil, section 2282, pp. 758–59; *United States v. Moss-American, Inc.,* 78 F.R.D. 214 (D.Wis.1978); *Discovery Sanctions,* 84 F.R.D. 145, 149 (1979).

**12.** See also, address of the Chief Justice to the American Bar Association (February 3, 1980) ("the responsibility for control [of the pretrial processes] rests on both judges and lawyers. Where existing rules and statutes permit abuse, they must be changed. Where power lies with judges to prevent or correct abuse and misuse of the system, judges must act.") 66 ABAJ 295, 296.

 

been free to do so since the main production was completed in 1977." On the basis of this concession, defendants have suggested in their reply memorandum that the order compelling compliance with the subpoena be limited to those Litton documents which had previously been physically stamped "confidential" by Litton in accordance with procedures established in the private litigation. The Court is, of course, desirous of minimizing the discovery problems of all of the parties and it will accordingly modify its previous order in that respect.

However, with respect to those 35,000 documents still at issue, Litton shall search its files and shall make available to defendants within twenty days of the date of this Order those documents which defendants previously copied pursuant to Litton's production in the private litigation between Litton and AT&T and which Litton at that time designated as being confidential.[13] These documents will, upon their production, be accorded the protection of this Court's Pretrial Order No. 8, and they will be subject to other protective orders as may be appropriate upon the application of a party or of Litton.

For the reasons stated, it is this 14th day of May, 1980,

ORDERED That defendants' motion for an order to require Litton Industries, Inc. to bear costs, expenses, and attorneys fees be and it is hereby granted in part and denied in part, and it is further

ORDERED That Litton Industries, Inc. be and it is hereby directed forthwith to search its files for all the documents previously produced to defendants in *Litton Systems, Inc. v. AT&T, et al.,* 76 Civ. 2512 WCC (S.D.N.Y.) which Litton in that action marked as being confidential, and to make such documents available to defendants for copying within twenty days of the date of this order, and it is further

ORDERED That the costs and expenses of such search, production, and copying shall be borne by Litton Industries, Inc., the precise amount of any costs expended by defendants in connection therewith to be determined in a subsequent proceeding, and it is further

ORDERED That defendants' request for attorneys fees be and it is hereby denied, except for fees for the time attorneys and others may expend in the review of the documents produced by Litton, and it is further

ORDERED That the cross-motion of Litton Industries, Inc. for costs be and it is hereby denied.

---

**13.** Litton argues (Reply Memorandum filed April 16, 1980, at 2), that it has "no way short of making a complete total physical review of all documents produced in the New York case to determine which ones are confidential," and that this imposes a great burden upon it. But this Court has previously held that "[a]ny bur-

den to Litton arises solely from the fact it refuses to shortcut the subpoena route by declining to give its permission to AT&T to use the microfilm it already has, and it is thus entirely self-inflicted." February 13, 1980 Order, at p. 4.